1                    UNITED STATES BANKRUPTCY COURT
                       FOR THE DISTRICT OF KANSAS
2

3

IN RE:
4                                        Adversary No.
PARIS EDWARD THOMAS LOYLE and     20-5073
5  KATHERINE CHRISTINE LOYLE,

6            Debtors.
   _____
7

8  PARIS EDWARD THOMAS LOYLE and
   KATHERINE CHRISTINE LOYLE,
9

            Plaintiffs,
10
   vs.                                   Case No. 19-10065
11

UNITED STATES DEPARTMENT OF
12 EDUCATION and NAVIENT
   SOLUTIONS, LLC,
13

            Defendants.
14

15               TRANSCRIPT OF PROCEEDINGS

16      On the 18th day of May, 2021, came on to be heard

17 in the above-entitled and numbered cause before

18 HONORABLE MITCHELL L. HERREN, Presiding for the United

19 States Bankruptcy Court for the District of Kansas,

20 Sitting in Wichita.

21      Proceedings electronically recorded.  Transcript

22 produced by machine shorthand and computer-aided

23 transcription.

24

25

1

2

APPEARANCES
3         The Debtor/Plaintiffs Paris and Katherine Loyle
appeared in person and by and through:
4         Ms. January M. Bailey
          Prelle Eron & Bailey, PA
5         301 N. Main
          Suite 2000
6         Wichita, KS 67202

7         The Defendant United States Department of
Education appeared by and through:
8         Mr. Brian D. Sheern
          US Attorney's Office
9         1200 Epic Center
          301 N. Main
10        Wichita, KS 67202

11        The Defendant Navient Solutions appeared by and
through:
12        Mr. David Alan Gellis
          Manz Swanson Hall Fogarty & Gellis
13        1100 Main
          Suite 1930
14        Kansas City, MO 64105

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were electronically

2          recorded and have been requested transcribed:)

3          COURTROOM DEPUTY:  -- for the District of Kansas

4  is now in session, the Honorable Mitchell L. Herren,

5  presiding.

6          THE COURT:  Thank you.  You all may be seated.

7          Welcome.  We're here today in Adversary Proceeding

8  Number 20-5073 which arose out of Case Number 19-10065,

9  Paris Edward Thomas Loyle and Katherine Christine Loyle.

10         I believe the defendants we have here today

11 defending against claims brought by the debtors as

12 plaintiff are Navient Solutions and Department of

13 Education, so I'll go ahead and take appearances.

14         MS. BAILEY:  Good afternoon, Your Honor.

15 January Bailey appears as counsel for the plaintiffs who

16 appear in person, Paris Loyle and Katherine Loyle.

17         THE COURT:  All right.

18         Welcome.

19         MR. SHEERN:  Good afternoon, Your Honor.  Brian

20 Sheern on behalf of the Department of Education.

21         MR. GELLIS:  Good afternoon, Your Honor.  David

22 Gellis on behalf of Navient Solutions, LLC.

23         THE COURT:  All right.  I think we got to have

24 our discussion about where we are with masks and

25 everything.  If there are no more questions on that, at

1 the witness table we do have two or three of these little

2 shields if witnesses prefer that.  It might be a little

3 easier to understand and see witnesses if they're wearing

4 this.  And I've heard they're very stylish, so feel free

5 to wear those if you would like.

6          So, are there any matters that we need to take up

7 preliminarily before we get to opening statements?

8          MS. BAILEY:  Your Honor, we did jointly submit

9 the exhibits so I believe that all of the exhibits are

10 admitted and admissible and the parties agreed to that.

11          MR. SHEERN:  That's correct, Your Honor.

12          MR. GELLIS:  Agreed.

13          THE COURT:  Okay.  We will consider then

14 exhibits -- jointly numbered Exhibits 1 through at least

15 55.

16          Do you want to include the summary exhibit, 56, in

17 that stipulation as well?

18          MR. SHEERN:  That's fine with Department of

19 Education, Your Honor.

20          MR. GELLIS:  No objection, Your Honor.

21          THE COURT:  Okay.  The Court will consider

22 Exhibits 1 through 56 offered and admitted by stipulation

23 of all the parties.

24          All right.  Anything else preliminarily?

25          MS. BAILEY:  Your Honor, we also submitted

1  extensive stipulations yesterday with both parties,

2  Navient, and the Department of Education, regarding the

3  loans.  And so I wasn't -- I had hoped you had a chance

4  to look at those but we did stipulate to essentially the

5  terms of each of the loans; when they were taken out.

6          For the Department of Education, what the payment

7  history was on the consolidated loans, and the income

8  based repayment payments for the first year based on last

9  year's income.

10          THE COURT:  Okay.  I have seen and I've read a

11  stipulation of facts basically as to Navient and then one

12  DOE Stipulated Declaration as to Katherine Loyle and

13  another Stipulated Declaration as to Paris Loyle.

14          And both of the DOE stips appear to be from a

15  Kristin Bowman.

16          So do I have everything in that regard?

17          MS. BAILEY:  Yes, sir.

18          THE COURT:  Okay.  So I have read through those

19  and if you do have specific points you want to highlight,

20  feel free to do that.  You won't offend me by taking me

21  back to specific issues if you want because there's a lot

22  of detail in those stipulations but I do appreciate the

23  parties working through that and coming up with those

24  stipulations.  That would have taken a lot of laborious

25  time to put in through a single witness, so all right.

1       Anything else preliminarily?

2              MS. BAILEY:  Not from the plaintiffs, Your

3  Honor.

4              THE COURT:  Okay.

5              MR. SHEERN:  Nothing from DOE, Your Honor.

6              MR. GELLIS:  Nothing from Navient, Judge.

7              THE COURT:  All right.  Would the parties like

8  to make opening statements?

9              MS. BAILEY:  Yes, Your Honor, the plaintiff

10  would.

11              THE COURT:  And would the defendants like to do

12  that, too?

13              MR. SHEERN:  Uh, yes, briefly.

14              THE COURT:  Okay.

15              MR. GELLIS:  Yes, Your Honor.

16              THE COURT:  We'll go ahead and start with

17  opening then with Ms. Bailey.  We'll let you have the

18  floor.

19              MS. BAILEY:  Thank you, Your Honor.

20         May it please the Court.  Today we are seeking a

21  finding of undue hardship under 11 U.S.C. 523(a)(8) to

22  allow Paris and Katherine Loyle to discharge their

23  student loans.

24         Your Honor, at the time the Loyles filed this

25  adversary proceeding they owed approximately 544,000 in

1  student loans.  Through default judgments they have

2  discharged approximately 100,000 but they are left with a

3  very large chunk of money owed on these remaining student

4  loans.  To the tune of about 435,000.

5        This is split up with about $55,000 owed by Paris,

6  to Navient for a private student loan; 227,000 owed by

7  Paris to the Department of Education; and 153,000 owed by

8  Katherine to the Department of Education.

9        As you know, in 2004 the Tenth Circuit adopted the

10  three-part *Brunner* test in the *Polleys* case.  In adopting

11  the test the Court stated that, "To better advance the

12  bankruptcy code's fresh start policy and to provide

13  judges with the discretion to weigh all relevant

14  considerations the terms of the test must be applied such

15  that debtors who truly cannot afford to repay their loans

16  may have the loans discharged."

17        Under the first part of the test, the Loyles will

18  show that they cannot maintain a minimal standard of

19  living while repaying this student loan debt.  The Loyles

20  have five children ranging from ages 18 to 6.  They do

21  not live an exorbitant lifestyle but try to provide the

22  best they can for their children.

23        Second, the Loyles will show that this state of

24  affairs is likely to persist for a significant portion of

25  the repayment period.  As the *Polleys* Court said, In

1  applying this prong courts need not require a

2  certainty -- certainty of helplessness.  Instead, a

3  realistic look must be made into the debtor's

4  circumstances and the debtor's ability to provide

5  adequate shelter, nutrition, healthcare, and the like.

6  Importantly, courts should base their estimation of a

7  debtor's prospects on specific articulable facts, not

8  unfounded optimism.  And the inquiry into the future

9  circumstances should be limited to the foreseeable

10  future, which is at most over the term of the loan.

11          Paris Loyle is 49 years old and Katherine Loyle is

12  43 years old.  Their retirement accounts are currently

13  only Katherine's mandatory KPERS account and their Social

14  Security income.

15          The third prong, which is an inquiry into the good

16  faith of the Loyles in seeking the discharge, through

17  their actions and testimony today the Court will be able

18  to see that good faith of the Loyles in this endeavor.

19          On the Navient loan, Paris has made payments

20  totalling over half of the original amount disbursed, yet

21  his current balance is about one-and-a-half times what he

22  originally borrowed.

23          For their Department of Education loans, the

24  Loyles have continuously been in income based repayment

25  programs or forbearance since they consolidated the loans

1   in 2012.  Prior to these consolidations, they were in

2   other payment programs and consolidations with those

3   public student loans.

4        Thank you, Your Honor, and we do hope that we find

5   undue hardship today.

6        THE COURT:  All right.  Thank you.

7        Mr. Gellis.

8        Or, actually, Mr. Sheern, that's fine.

9        MR. SHEERN:  Either way, Your Honor.

10       May it please the Court.  Your Honor, the reason

11  that we are here today, as counsel mentioned, is to

12  determine if two gainfully employed, healthy individuals

13  in their mid to late 40s, who have an adjusted gross

14  income of this last year of approximately $119,000 should

15  have their student loans discharged by this Court.

16       As we know in the past from case law, it's

17  presumptively found that student loans should not be

18  discharged.  And in this case, the answer is no.

19       When you review the evidence in this case you'll

20  see that the plaintiffs are unable to prove their

21  hardship burden, their undue hardship burden.  And I

22  emphasize it is plaintiff's burden to prove the three

23  prongs from the *Brunner* test.

24       You will see the evidence and you will see that

25  the plaintiffs have more than enough income and

1  disposable income to repay on their student loans and

2  maintain a minimal lifestyle.  You will see that the

3  plaintiffs cannot show dire financial circumstances that

4  are likely to last for a significant portion of the

5  repayment period.  There are no long-term disabilities;

6  there are no children with disabilities in this case.

7  It's simply a case of math and how much they spend versus

8  how much they bring in.

9       Finally, the evidence will show that the

10  plaintiffs have not made a good faith attempt to repay

11  their student loans to the Department of Education since

12  2012.  They have not maximized their income and they have

13  not minimized their expenses.  And plaintiffs must prove

14  all three of these prongs.  If they fail at any one

15  prong, then the loans are not dischargeable.

16       Katherine is a teacher and Paris is a

17  chiropractor.  They're able to work in these professions

18  and they have been working in these professions for some

19  time.  They have been able to benefit from these

20  professions because of the student loan system that they

21  borrowed from that paid for their education.  And because

22  of that, they have an obligation to pay back into the

23  system what they can afford for future borrowers to have

24  the same opportunities as they did to further their

25  education and work in similar careers.

1       So the Department of Education would ask that the

2  loans not be discharged today.  Thank you.

3          THE COURT:  All right.  Thank you.

4      Mr. Gellis.

5          MR. GELLIS:  May it please the Court.  Your

6  Honor, on behalf of Navient we would also echo the

7  arguments and the -- the statement made on behalf of the

8  Department of Education.  I won't re -- rehash the same

9  points.  However, as counsel stated, and the Court is

10 well aware, the *Brunner* test requires that evidence that

11 it cannot -- that the debtors cannot maintain a minimal

12 standard of living.

13      This is different than the typical hardship

14 suffered by all debtors and with regard to these debtors

15 there's no evidence that there's any injury or physical

16 limitation.  They are both gainfully employed.

17      As counsel for the Department of Education

18 mentioned, they both have jobs which provide reliable

19 income.  They are at a point where children are moving

20 out of the -- moving forward.  They're lessening their

21 expenses related to childcare.

22      The evidence will also show that there has been

23 income coming into the house in the form of tax credits

24 or tax refunds that have -- could have easily gone

25 towards repaying these loans and have not.

1        With regard to the Navient loans, there -- as

2  counsel for the debtors indicated, there is approximately

3  $55,000 owed on the Navient loans which were taken out to

4  fund Mr. Loyle's medical education for his medical degree

5  beyond the chiropractic degree and that was done so well

6  understanding that these debts would be owed and would

7  need to be repaid and we believe that the debtors will be

8  unable to establish all three prongs of the *Brunner* test

9  and that the debts should not be discharged.

10        THE COURT:  Okay.  Thank you.

11      Ms. Bailey, you may present your evidence.

12        MS. BAILEY:  Thank you, Your Honor.

13      I would like to call Paris Loyle to the stand.

14        COURTROOM DEPUTY:  Would you please raise your

15  right hand.

16        Do you solemnly swear that the testimony which you

17  are about to give in the case now in hearing shall be the

18  truth, the whole truth and nothing but the truth, so help

19  you God?

20        THE WITNESS:  I do.

21        COURTROOM DEPUTY:  Sorry, I should have hooked

22  this up, January?

23        MS. BAILEY:  Yes, please.

24        COURTROOM DEPUTY:  Judge, I want to check

25  something.

1    I was just distracted by judge out here talking

2  about the masks.

3    MS. BAILEY:  Do I need to switch this to show

4  from computer instead of the --

5    COURTROOM DEPUTY:  I am so sorry.

6    THE COURT:  I'm not seeing anything yet.

7    Do we need to go off the record for a few minutes

8  and get Chad in here?

9    COURTROOM DEPUTY:  Yes, I've sent him a message.

10  I apologize.

11    THE COURT:  Okay.  We'll go off the record.

12    COURTROOM DEPUTY:  Thank you, Your Honor.

13    (Recess taken.)

14                    **PARIS LOYLE,**

15  called as a witness on behalf of the Plaintiff, having

16  been first duly sworn, testified as follows:

17                  DIRECT EXAMINATION

18  BY MS. BAILEY:

19  Q.    Okay.  Paris, so I know that you've testified at

20  your deposition.  Have you ever testified in court

21  before?

22  **A.    No.**

23  Q.    Okay.  So you were placed under oath and so

24  everything that you say today needs to be truthful and if

25  there's something that you don't understand, that is

1  asked by me or by one of the defendants, just say you

2  don't understand and we can clarify.

3       Where we're going to go today is we're going to

4  talk a little bit about who you are and your situation

5  and then we're going to talk a little bit about your

6  future situation and then your student loans.  So I would

7  like to start off by asking you to tell the Court a

8  little bit about yourself.

9  **A.     Well, I'm Paris Loyle.  I grew up here in Kansas,**

10 **Wichita, went to school in Regis University in Denver,**

11 **Colorado.  From there, a couple prerequisite courses and**

12 **then on to Parker College where I got a chiropractic**

13 **degree.  I worked a little bit in Wichita and then moved**

14 **to Colorado, opened an office there for awhile and then**

15 **decided to go to med school.**

16      **Went to med school, finished up there, worked on**

17 **getting a residency, that didn't work out and I ended up**

18 **moving back to Wichita and here we are.**

19 Q.     Okay.  That's the short end of it, huh?

20 **A.     Mm-hmm.**

21 Q.     Okay.  You mentioned Regis.  What -- when did you

22 go there?  Did you get a degree?

23 **A.     Regis, '89 to '93, got a degree in English.**

24 Q.     Okay.  And you said Parker for chiropractic

25 school?

1  A.      Parker was chiropractic.

2  Q.      When were you there?

3  A.      '95 to '97.

4  Q.      Okay.  And then when were you in med school?

5  Where were you in med school?

6  A.      Med school started in Chester -- or American

7  University in Antigua, on the island of Antigua.  And

8  from there I transferred to St. Matthew's University.

9  Started that process in 2006 and ended after St.

10 Matthew's in Wyoming in 2011.

11 Q.      Does St. Matthew's have a branch in Wyoming, is

12 that what you did there?

13 A.      No, it's clinical work and hospital work.  You do

14 two years of classroom work on the island and then you do

15 clinical work in the U.S. for two years in different

16 hospitals.  I was all over the U.S. in that case but we

17 ended up in Wyoming.

18 Q.      Okay.  And I don't know a lot about post-med

19 school other than seeing my doctor at her office but I

20 understand there's some boards and a residency.  Can you

21 explain --

22 A.      Correct.  Along the way, after the first two years

23 you take a part one board, and then a little while later

24 after some clinical work, part two.  There's also, after

25 you're in residency, you would take what is known as part

1  three.

2       I passed both -- everything I needed to to get a

3  residency, part one and two, but was not able to work

4  because I don't have a residency and I can't use that

5  medical license.  Even though I have everything I would

6  need up to the residency.

7  Q.    So why didn't you get a residency?

8  A.    The problem in the residency, there's a

9  bottlenecking problem.  So on one end there's a large

10 especially in rural areas, which is why we went to

11 Wyoming to better my chances for making it as a

12 physician.

13      On the other hand, there's only -- there are very

14 few spots at hospitals.  They're trying to open this up.

15 This has been through Congress a few times, but there's

16 not enough spots for residents so there's more applicants

17 going in than there are going through the system and then

18 a bigger need on the other end.  But because of all these

19 applicants, I wasn't able to get that residency spot.

20 Q.    What about the next year?

21 A.    And I applied two more years but every minute that

22 you're out, there's more coming in and you're less and

23 less likely.  The odds go down quickly.

24 Q.    And so when did you finish med school and apply

25 for these residencies?

1   A.      During that 2011 year and then two years after.

2   Q.      Okay.  Obviously, since this case was jointly

3   filed with your spouse, we know that you're married.  Do

4   you and Mrs. Loyle have children?

5   A.      Five children, yes.

6   Q.      How old are your children?

7   A.      18, 16, 14, 9, and the youngest will be six this

8   month.

9   Q.      Um, I know we had talked beforehand but we just

10  want to make sure not to say your kids' names on the

11  record so you can say, you know, my 16-year-old daughter

12  or, um, refer to them that way.

13          So, let's talk a little bit about where all you've

14  worked.  There's obviously a period of time between when

15  you went to chiropractic school and when you went to

16  medical school.  What did you do between that time?

17  A.      After chiropractic school I worked in Wichita for

18  a year and then I moved to Denver, Colorado where I

19  opened an office and worked in that office until 2006.

20          Went to medical school, clinical role of a

21  resident.  And while we were in Wyoming I did a little

22  bit of work for a drug testing -- occupational health

23  drug testing.  I did D.O.T. physicals, exams -- physical

24  exams part-time whenever they needed me.

25          From there we moved to Wichita where I -- that was

 1  a tough -- because trying to afford daycare but I didn't

 2  have a job and it's only Kate's income, I couldn't get a

 3  job for a while there, there was just nothing available.

 4      I tried to get a job at the post office, which I

 5  was able to do a substitute, uh, postal worker delivering

 6  mail because I couldn't find a chiropractic job.  I

 7  thought maybe I could get in there full-time but the

 8  system is really tough there and I worked for a year but

 9  they had me on call 24/7 and I was home with my kids so I

10  had to have help every time.  And there's not enough

11  money to pay for daycare and work for them.

12      So I stuck it out for a year, applied for the

13  full-time jobs there, was never a full-time job at the

14  post office.  And I think 2017, December I was able to

15  get a job with a company called Renuva Pain and Injury --

16  or not injury, just Renuva Pain Center.  Worked for them

17  for about a year.  They closed down and I was able to get

18  on with The Joint, which is just another chiropractic

19  position and that's where I currently am.

20  Q.    So you work at The Joint as an employee, not as an

21  owner --

22  A.    No.

23  Q.    -- or anything like that?

24  A.    Just an employee.

25  Q.    Okay.  Let's go over your current situation.  I'm

1  going to bring up your petition that was filed in the

2  case and Schedule A, B is the property schedules.  Your

3  case is filed in January of 2019 so you've had a little

4  bit of time pass since then.

5       On your real property you listed a house on

6  Stratford.  Is that still where you live?

7  **A.     Yes.**

8  Q.     And the value, according to this, was 238?

9  **A.     Yes.**

10 Q.     You think it's still about -- other than housing

11 prices are inflated right now?

12 **A.     Yeah, they are.  That's a fair amount I believe,**

13 **yes.**

14 Q.     And do you guys have any other real property?

15 **A.     No.**

16 Q.     Is there a loan on this property?

17 **A.     Yes.**

18 Q.     Do you know how much is owed on the property

19 about?

20 **A.     I don't know what is owed.**

21 Q.     Okay.  Are you both on the mortgage loan for this

22 house?

23 **A.     My wife is on the loan.  Not me.**

24 Q.     Why -- why aren't you on it?

25 **A.     I was unable to get a home loan because of my debt**

1  to income ratio.  The school loan is so high that I am

2  not able to purchase a home or a car on my own.

3  Q.     Okay.  The next page here we've got vehicles.  So

4  we've got a 2005 Honda Pilot.  Do you guys still have

5  that?

6  A.     We do have the Pilot.  The mileage is getting

7  close to 200,000 on that.  We're definitely going to need

8  another vehicle.

9         The Honda Accord, '99 is owed, 250 some thousand,

10  also we're going to need a vehicle soon.

11  Q.     And does your daughter still drive that?

12  A.     Still driving it.

13  Q.     '99 Accord?

14  A.     Still driving the Accord, yes.

15  Q.     Okay.

16  A.     And I am probably unable to get a loan on my own

17  for a car.  We have to pay cash or not for that, but my

18  own --

19  Q.     And then there's a 2012 Camry, do you still have

20  that one?

21  A.     Still have that, yes.

22  Q.     Okay.  Do you have loans on any of these vehicles?

23  A.     The Toyota Camry, yes.

24  Q.     Okay.  How much is owed on that?

25  A.     It's under 4,000.  3,000 something at this point.

1  Q.     Okay.  And the other two are paid off?

2  **A.     Yes.**

3  Q.     Okay.  You have any new vehicles since the case

4  was filed?

5  **A.     No.**

6  Q.     Okay, I'm going to skip over like furniture and

7  stuff like that.

8         Over here in the, uh, Retirement Accounts on page

9  11 of the petition we have got a KPERS account listed.

10 Is that yours?

11 **A.     KPERS is my wife, that's the mandatory amount that**

12 **they're able to put in.  I have no retirement at all**

13 **because I haven't been able to put money aside for that**

14 **and I don't have any through work; no retirement.**

15 Q.     Okay.  Do you have any new assets since the case

16 was filed other than just general furniture or something?

17 **A.     No.**

18 Q.     Do you anticipate in the future having any big

19 assets that you might receive or anything?  Like

20 inheritance or winning the lottery or anything like that?

21 **A.     No.**

22 Q.     Okay.  We're going to turn over to Exhibit 1,

23 which is your income.

24        Those are your pay stubs and, yeah, we've talked

25 about that binder.  We have the exhibits in there.

 1      So we've got your, um -- could you tell me what is

 2  on page 1 here?

 3  **A.      Page 1 of the exhibit or what you have on the**

 4  **screen?**

 5  Q.      Yeah, the exhibit.  So turn to Exhibit 1.

 6  **A.      Oh.  I thought --**

 7  Q.      It is going to be page 1.

 8  **A.      Gotcha.**

 9  Q.      The pages are numbered in the bottom, right-hand

10  corner?

11  **A.      Okay.  Yeah.  This is a pay stub earning statement**

12  **for The Joint.  The Joint is owned by what is known as**

13  **Air Capital Chiropractic.**

14  Q.      Okay.  So on this pay stub, can you tell me a

15  little bit about how you're paid?

16  **A.      I am paid salary and on this it's showing a gift**

17  **card so I'm not sure what that gift card was for but at**

18  **holidays, or -- that's about the time they give us a**

19  **gift, I think that's probably what that one was for.**

20  **Typically once a month there is a bonus and**

21  **they -- they're that 1,078, which is a relatively large**

22  **one for me.  Typically I'm about $300 extra on those.**

23  Q.      So that is the year-to-date for February --

24  **A.      Oh, that is year-to-date.  I was going to say**

25  **that's a little more accurate.  Year-to-date, yes.**

1  Q.     And --

2  **A.     So that's why it is a little higher one than**

3  **typical.**

4  Q.     So the 2500 is your salary?

5  **A.     Yes.**

6  Q.     And how often are you paid?

7  **A.     Biweekly.**

8  Q.     Okay.  If we could turn to Exhibit 56, which is

9  the last one, the very end of the binder.

10 **A.     Oh, this is actually --**

11 Q.     If you want to turn to the binder, otherwise I

12 have it pulled up on the screen.

13 **A.     Gotcha.  Okay.  Oh, that's not it.**

14 Q.     Here you go.

15        So what we've done here is taken your last

16 paycheck that -- that we just looked at, February 26th,

17 and your last paycheck that you received in 2020.  You

18 worked -- did you work at The Joint all of 2020?

19 **A.     Yes.**

20 Q.     Okay.  So we've got basically 14 months' worth of

21 income there that we used the year-to-date numbers on to

22 average that out.  We've got a per check average and a

23 monthly average.  I want you to look at those two columns

24 and tell me if those -- does that seem about right for

25 your take home on a check?  Is 2,025?

Case 20-05073     Doc# 130 PH Filed 09/01/21 126 Page 23 of 148

1  A.     Yes.

2  Q.     Average.  So that is a monthly of average of

3  4300 -- 4388?  For you --

4  A.     Yes.

5  Q.     -- take home per month?

6         Okay.  As far as expenses, do you guys have one

7  bank account that you pay all your expenses from or how

8  do you guys do your expenses?

9  A.     **We don't, we each have our own -- basically our**

10 **own accounts that we pay different expenses from.  Kate**

11 **does -- or Katherine does typically the fixed expenses,**

12 **home and utilities, and I do basically everything else.**

13 **Big things, cars, things that come up randomly, health,**

14 **emergencies, home, fixing groceries.  Soccer is a main**

15 **part of that.**

16 Q.     Okay.

17 A.     **Summer school.**

18 Q.     So -- excuse me.  So let's go through some of your

19 expenses.

20         Some of these we'll go through with Kate later

21 because you mentioned she pays them.

22         I've got, on Exhibit 9, which is your Andover

23 State Bank bank accounts --

24 A.     Yes.

25 Q.     -- if you turn to page 232.

1   A.      Yes.

2   Q.      Somewhere on this page we have an expense for your

3   homeowner's association?

4   A.      Yes.

5   Q.      Where is that?

6   A.      Homeowner's association?

7   Q.      Is that the Brookhaven Estate?

8   A.      It is.

9   Q.      Okay.  So that is 179.38.  How often do you guys

10  have your HOA dues?

11  A.      Yearly.

12  Q.      Quarterly?

13          Oh, yearly, okay.

14          You said that Katherine pays the house payments so

15  we'll look at her -- her bank statements later for that

16  with her.

17          What about home maintenance?

18          How much -- how much do you guys spend in home

19  maintenance?  Do you know?

20  A.      I do the home maintenance and -- not a hundred

21  percent, maybe 300 a month on that.

22  Q.      How much do you think you spend in like a year on

23  home maintenance?  That's kind of how I usually think

24  about it with my clients.

25  A.      I don't know what it is per year.

Case 20-05073     Doc# 130     Filed 09/01/21     Page 25 of 148

```
 1          I have looked at this but I'm not remembering

 2   right now.   I mean, I would be guessing a little bit at

 3   this moment.

 4   Q.      Okay.  Don't worry about it.

 5           Then, uh, I think you pay the cell phones?

 6   A.      I do, it's about $238 or so.

 7   Q.      Okay.  On Exhibit 9 still, we've got page 252,

 8   which is one of your most recent statements.  I think

 9   this has your --

10   A.      252?

11   Q.      You're on AT&T now?

12   A.      Yes.

13   Q.      Okay.  Um, so I'm showing 238 for that?

14   A.      Yes.  Correct.

15   Q.      Okay.  Who pays the car payment?

16   A.      I do.

17   Q.      Okay.  How much do you pay for your car payment?

18   A.      165.

19   Q.      Okay.  You want to flip over to page 256?

20   A.      Yes.

21   Q.      And I think we've got that near the bottom of the

22   page?

23   A.      Yes.

24   Q.      Also on this page you've got a PayPal thing for

25   $75.  What's that?
```

1  A.      Right.   That's for a marshal arts course I take.

2  Q.      Okay.   Do you have that every month or --

3  A.      Every month; that's a monthly charge, yes.

4  Q.      Okay.   Let's see.   Who pays for your car tags

5  yearly?

6  A.      I do the yearly car tags.

7  Q.      Okay.   Of course those are going to change on a

8  yearly basis?

9  A.      Right.

10  Q.      But turn to page 228.

11  A.      Okay.

12  Q.      Should be on there.   I think that's, as I

13  understand it when I Googled it, the Pay it Kansas?

14  A.      Yes.

15  Q.      Okay.   So that's 250 a year on those?

16  A.      That's -- sounds about right.

17          I'm not seeing it on the sheet.   Oh, there we go.

18  Q.      Do you have any expenses that you pay related to

19  being a chiropractor?

20  A.      I have continued education, 50 hours' worth of

21  continuing education.   It's about $500 a year and my

22  professional insurance is about 2,000 a year.

23  Q.      Okay.   So 50 hours is a lot more than we have to

24  get.   Lawyers have to get 12 hours.

25          We've got, I think, one of your classes for

1  continuing ed here on page 247.

2  **A.     Yes.**

3  Q.     Which one is that?

4  **A.     Wise D.C.**

5  Q.     Okay.  So that's --

6  **A.     475.**

7  Q.     -- 475?  How many hours was that for?

8  **A.     That is for 40 hours I believe.**

9  Q.     Okay.  And then you mentioned insurance.

10 **A.     Yes.**

11 Q.     Your employer doesn't pay that?

12 **A.     No, I'm paying that.**

13 Q.     Okay.  How much is your professional insurance?

14 **A.     2000, a little over, but about that.**

15 Q.     Per month?

16 **A.     No, per year.**

17 Q.     Okay.  So that's going to be page 217.

18        Do you see that expense on there?

19 **A.     On 217?  I do not see that.**

20 Q.     Is that -- you said it was 2,000?

21 **A.     Yes.**

22 Q.     Is that a check you wrote?

23 **A.     I do a money order.**

24 Q.     Okay.  So that's what we've got in the middle of

25 the page here I think is that?

1  A.      Oh, right there.

2  Q.      2,093?

3  A.      Yes, that's it.

4  Q.      Okay.  So some of the expenses that are maybe a

5  little bit harder to figure out, um -- how about auto

6  maintenance?

7  A.      Auto maintenance?  I can't see the numbers.  140 a

8  month.  Oil changes, and some of those get expensive.

9  Q.      What about gasoline for your cars?

10  A.      Gasoline typically may be around 250 now.  We've

11  done a lot less traveling than we normally would do.

12  Q.      What do you mean by "traveling?"  Are you going,

13  taking road trips to D.C. and stuff or --

14  A.      No, we don't -- we don't do any fun stuff, but we

15  drive to Kansas City quite a bit on the weekends.

16  Q.      Okay.

17  A.      My kids are in a league that is in Kansas City so

18  they have to travel there and we spend a bit more on that

19  and we haven't had to do that lately.

20  Q.      Okay.  Well, let's talk a little bit about soccer.

21  You mentioned it earlier, I think you said competitive

22  soccer.  What --

23  A.      Yes.

24  Q.      Tell me a little bit about the --

25  A.      The three older --

1  Q.      -- why you would do that.

2  A.      -- are playing competitive soccer.

3          We basically pushed them to do whatever sport they

4  want, just to be healthier people, to learn team, to be a

5  part of a group, to learn direction, to be stronger,

6  better people.

7          It's a bit of an investment in their future.  My

8  oldest daughter now has a scholarship to Butler, my

9  younger -- the next daughter has gotten scholarship

10 offers already for her.  My son is a pretty good player,

11 too, and can easily do the same thing so that is going to

12 help us later as well as just building them up as people,

13 keeping them out of trouble.

14         Students do better when they have more activities.

15 And they're smarter kids typically.  And they're all

16 doing really well in school.

17 Q.      Um, why soccer?

18 A.      Uh, I don't know if it's what we pushed or didn't

19 but their mother and I both played soccer and both were

20 on scholarships for soccer for college.  So it was just

21 sort of a natural thing; they see us doing it.

22 Q.      So student loans didn't pay for all of your

23 college?

24 A.      No, definitely not all of it.

25 Q.      Um --

1   A.      But it helps.

2   Q.      How much does competitive soccer cost?

3   A.      It seems to be costing now, I'm spending maybe

4   4,000 on league fees to put each, you know, per -- that's

5   the total.  There is a lot more coaching involved now and

6   you have to pay for coaching and league fees and

7   tournaments and so it seems to be --

8   Q.      So 4,000 how often?

9   A.      Yearly.

10  Q.      Okay.  Is that for --

11  A.      And that's just for the league and the coaches.

12  The clubs that they play for.

13  Q.      Is that for all of the kids?

14  A.      That is for three, four of them.

15  Q.      Okay.

16  A.      Maybe.

17  Q.      You said they are in Kansas City.

18  A.      So the competitive league's all in Kansas City.

19  So they play weekends in Kansas City, sometimes one day,

20  sometimes two.  I've got two kids with one club, one with

21  another so we're back and forth quite a bit.

22  Q.      Is this all year or -- how -- how -- what's the

23  season like?

24  A.      Fall and spring, I believe are there.  The two

25  seasons that are there.

1          And then summer/winter are in town.

2     Q.     Okay.

3     A.     A lot of expenses there.

4     Q.     Are you going to Kansas City every weekend then on

5     those seasons or -- and you get a hotel every time?

6     What's the deal?

7     A.     We don't do that every time.  We try to just -- if

8     we have a game on one day, we'll just go up for a game.

9     Sometimes we'll trade, one will go up Saturday and one

10    will go up Sunday.  But if there are tournaments and

11    other times they're two early and two late games so we'll

12    go up about a fourth of the time or a third of the time

13    maybe and we do get a hotel on those.  So that's another

14    big piece of that.

15         Probably spend about, I don't know, 1500 in hotels

16    throughout a season.

17    Q.     The yearly season or the half a -- the half year

18    season?

19    A.     It's fairly rare we go so maybe in a year.

20    Q.     Okay.  What about other vacations?

21    A.     We --

22    Q.     Besides Kansas City?

23    A.     Um, I don't know that's a vacation; it's a lot of

24    running around.

25         No, we don't really go on any big vacations.  We

1  don't have extra for that.  We drive to Colorado, stay in

2  a condo my mother has for free and we don't have any

3  expenses.  We just are able to -- other than gas, normal

4  food.  We don't go out, just hike, do the free things.

5  That's probably the only place we've been.

6  Q.     Okay.

7  A.     And then Kate's family is in Colorado so we can

8  visit them.

9  Q.     How long have you guys been married?

10 A.     This will be 19 years this month.

11 Q.     Congratulations.  So you met in Colorado then?

12 A.     We did.

13 Q.     You mentioned earlier that you do not have any

14 retirement accounts?

15 A.     I have none.

16 Q.     And how old are you?

17 A.     50 in August; 49 now.

18 Q.     Have you spoken to any financial advisors or

19 anything about your retirement?

20 A.     I did go to a financial advisor to start investing

21 and I was told -- since he said he was a numbers guy that

22 these numbers are so astronomical that I would never pay

23 them off and it wasn't worth his time or my time to

24 invest in that right now; I had to get rid of this debt

25 or I would never make it.

1  Q.    Okay.  On your expenses, I saw on your paycheck

2  stub you have health insurance there?

3  **A.    Yes.**

4  Q.    Does that pay for everyone's health insurance?

5  **A.    That covers me and the children.**

6  Q.    Okay.  Do you have out-of-pocket medical expenses

7  or do you have a --

8  **A.    Do have out-of-pocket, as well.  Probably, I'm not**

9  **a hundred percent on these numbers, either.  3,000 in a**

10 **year of that.**

11 Q.    Okay.  What's your deductible?

12 **A.    6,000 for the family.**

13 Q.    Okay.

14 **A.    Which I ordinarily would not be able to meet.  Any**

15 **emergency I don't think I can really handle that.**

16 Q.    So with the family of seven probably the question

17 that is on everybody's mind is how much do you spend on

18 food and stuff?

19 **A.    Food is -- and household is pretty expensive just**

20 **because we have a lot of mouths to feed.  It's about**

21 **$2,000 a month.**

22 Q.    Is that just food or --

23 **A.    No, that includes some household items as well,**

24 **clothing and maybe some shoes, or occasional other**

25 **household items:  Kleenex, tissues, cleaners, cleaning**

1  things and food.

2  Q.     That include --

3  A.     It is definitely the bulk.

4  Q.     When you -- how did you come up with that number?

5  A.     Going through the statements we -- we looked up a

6  little bit more than previously to try to get some more

7  proper numbers and it's just even more than we suspected

8  it to be.

9  Q.     Okay.

10  A.     After we had gone through the bank statements.

11  Q.     Okay.  Let's shift over to your future situation.

12  So your oldest is 18 now?

13  A.     Yes.

14  Q.     And is she a senior?

15  A.     Correct.

16  Q.     Okay.  Is -- and you said she had a scholarship?

17  A.     Yes.

18  Q.     Where is she going to school next year?

19  A.     Butler Community College.

20  Q.     Okay.  How much does her scholarship cover?

21  A.     I don't really know the amount.  It covers tuition

22  and books.

23  Q.     Okay.  Is she going to take out loans for the rest

24  or is she going to stay at home or --

25  A.     She will be living on the campus, which is

1  **approximately 5,000 a year extra cost that we'll help her**

2  **with.**

3  Q.    Okay.  I know that over the last couple of years

4  you had some expenses related to Butler.  Did you -- were

5  one of you guys taking classes there or --

6  **A.    No, that was also my oldest daughter's started**

7  **taking courses through the high school.  There's an**

8  **academy program so she's got an associate's degree as**

9  **she's graduating from high school as well and we paid for**

10 **that as well.**

11 Q.    And do you -- so she's graduated high school now

12 so you won't have that expense for her.  Are your other

13 children doing this -- is your -- well, I guess is your

14 next child doing this program also?

15 **A.    Yes, the next two are both planning on taking**

16 **courses.  They won't take that exact academy program but**

17 **they're take courses through the high school and Butler**

18 **County.**

19 Q.    Okay.  So we looked at your income earlier and you

20 make 2500 gross biweekly plus some bonuses.

21       I'm going to shift back over to Exhibit 56, which

22 was your -- no, sorry.  Exhibit 1.

23       I'm going to look at the last paycheck in

24 December, which is going to be page -- there we go.  Page

25 6.

1  A.     Yes.

2  Q.    So I see bonuses totalling about 6300 for the

3  year, so that's not a -- you know, that's a good chunk of

4  change.  How do you get the bonuses?  How do you maximize

5  those?

6  A.     The bonuses are basically on people that sign in

7  or do their wellness program or buy packages.  So

8  there's -- new people are just sort of randomly given to

9  the doctors, whoever comes in, we do the exam.  If they

10 buy packages or join the wellness program we get about 10

11 percent of that cost, which is -- 10 percent of $88 or 10

12 percent of -- that's the basic of it, is 10 percent of

13 whatever the cost is that they sign up for that moment.

14 Q.    Okay.  So like you go in for an initial

15 consultation and you try to up-sell us to come in again?

16 A.     It's basically a -- yes.

17 Q.    Okay.

18 A.     Well, you just really, get on a treatment program,

19 that is the cheaper way to go there.  The other programs

20 are a little more expensive but that's the main one, you

21 get 10 percent of whatever they do.

22 Q.    Okay.

23 A.     But that's it.  That is the max is 88.  It is

24 cheaper for other people; military.

25 Q.    So what does your future income look like?  Are

1  you planning on staying with this company?  If you stay

2  with them, what's your potential?

3  A.     I am and that's -- I'm pretty much there.  There's

4  no guaranteed anything other than whatever my salary and

5  then the bonus, depending if we do well or not, it's a

6  little up and down.  And we have to make a certain

7  percentage of that.  If we don't have over 50 percent of

8  the people that come then, fine, then we don't get any

9  bonus at all.

10  Q.     You said that you had your own chiropractic place

11  in Colorado?

12  A.     Yes.

13  Q.     Did you make more money doing that?

14  A.     No.

15  Q.     Short answer.

16  A.     Yes, that -- yeah, to try to do that again, I

17  understand the only other way to really make money is do

18  it on your own but the time and effort and money, I had

19  to get a loan to do that, and I was single, and that's

20  all I would dedicate it to, was getting a business and

21  there's no way I could do that with my children and have

22  any money.

23  Q.     Why don't you -- can you -- is there anything you

24  can do with your medical degree without having that

25  residency?  Like research or something like that?

1  **A.      My medical degree is useless, and I have applied**

2  **for positions of all kinds thinking I could do research**

3  **but with no experience I have not gotten any.**

4  Q.      Okay.  This is the last paycheck stub in 2020.

5  Obviously 2020 was a very strange year.  Was your income

6  affected at all by COVID?

7  **A.      Strangely, no.  There was only a short amount of**

8  **time where the people stopped coming in but it just went**

9  **right back to normal.**

10  Q.      Okay.  So you don't think that it was that much

11  lower than what it will be this year?

12  **A.      No.  It's increased, it's right back up to where**

13  **it had been.**

14  Q.      Okay.  So let's go over some of your student

15  loans.  First thing I want to do is turn to Exhibit 18.

16          And can you tell me what Exhibit 18 is?

17  **A.      Federal Student Aid, National Student Loan Data**

18  **System.**

19  Q.      Okay.  What does this document tell us?

20  **A.      It's my loan history.**

21  Q.      Okay.  So for this, as I was looking at it, I

22  thought to start at the end, um, so if you turn to page

23  431.

24  **A.      Yes.**

25  Q.      And that's going back as far in history as we can,

```
 1  I guess.
 2          I want to go through your loans here.  Kind of
 3  quickly probably.
 4          You said you went to Regis?
 5  A.      Yes.
 6  Q.      And you took out some loans there?
 7  A.      Correct.
 8  Q.      Okay.  This bottom loan here, when did you take it
 9  out?
10  A.      In 1989.
11  Q.      Okay.
12  A.      July.
13  Q.      And, um, how much did you get then?
14  A.      2,625.
15  Q.      Okay.  How about right above that?
16  A.      Above that, in August of 1989, $2,000.
17  Q.      Okay.  Keep going.
18  A.      And in 1991, March, $1,000.  No, that's -- Parker
19  is the next one.
20  Q.      Okay.  So you got three loans at Regis totalling
21  5 --
22  A.      5625.
23  Q.      Okay.  Then -- then you said Parker is next?
24  A.      Yes.
25  Q.      And how much did you take out there?
```

1   A.      In '94 November, 8,500.

2           See, I'm not sure how this is broken down.  It was

3   broken down maybe in two; was given 4,250.

4   Q.      I think it's probably --

5   A.      Probably for each semester.

6           For one person in '95, right.

7   Q.      I'm assuming it is for each semester.

8               MR. SHEERN:  It appears so.

9   A.      And then in that same month, I guess another 5,000

10  for each semester.

11  BY MS. BAILEY:

12  Q.      And those are your subsidized and unsubsidized

13  loans?

14  A.      Right.

15  Q.      So that's the '94 --

16  A.      '94.

17  Q.      -- school year?

18  A.      Yes.

19  Q.      Then we have to skip page 430, it's a summary.  We

20  could go back -- up to page 429.

21  A.      Yes.

22  Q.      And we've got some more loans?

23  A.      Then in '95, eight -- well, so again that broken

24  down from 8500, 4250; and the other disbursement 10,000

25  broken down to 5,000 in '95, as well.

1  Q.     Okay.

2  A.     And then in '96, this is nonsubsidized, 10,000

3  disbursement.  On that one I got 5,000 in August '96.

4         And then again Parker subsidized for 8,500, or

5  4,250 a couple times.

6  Q.     Okay.  And then the previous page, 428?

7  A.     428, Parker University, '96-'7, it looks like the

8  10,000 disbursement in $5,000 increments.

9         '96-'7 same thing:  Subsidized 8,500; and 4,250

10 disbursement.

11        In December '96, 4,031.  I don't really understand

12 that loan disbursement value of a dollar.

13        And --

14 Q.     Okay, so --

15 A.     The first one is -- yeah, 4,031.

16 Q.     Couple of them up there.  Loan number ten?

17 A.     Yes.

18 Q.     What's that?

19 A.     Consolidated with direct loan of 47,000.  Is that

20 a consolidation loan?

21 Q.     Did you consolidate your loans in 1999?

22 A.     I did consolidate loans, yes.

23        I don't know if I did in '99.  Must have.  That is

24 when I was doing the direct consolidation.

25 Q.     Okay.

1   A.       After chiro, yes.

2   Q.       So it looks like you consolidated 47,000

3   subsidized and 59 un?

4   A.       58, 59,000 unsubsidized.

5   Q.       Okay.  And then the next entry above that is --

6   A.       2002 consolidation for $50,500.

7            And in that same time the unsubsidized

8   consolidation of 71,308.68.

9   Q.       Then above that?

10  A.       Consolidated FFEL loan, 125,640 in 2004.

11           And in 2008 -- should I go on to '8?

12  Q.       Yeah.

13  A.       That's the Davenport University.

14  Q.       Wait.  What's Davenport for?

15  A.       Davenport was while I was in med school and

16  there's another university that was doing a master's in

17  business.

18  Q.       That's ambitious.

19  A.       It was a little more ambitious than I needed.

20  Q.       How much classes did you take there?

21  A.       I only started those courses in '81 or maybe one

22  or two courses into that.

23  Q.       Okay.  So you took out a couple loans?

24  A.       I took out a loan for that, 1,700 in 2008; and

25  8,500 in 2008.

 1          **And then 3,778 in that same year.**

 2    Q.     Oh, that one I think -- I don't -- that one has a

 3    disbursed amount of zero.

 4    **A.     Oh, that was not disbursed.  That is probably**

 5    **where I ended it then after that second one.**

 6    Q.     Okay.  So then loans one and two, I believe, are

 7    the current loans that you have right now?

 8    **A.     And then a direct consolidated loan, where**

 9    **subsidized and unsubsidized 105,402 and 68,105.**

10    Q.     Okay.  So what I am hearing here is that you took

11    out loans mostly in the '90s --

12    **A.     Correct.**

13    Q.     -- on your student loans and you've consolidated

14    them, I think four different times?

15    **A.     Yes.**

16    Q.     Okay.  Now your current loan, um, let's turn to

17    Exhibit 37.

18           Are you on that?

19    **A.     Yes.  I am.**

20    Q.     Okay.

21    **A.     Direct consolidation loans.**

22    Q.     Okay.  So I like this summary here because it's

23    got a lot of good information on it and it's only one

24    page.

25              THE COURT:  What page are you on, Ms. Bailey?

1          MS. BAILEY:  Sorry, this is Exhibit 37, which is

2   page 693.

3          THE COURT:  Thank you.

4   BY MS. BAILEY:

5   Q.     So, Paris, on these consolidation loans, how much

6   was the original amount borrowed on them?

7   **A.     The original amount, 68,105, and 105,402.**

8   Q.     Okay.  What's your interest rate on those loans?

9   **A.     4.38 percent.**

10  Q.     Okay.  How much do you owe on them altogether

11  right now?

12  **A.     And currently it is 226,699.**

13  Q.     How much interest is accruing on these loans?  On

14  a month -- well, it says on a daily basis on the -- on

15  the sheet.

16  **A.     On a daily basis?  The capitalized interest here?**

17  Q.     Uh, no.  It says interest accrues on the principal

18  at the rate of --

19  **A.     Principal 25.71 a day.**

20  Q.     Okay.  I thought I had on there -- okay.  So for

21  this, I'm going to refer to our stipulations.  We've

22  got -- let me pull it up.

23         Stipulations with the Department of Education.

24          MS. BAILEY:  And this is document 127 filed in

25  the case, Your Honor.

1  BY MS. BAILEY:

2  Q.     Paragraph 16 on page 6 shows the disbursements on

3  the direct consolidation loan totalled 173,000.

4         When you got this loan, Mr. Loyle, do you remember

5  how much your payment was?

6  **A.     I do not.**

7  Q.     It's not in the book.

8  **A.     I do not remember.**

9  Q.     Or it's in the book but it's hard to find.

10 **A.     I don't remember.**

11 Q.     There's a couple of repayment options for you.

12 Let me pull up this stipulation here.

13        Okay.  Oops.

14        So we've got paragraph 16 showing that the -- you

15 borrowed 173,000.  You've got a repayment period

16 beginning in August 2012.  And you immediately applied

17 for income based repayment?

18 **A.     Yes.**

19 Q.     And how much was your monthly payment on that?

20 **A.     67.62.**

21 Q.     Did you make that payment?

22 **A.     Yes.**

23 Q.     Okay.  It looks like through paragraph 18 you made

24 that for the whole year?

25 **A.     Yes.**

1  Q.    And then the next year you had to tell them your

2  income again?

3  A.    Right.

4  Q.    And what was your payment then?

5  A.    And my --

6  Q.    Paragraph 19.

7  A.    276.37.

8  Q.    Okay. Did you make -- you didn't make all those

9  payments. You got a forbearance for part of it at least?

10 A.    Right.

11 Q.    And then a hardship deferment.

12       Okay. On the next page shows you made some of

13 those 276 payments.

14       You made another hardship deferment request?

15 A.    Yes.

16 Q.    2016 you applied for another income based

17 repayment in paragraph 23?

18 A.    Right.

19 Q.    And your -- how much were your payments then?

20 A.    Payments now $73.38.

21 Q.    Did you make those payments?

22 A.    I did make some of those payments, yes.

23 Q.    Okay. What about paragraph 24 then in 2017?

24 A.    More income driven repayment plan.

25 Q.    What was your payment then?

1  A.     My -- zero dollars at that point.

2  Q.     Okay.

3  A.     In December, yes.

4  Q.     What about then in 2018?

5  A.     Resubmitted for recertifying the income driven

6  repayment and I'm not sure what happened, couldn't be

7  processed.

8         I tried that again and it was approved for $127 a

9  month.

10 Q.     Okay.  Did you make those payments?

11 A.     And I did not make those.

12 Q.     Okay.  But, let's see.  So that was September of

13 2018 and then three months later you filed your

14 bankruptcy case?

15 A.     Right.

16 Q.     Okay, so paragraph 26 shows that you made 35

17 payments towards your loans.

18        I'm assuming that does not count the 12 that you

19 didn't have to make payment?

20 A.     Right.

21 Q.     Or you did make the zero dollar payment.

22        Paid about 2900 on those loans.

23        There's a lot of paragraphs there about your

24 communication and payment history and stuff on those

25 loans.

1  A.     I --

2  Q.     You think you've --

3  A.     **-- did everything I could to keep up with that**

4  **because I knew that was crushing me.**

5  Q.     Okay.  There's a couple with the Department of

6  Education; there's a couple of repay -- different types

7  of repayment options.  The first one, the standard

8  repayment, you would have had a 30-year program on that

9  from 2012 and apparently the Department of Education did

10 calculate it.

11         So on paragraph 33 --

12 A.     **Yes.**

13 Q.     -- if you were to repay those -- at the beginning

14 of the loan, if you were to have started making payments

15 on those loans you would have been paying 878 a month?

16 A.     **Right.**

17 Q.     The next two options are both income driven

18 repayment programs which you've been on income based

19 repayment?

20 A.     **Mm-hmm.**

21 Q.     Do you know how that payment is calculated?

22         You don't have to read it, I'm just asking.

23 A.     **I don't know exactly the small percentage of my**

24 **income and poverty level, I'm not sure how that's exactly**

25 **calculated.**

1  Q.     Okay.  So it's -- the IBR is the 15 percent of

2  income minus 150 percent of poverty level.  So --

3  **A.     Okay.**

4  Q.     -- jointly they're calculating that your payment

5  on this would be 742.80, and so your portion right at the

6  bottom of paragraph 35 would be 443 of that?

7  **A.     Yes.**

8  Q.     And that's for 300 payments of 25 years.  I think

9  you said earlier, you're turning 50 later this year?

10 **A.     I'd be 75 by the end of this.**

11 Q.     Okay.  The other option is a newer program which I

12 think is not maybe so new any more, but repay is only 10

13 percent of your disposable income.  So it's the same

14 calculation only it's 10 percent instead of 15.  But it's

15 also a 25-year program.

16        So for that, at least this first year based on

17 your 2020 income they're calculating a payment of 495.20.

18        So we mentioned earlier that your interest accrues

19 at, what?  $20 a day or something?

20 **A.     25.71, yes.**

21 Q.     So 300 a month for your portion of the monthly

22 payment, that's not paying your interest.

23 **A.     No.  Never be done with it.**

24 Q.     What about your Navient loans?  Let's turn to

25 those stipulations.

 1          MS. BAILEY:  Which is document 125 filed in the

 2  case, Your Honor.

 3  BY MS. BAILEY:

 4  Q.     What -- when did you take out this Navient loan?

 5  **A.     December the 5th -- August of 2006, that sounds**

 6  **about right.**

 7  Q.     So which school is this for?

 8  **A.     This is for AUA or American University in Antigua**

 9  **[inaudible].**

10  Q.     Okay.  So you borrowed basically 19,2 twice so

11  38,4 is what you borrowed?

12  **A.     Right.**

13  Q.     And your current balance?

14  **A.     My current balance on?**

15  Q.     The Navient loan.

16  **A.     I am not a hundred percent on that, no.**

17  Q.     It's paragraph 2.

18  **A.     Okay, I don't have that one here.**

19  Q.     It's on the screen.

20  **A.     Oh, I see, yes.  55,706.**

21  Q.     And paragraph 5, this originally was a 25-year

22  loan?

23  **A.     Yes.**

24  Q.     Paragraph 6, how much have you paid on this loan?

25  **A.     21,427.**

1  Q.     So of that 38,000 that you borrowed you have paid

2  21 --

3  A.     Right.

4  Q.     -- back?

5  A.     Yes.

6  Q.     Looks like some knocked down principal but

7  obviously you've had more interest?

8  A.     Right.

9  Q.     Have you made regular payments on this loan?

10  A.     I did make regular payments for quite awhile.

11  Q.     Okay.  Do you feel like you've made a -- as much

12  of an effort as you can on these loans?

13  A.     Absolutely.

14  Q.     If you don't get the discharge of your loans, what

15  does your financial future look like?

16  A.     I don't have a financial future with this.  I

17  don't know what I'd be able to do.  It would be difficult

18  even to take care of my children.  If any little thing

19  happens in any given day, I won't be able to pay for it,

20  no emergencies, no extra things in the house.  I would

21  never be able to save any money for my own retirement.

22         We've been on free and reduced lunch -- lunches in

23  the past because of all this debt and it's not a good

24  feeling or a place to be.  Or where I ever wanted to be.

25  Q.     Well, your income's certainly better than it has

1   been in the past.

2   **A.      Yes.**

3   Q.      But you owe 226,000 to the Department of

4   Education?

5   **A.      Yes.**

6   Q.      And 55 to Navient?

7   **A.      Yes.**

8   Q.      Do you think even if you were 20, do you think

9   you'd have a chance to repay these loans?

10  **A.      Not with my situation, no.**

11  Q.      Okay.

12          MS. BAILEY:  I don't think I have any more

13  questions for the witness at this time.

14          THE COURT:  All right.

15      Cross-examination?

16          MR. SHEERN:  Yes, Your Honor.

17          COURTROOM DEPUTY:  Mr. Sheern, are you going to

18  want the ELMO?

19          MR. SHEERN:  I don't think so.

20      Judge, you have copies of the exhibits at the

21  bench, don't you?

22          THE COURT:  I do.

23          MR. SHEERN:  Okay.  Then I think as long as the

24  witness has the binder that will be sufficient.  I don't

25  have a fancy computer to display them like that, which

1    was pretty nice.

2         All right.

3                    CROSS-EXAMINATION

4    BY MR. SHEERN:

5    Q.     Doctor, it's nice to see you again.  We met at

6    your deposition, didn't we?

7    **A.     Yes.**

8    Q.     All right.  I kind of want to go through some of

9    your expenses and some of your testimony that you talked

10   about and get some clarification on it.

11        One expense that's included was included on your

12   Schedule J and it was included in your interrogatories

13   that you served your responses to on Navient and that

14   included a thousand dollars to 1200 a month on daycare.

15   Do you recall that expense?

16   **A.     Yes.**

17   Q.     Okay.  And that expense no longer exists, right?

18   **A.     Correct.**

19   Q.     Okay.  And that's because your youngest child, I

20   think you said, is turning six soon, is now in elementary

21   school, is that right?

22   **A.     Right.**

23   Q.     Okay.  And you started chiropractic school, is

24   that right, in 1996?

25        Is that correct?

```
 1  A.      '90 --

 2  Q.      Or was that undergrade at '96?

 3  A.      No, no, chiropractic, I believe, was '95.

 4  Q.      All right.  So about 25, 26 years ago?

 5  A.      Right.

 6  Q.      All right.  I would like you to turn, if you

 7  would, please, to -- let's see here -- Exhibit 9 in your

 8  binder.

 9          Exhibit 9, please.  And let me know when you get

10  there.

11  A.      Yes.

12  Q.      Okay.  Can you identify what these documents are?

13  A.      Andover State Bank bank statements.

14  Q.      All right.  And this is your checking account for

15  you personally, correct?

16  A.      Yes.

17  Q.      Okay.  I just have a few questions and

18  clarifications on some of the charges that you have in

19  your bank account.

20  A.      Mm-hmm.

21  Q.      I'll take this off so maybe you can hear me a

22  little bit better.

23          If you would turn to Loyle 127, please.  Page 127.

24          Let me know when you get there.

25  A.      There.
```

1   Q.      Okay.  On August 1st of 2018 and August 10th of

2   2018 --

3   A.      Yes.

4   Q.      -- there are two charges for Blue Sombrero Sports?

5   A.      Yes.

6   Q.      Is that for soccer?

7   A.      Yes.

8   Q.      Okay.  So those are club fees, we would call them,

9   for your kids to play soccer?

10  A.      Correct.

11  Q.      Okay.  And there's one for 330 and one for 350,

12  correct?

13  A.      Yes.

14  Q.      Okay.  If you would then turn to page 132.

15          Are you there?

16  A.      Yes, sir.

17  Q.      Okay.  On August 24th and August 29th we have a

18  total of three more Blue Sombrero charges, correct?

19  A.      Yes.

20  Q.      And those are also for soccer fees for your

21  children?

22  A.      Correct.

23  Q.      And then if you would turn to 157, please.

24  A.      All right.  I'm there.

25  Q.      Well, you're faster than I am.

1          All right.  We have another Blue Sombrero fee on

2  February 20th, right?

3  **A.     Correct.**

4  Q.     For 129.51 and those are soccer fees?

5  **A.     Yes.**

6  Q.     Okay.  And then if you would turn to page 180,

7  please.

8  **A.     Okay.  Got it.**

9  Q.     All right.  August 7th, 2019 we have Butler CC

10  online at El Dorado for $20?

11  **A.     Yes.**

12  Q.     Is that a charge for your oldest daughter for

13  education at Butler County Community College?

14  **A.     Yes.**

15  Q.     And then at the bottom of that same page, 180, we

16  then have three more Blue Sombrero soccer fees for your

17  children, correct?

18  **A.     Correct.**

19  Q.     41.50, 250, and then another 250, right?

20  **A.     Yes.**

21  Q.     If you would turn to 186, please.

22  **A.     All right.  Got it.**

23  Q.     We have, on this month, which is September of

24  2019, the next month, we have three more Blue Sombrero

25  soccer fees of 41.50, 250, and another 250 for your kids,

1  correct?

2  **A.       Correct.**

3  Q.      All right.  And then if you would turn, please, to

4  190?

5  **A.       Yes, got it.**

6  Q.      That is the next month, October of 2019 and,

7  again, we have those same three Blue Sombrero soccer fees

8  on your bank account, correct?

9  **A.       Yes.**

10 Q.      All right.  And then if you would turn, please, to

11 192, the next page.

12 **A.       Okay.**

13 Q.      October 15th?

14 **A.       Yes.**

15 Q.      Are those -- there's two charges for $250 --

16 **A.       Yes.**

17 Q.      -- to Blue Sombrero?

18 **A.       Right.**

19 Q.      Are those different charges or the same charges,

20 or do you know, of the prior page?

21 **A.       They're --**

22 Q.      They in addition?

23 **A.       They are different charges, I believe.  Yes.**

24 Q.      Okay.  And then if you would turn to 194, please.

25         And this is November of 2019, we have another Blue

1  Sombrero soccer fee for 41.50, correct?

2  **A.     Sorry, tell me where you are again?**

3  Q.     Sorry, page 194.

4  **A.     Okay.**

5  Q.     November 13th.

6  **A.     November 13th.  Yes.**

7  Q.     All right.

8  **A.     Blue Sombrero again, yes.**

9  Q.     And then if you would turn to 196.

10  **A.     196.  Okay.**

11  Q.     And then if you look at 11-25-19 at the top, we

12  have Kinder Care Portland?

13  **A.     Mm-hmm.**

14  Q.     If you look further down at the bottom, another

15  Kinder Care Portland?

16  **A.     Yes.**

17  Q.     These were what I mentioned earlier, right?  Some

18  of the charges related to your youngest child's daycare

19  that you no longer have to pay, is that right?

20  **A.     Correct.**

21  Q.     Okay.  And then if you move over to 198.

22  **A.     Yes.**

23  Q.     We went over -- we just mentioned that one where

24  it's another December 19th, 2019, another Blue Sombrero

25  soccer fee, right?

1  A.     Yes.

2  Q.     Okay.  Okay.  Then if you turn to 209.  Two zero

3  nine.

4  A.     Okay.

5  Q.     We go down to the middle -- or excuse me,

6  February -- February 5th of 2020, we have a Butler CC El

7  Dorado, fee of 219.85?

8  A.     Yes.

9  Q.     And that's, again, for your oldest daughter's

10  secondary education or associate's degree at Butler

11  County, correct?

12  A.     Correct.

13  Q.     Okay.  And then if we go on to 212?

14  A.     Mm-hmm.

15  Q.     Two one two.  Looks like on 2-26-20 you got one of

16  your tax refunds for $7,200, correct?

17  A.     20?  Yeah, uh --

18  Q.     Up there in the credits?  On February 26th of

19  2020?

20  A.     February 26th.  This is on 212?

21  Q.     Yes.

22  A.     Oh, I se.  Yes.

23  Q.     Under the credit activity, is that right?

24  A.     Yes, 7200.  That's what I have here.

25  Q.     Okay.  And then you got a refund of approximately

1  I believe $7800 for tax year 2020, is that right?  If you

2  recall off the top of your head?

3  **A.      I don't recall exactly what that was.**

4  Q.      Okay.  We can come back to that, that's okay.

5          And then if we go down one line, basically two

6  lines, to February 13th, 2020 we have Kansas Rush

7  Wichita, Plano, Texas, 41.50, do you see that?

8  **A.      Yes.**

9  Q.      And Rush is a soccer club that plays here -- well

10  out of Kansas City but they have teams in Wichita, right?

11  **A.      Correct.**

12  Q.      Okay.  And so that's a payment for one of your

13  kid's soccer fees?

14  **A.      Right.**

15  Q.      And it appears as we go through here, it looks

16  like your soccer fee payments move from being Blue

17  Sombrero payments, as they appear on your bank

18  statements, to Kansas Rush payments, is that right?

19  **A.      Yes.**

20  Q.      Okay.  Did your kids change soccer clubs?

21  **A.      Same club.**

22  Q.      Same club.  Okay.

23          So if we move to Loyle 216?

24  **A.      Mm-hmm.  There.**

25  Q.      Then 3-13 and 3-16 we have two Kansas Rush

1  payments.  So those are soccer payments, right?

2  A.      Correct.

3  Q.      And then if we move to 2-20?

4  A.      Mm-hmm.

5  Q.      We have at the top a Butler CC online El Dorado

6  payment for 306.45.  And, again, that's a payment for

7  your oldest child's education, right?

8  A.      Right.

9  Q.      Okay.  And then if we go up from that to the

10  credit activity, on April 15th, 2020?

11  A.      Yes.

12  Q.      You got a, what I'll call a stimulus payment?

13  A.      Yes.

14  Q.      Okay.  And have you -- my understanding is you

15  have received two stimulus payments, is that right?

16  A.      Correct.

17  Q.      Have you received a third one?  Do you know?

18  A.      I don't.

19  Q.      Do you know if you are going to be receiving a

20  third one or not?

21  A.      I'm not a hundred percent on that one.  No, I

22  don't.

23  Q.      Okay.  Well, at least as we sit here today, as far

24  as you know you have not received a third one?

25  A.      Right.

1  Q.    Okay.  Okay.  So then let's turn to 228, please.

2  **A.    Yes.**

3  Q.    Okay.  So on June 19th of 2020 we have one payment

4  to Kansas Rush of 402.50, correct?

5  **A.    Yes.**

6  Q.    Then we move down a few lines and we have one,

7  two, three, four payments in a row --

8  **A.    Yes.**

9  Q.    -- to Butler County online in El Dorado?

10  **A.    Yes.**

11  Q.    And those are also for your daughter's education?

12  **A.    Right.**

13  Q.    All right.  And then we keep going down, 620, 920?

14  **A.    620, 920, yes.**

15  Q.    We have a payment for soccer, correct?

16  **A.    Yes.**

17  Q.    Of $1,551.50?

18  **A.    Yes.**

19  Q.    And then July 13th we have two more payments for

20  your kids' soccer fees of 267.25 each, correct?

21  **A.    Correct.**

22  Q.    Okay.  Do you know why the June 29th, 2020 charge

23  of 1550 was a little bit larger than some of your other

24  soccer fee charges or do you actually recall?

25  **A.    I believe because the younger one of the children**

1  **were starting.**

2  Q.     Okay.  So then if we move to 232.

3  **A.     232?**

4  Q.     232.

5  **A.     Yes.**

6  Q.     All right.  On August 10th of '20 we have another

7  charge for your daughter's education at Butler County,

8  correct?

9  **A.     Yes.**

10  Q.     Then if we move to 235.

11  **A.     235.**

12  Q.     One page over?

13  **A.     Yes.**

14  Q.     On August 17th we have another charge for your

15  daughter's education at Butler for 130.60, correct?

16  **A.     Yes, correct.**

17  Q.     All right.  Then if we go to page 244.

18  **A.     Okay.**

19  Q.     On 11-6-20 we have another Butler County charge of

20  484.75 for your daughter, correct?

21  **A.     Yes.**

22  Q.     And then on 251?

23  **A.     Yes.**

24  Q.     Okay.  That's when you got your most recent, your

25  second stimulus check of $4200 on January 4th of this

1  year, right?

2  **A.     Yes.**

3  Q.     All right.  Then if we go to Loyle two five five,

4  255?

5  **A.     There, yes.**

6  Q.     Okay.  We have on January 19th of '21?

7  **A.     Mm-hmm.**

8  Q.     BCC Tuition of 2,257.50.  Is that additional

9  tuition to Butler County Community College for your

10 oldest daughter?

11 **A.     I believe that's [inaudible] yes.**

12 Q.     Okay.

13 **A.     That's the only one.**

14 Q.     And then the ending balance on what is the most

15 recent individual checking statement we have for you?

16 **A.     Mm-hmm.**

17 Q.     If you look at the top, ending balance on February

18 9th of this year you had a balance in your checking

19 account of $22,248.31, right?

20 **A.     Yes.**

21 Q.     Okay.

22        THE COURT:  What page were you on?

23        MR. SHEERN:  Sorry, Your Honor.  That was page

24 255.

25        THE COURT:  Thank you.

1           MR. SHEERN:  You're welcome.

2    BY MR. SHEERN:

3    Q.    So if you would turn to Exhibit 11, please.

4    **A.    Okay.**

5    Q.    So these are Andover Bank statements?

6    **A.    Yes.**

7    Q.    Related to the same bank we were just speaking

8    about, right?

9          This is the same bank --

10   **A.    Yes, yes.**

11   Q.    -- where you have your checking account?

12   **A.    Yes.**

13   Q.    Okay.  And these just include your checking

14   account but also your children's, they look like they

15   call them Pop Money accounts but they are basically

16   children's savings accounts, is that right?

17   **A.    Yes, yes.**

18   Q.    Okay.  So if we turn to the last page -- oh,

19   excuse me, I'm incorrect.  Not the last page, but 393.

20   **A.    Okay.**

21   Q.    Three nine three?

22   **A.    Yes.**

23   Q.    Do you see that?

24   **A.    I do.**

25   Q.    So at the very top of that page it says checking

1  -- the last four numbers of the checking account are

2  1243.  That's your checking account, right?

3  **A.      Right.**

4  Q.      Okay.  In this statement amount, if you look at

5  the very bottom, is printed March 8th, 2021 at 10:00 a.m.

6          Do you see that?

7  **A.      I do.**

8  Q.      Okay.  So this is as far as what we have in our

9  exhibits today, the most recent of what your account

10 balances are --

11 **A.      Mm-hmm.**

12 Q.      -- that we know of as we sit here today.

13         And so if we look on page 393, that same page,

14 your checking account balance on March 8th, 2021 was

15 $23,728.11, correct?

16 **A.      Yes.**

17 Q.      And if we include the children's accounts on all

18 of this your total deposits at Andover State Bank was

19 28,707.15, right?

20 **A.      If you want to include their money.**

21 Q.      Yeah, that's what is at Andover State Bank for

22 your family, right?

23 **A.      Yes.**

24 Q.      Okay.  And you mentioned earlier, and we've talked

25 a lot about the soccer fees, or went through the

1  different ones in here to make sure we knew which were

2  which, and you estimated that in addition to the fees

3  that we just identified you probably spend around $1500 a

4  year traveling for soccer, is that correct?

5  **A.      Yes.**

6  Q.      And I believe you said earlier it but I want to

7  make sure this is correct, but your employment was not

8  affected by COVID; that you remained employed the entire

9  time and you did not lose income over the last year or

10  so?

11  **A.      I did remain employed over that whole time.**

12  Q.      And you mentioned in your direct examination that

13  one of the impacts that paying your student loans back on

14  your family could be, would be if you had an emergency or

15  if you needed to get something quickly for your kids, or

16  if you had an income change, is that right?  Do you

17  recall saying that?

18  **A.      Rephrase that one for me.**

19  Q.      Sure.  It was my understanding from hearing your

20  testimony earlier at the very end of your direct

21  examination, your attorney asked you what impact having

22  to pay these student loans --

23  **A.      Yes.**

24  Q.      -- on you would be.  And one of the things you

25  mentioned was, um, taking care of emergencies or hospital

1  bills or --

2  **A.    Yes.**

3  Q.    -- something rather immediate, right?

4  **A.    Correct.**

5  Q.    Okay.  But you are also familiar with the income

6  based repayment plan, right?  That was -- you've applied

7  for that multiple times?

8  **A.    I did.**

9  Q.    And you're familiar with how to do that, right?

10  **A.    Basically.  I believe I am, I --**

11  Q.    And you've requested deferments in the past?

12  **A.    Yes.**

13  Q.    And you've requested forbearances in the past,

14  right?

15  **A.    Yes.**

16  Q.    So at least in the documented history of your

17  student loans up to this date, you would agree that you

18  knew if your income dropped substantially at one point in

19  time you could contact the Department of Education and

20  request a deferment -- excuse me, a forbearance, a

21  deferment, or an income-based repayment change in your

22  loan, right?

23  **A.    I knew I could do those things, I didn't know**

24  **where it landed to do with whatever I just -- yes, tried**

25  **to keep up with it all.**

1  Q.     Okay.

2         MR. SHEERN:  I don't have any further questions

3  right now, Your Honor.

4         THE COURT:  All right.

5         MR. SHEERN:  Thank you, sir.

6                      CROSS-EXAMINATION

7  BY MR. GELLIS:

8  Q.     Good afternoon, sir.  My name is David Gellis.  I

9  represent Navient, do you understand that?

10 **A.     Yes.**

11 Q.     And I'm going to have a few follow-up questions

12 for you.  I know a lot of this is -- has kind of already

13 been covered.  There are a couple of things I'd like to

14 clear up with you.

15        The Navient loans you took out when you were

16 attending medical school, correct?

17 **A.     Correct.**

18 Q.     Yes?  So that was after you had already taken out

19 loans for your undergraduate and for your chiropractic

20 education, correct?

21 **A.     Yes.**

22 Q.     So you already knew at that point that you had

23 over $100,000 in loans that you would need to repay back,

24 correct?

25 **A.     Yes.**

1  Q.     And you attend -- where did you start off

2  attending medical school?

3  **A.     American University Antigua through Kasturba.**

4  Q.     Why did you attend a medical school outside the

5  United States?

6  **A.     They would have to retake an MCAT exam.  When I**

7  **had been out of college for so many years, I don't think**

8  **-- it would have taken me a long time to restudy**

9  **chemistry and the basic physics and those classes to**

10 **retake an MCAT to go to the U.S. schools.**

11 Q.     Did you understand whether or not there would be

12 any more increased difficulty in getting a residency if

13 you attended a school outside of the United States as

14 opposed to one within the 50 --

15 **A.     You're a little second class but of course they**

16 **project everything as being well.**

17 Q.     But you were aware of that when you began the

18 process, correct?

19 **A.     That I would be probably second class as**

20 **Caribbean?  I think so.**

21 Q.     I want to make sure I understood.  You -- you

22 mentioned that your oldest daughter is going to be

23 attending Butler Community College full-time, correct?

24 **A.     Correct.**

25 Q.     And she had a scholarship to cover books and

1  tuition?

2  **A.     Yes.**

3  Q.     But you were intending to help pay for some of her

4  education, correct?

5  **A.     Correct.**

6  Q.     And I think it's my understanding that you

7  intended to pay approximately $300 per month, is that

8  right?

9  **A.     I'm not exactly what the number will be, not sure.**

10  Q.     Is it your position that it's not an undue

11  hardship for you to help pay for some of your daughter's

12  education?

13  **A.     It's all difficult.  I have no retirement.  But I**

14  **don't want them to be in this position ever so I want to**

15  **do everything I can to make sure they can live better**

16  **than I'm living.**

17  Q.     So it's your intention to put the money towards

18  her education as opposed to repaying your education?

19  **A.     That's not my intent at all.  My intent is to help**

20  **her live without debt.**

21  Q.     Do any of your children play soccer in their local

22  school teams?

23  **A.     Yes, the three older.**

24  Q.     In addition to that they also play at the club

25  sports that you have to pay for?

1  A.       Correct.

2  Q.       You know whether they would be eligible for the

3  scholarships you spoke of if they just continued to play

4  at their school teams?

5  A.       You're eligible no matter where you are or what

6  you play.  The level of soccer is so low now in the high

7  schools it's all transferred to competitive sports.

8  Q.       What happened to your practice in Colorado when

9  you went back to medical -- or went to medical school?

10 A.       I just gave it up.

11 Q.       You mentioned the -- and I'm sorry, you had -- you

12 have three cars?

13 A.       Yes.

14 Q.       Three vehicles in the family?

15 A.       Yes.

16 Q.       How far do you drive to work?

17 A.       Uh, gosh, I don't know the exact mileage.  I drive

18 to Derby two days a week, which is 30-minute drive and I

19 drive to east side in about a 10-minute drive the other

20 three days.

21 Q.       It's my understanding your wife's school is --

22 that she drives to is about four miles from your house?

23 A.       That's probably about right.

24 Q.       And at this point you're only making a payment on

25 one of the three vehicles, correct?

1   A.      Correct.

2           MR. GELLIS:  Thank you, sir, I don't have

3   anything further.

4           THE COURT:  Ms. Bailey?

5                    REDIRECT EXAMINATION

6   BY MS. BAILEY:

7   Q.      So, um, Mr. Sheern went through and asked you

8   about a bunch of the club soccer fees.

9   A.      Yes.

10  Q.      And earlier you had thrown out a number on

11  those --

12  A.      Yes.

13  Q.      -- of 4,000 a year.

14  A.      Right.

15  Q.      Did you -- how did you get to that number?

16  A.      That's basically the fees for their clubs.

17  Q.      Did you just remember that's what you paid or --

18  A.      No, we went through bank statements and tried to

19  sort out all these payments and where this money was

20  going.

21  Q.      Okay.  So you basically added up the ones that he

22  went through?

23  A.      Right.

24  Q.      And any that he might have missed?

25  A.      I -- just might easily have missed some but he

1 only mentioned Sombrero and not Kansas -- the other club

2 that my son plays for.

3 Q.     No, he mentioned Kansas Rush, also.

4 A.     Not Rush, Blue Sombrero and Rush is the same one

5 but my son plays as well, so his club is different.

6 Q.     Oh, what's his club name?

7 A.     Sporting Wichita.

8 Q.     Okay.  And you kind of have a lot of money in your

9 bank account right now?

10 A.     That is only due to random checks from COVID which

11 is way out of the loop and nothing to do with our income.

12        And the tax refund, which we always attempt to try

13 to hang on to for the needs.  We have fence that's

14 literally blown over in the wind.  And a porch that's --

15 that the dog has stepped on and broken that I got an

16 estimate on is about $10,000.

17        Air condition, I had someone come out to check

18 that out, that needs new air conditioning and that's

19 $6,000.

20        The carpets need replaced and the flooring, I

21 don't even know full cost of that.  None of that money

22 would be there.  I don't even have enough to do that.

23 Those stimulus checks would be a help but it wouldn't

24 cover all of the expenses just upkeeping my house.  Even

25 the siding needs to be dealt with.

1  Q.     So you're trying to decide how to spend the money?

2  **A.     We're trying to see which is most important.**

3  Q.     Okay.  Is there anything else that you want to

4  tell the Court about your situation before you're done?

5  **A.     Just it's rough to even think about how to retire**

6  **and live without any retirement.  And I can't put any**

7  **money away in retirement.  I'm not even going to live**

8  **with if every little -- my true extra income is probably**

9  **less than a thousand dollars at the end of the day and I**

10 **couldn't even afford to retire.  Or help out any kid or**

11 **really pay an amount that looks like is a bit of money.**

12 **But 28 is too high, that's the kids' money, mine is only**

13 **23 but that's just the circumstances of COVID.  It just**

14 **would be hard.**

15 Q.     So just to clarify, the four grand a year that

16 you're spending on your kids' soccer, add in some travel,

17 even add in the amount that you've paid for Butler for

18 your oldest, if you were paying a thousand bucks a month

19 on your student loans, how much would you be paying on

20 principal for those?

21 **A.     Probably nothing.  I'd never pay it down in**

22 **principal.  They would just continue to get over, that's**

23 **why I went to -- well, that's what I was told when I**

24 **tried to invest money.**

25 Q.     Okay.

1  **A.    That it wasn't worth it.  I had too much**

2  **insurmountable debt.**

3         MS. BAILEY:  Thank you.

4      That's all I have.

5         THE COURT:  Okay.  Any recross?

6         MR. SHEERN:  Yes, sir.

7                    RECROSS EXAMINATION

8  BY MR. SHEERN:

9  Q.    So, I went through a lot of the soccer charges

10 that I could find and identify as soccer charges but I

11 want to be clear on the record that there is another team

12 that you pay for a different child to play on that I

13 didn't identify in any of the questions that I asked on

14 my cross-examination, correct?

15 **A.    Correct.**

16 Q.    Okay.  And the name of that team is what?

17 **A.    Sporting Wichita.**

18 Q.    Okay.  And do you think that in addition to what I

19 identified, when you add Sporting Wichita, it really

20 comes out to about $4,000 a year in fees is what you

21 could add up?

22 **A.    Yes.**

23 Q.    Correct?  And then you -- then you mentioned $1500

24 in hotel bills, correct?

25 **A.    I think that's probably more per year but, yes.**

1   Q.      Per year?

2   **A.      Right.**

3   Q.      And then the other thing we didn't mention is, I

4   assume you have to buy uniforms, cleats --

5   **A.      Of course.**

6   Q.      -- gear, bags, all of that stuff, correct?

7   **A.      Yes.**

8   Q.      Do you have any idea how much that costs?  Per

9   year?

10          How many kids do you buy it for?  Three?

11  **A.      It was five and it -- it'll be four.**

12  Q.      Okay.

13              MR. SHEERN:  I don't have any other questions.

14  Thank you.

15              MR. GELLIS:  Nothing further.

16              THE COURT:  All right.  Any follow-up,

17  Ms. Bailey?

18          All right.  Sir, you are excused for now as a

19  witness.

20              THE WITNESS:  Thank you.

21              THE COURT:  This would be a good time to take a

22  short afternoon break.  Why don't we take about ten

23  minutes and come back at 3:30.

24              COURTROOM DEPUTY:  All rise.

25          (Recess taken.)

1      THE COURT:  Be seated.

2      Before you call your next witness, Ms. Bailey,

3 just a housekeeping matter so we can let the CSOs know.

4 Do we think we'll go past 5 o'clock?

5      MS. BAILEY:  Your Honor, I was planning to go a

6 little bit quicker with Mrs. Loyle, so I hope not.

7      THE COURT:  And she's our only other witness,

8 correct?

9      MS. BAILEY:  Correct.

10      THE COURT:  Okay.  Yeah, if you could just let

11 the CSOs know, unlikely to go past 5:00.

12      MS. BAILEY:  Okay.

13      THE COURT:  But if we need to, we will.  We just

14 need to give them some head's up if it looks like we are

15 going to go longer.

16      So, okay.  Go ahead.

17      MS. BAILEY:  I would like to call Katherine

18 Loyle to the stand.

19      THE COURT:  All right.

20      COURTROOM DEPUTY:  Would you please raise your

21 right hand.

22      Thank you.

23      Do you solemnly swear that the testimony which you

24 are about to give in the case now in hearing shall be the

25 truth, the whole truth, and nothing but the truth, so

1  help you God?

2          THE WITNESS:  I do.

3                    **KATHERINE LOYLE,**

4  called as a witness on behalf of the Plaintiff, having

5  been first duly sworn, testified as follows:

6                    DIRECT EXAMINATION

7  BY MS. BAILEY:

8  Q.    Okay, Kate, you heard everything that went on with

9  Paris' testimony so I'm not going to repeat some of the,

10  you know, information about testifying and stuff.  I'm

11  assuming that you understood all of that?

12  **A.    Yes.**

13  Q.    Just make sure you say yes or no so that the --

14  **A.    Yes.**

15  Q.    They can get it.  Okay.  Awesome.

16        So Paris told us a little bit about your family.

17  Can you tell us a little bit about you and your education

18  history.

19  **A.    Sure.  I grew up in Colorado and I went to school**

20  **on a soccer scholarship to the University of Maine to get**

21  **a degree in education.  After that I moved back to**

22  **Colorado and met my husband.  We got married and had a**

23  **baby and I started working on a master's degree from the**

24  **University of Phoenix in education and then that opened a**

25  **door for me to start teaching online part-time, in**

1  addition to working full-time as a school teacher.  And

2  then -- I'm trying to think.

3        When we were living in Grand Cayman, I'm sorry, so

4  I'm trying to just remember.  I was working just solely

5  online with the college and, um, I had six classes every

6  term that I used that allowed me to afford -- about

7  $42,000 a year, it allowed me to afford to be able to pay

8  our bills and stay home with the kids, work from home.

9        And then I was an adjunct instructor and the next

10 year I was only -- or the next term I was only given one

11 class instead of six because they had changed the

12 credentialing for of what a teacher could teach.  I was

13 teaching communications, I was teaching English,

14 humanities, and a success strategies class and because

15 the credentialing had changed the only class I could

16 continue teaching was the success strategies because my

17 master's wasn't in education.

18        So I went back to school to get another degree, a

19 master of arts in interdisciplinary studies so I could

20 get the necessary 18 credits in communications, 18 in

21 English, and 18 in humanities to pick these courses back

22 up.  I did get that degree and get those courses and pick

23 those courses back up.

24        By that time we had had five children and had

25 decided to move to Wichita to get a little bit more

1  support.   Paris was unable to get a residency and my

2  income was the only income we were living on for many

3  years.

4       I had the full-time teaching and the part-time

5  online school and our first year out here the school

6  where I was teaching online for 12 years shutdown and so

7  I was just kind of looking for any other work that I

8  could find but that at least helps you understand why I

9  have all the degrees.

10 Q.    So you teach -- where do you teach now?

11 A.    I'm at Andover High School.   I teach sophomore

12 English.

13 Q.    Why don't you teach -- I mean, don't colleges pay

14 better?

15 A.    Uh, normally, if you have a doctorate, definitely.

16 You know, it's about the same amount of pay but they pay

17 you as an adjunct.   An "adjunct" means that like what had

18 happened to me before:  You could go from six courses to

19 one without them even telling you, it would just happen.

20 And so there's no job security, actually.   There's no

21 guarantee of the courses you'll have.   There's no

22 insurance.   There's no really benefits, you're just kind

23 of paid by class and it's kind of -- they like having

24 adjuncts because they can kind of hire you when they need

25 you and keep you away when they don't.

1  Q.     Okay.  So you said that you had worked full-time

2  and then you were also working part-time for colleges?

3  **A.     Correct.**

4  Q.     Why aren't you doing that any more?

5  **A.     Well, the college shut down.**

6  Q.     Mm-hmm.

7  **A.     It transitioned.  They put the West Wood employees**

8  **into a school called -- we were supposed to teach for**

9  **National American University, there was some agreement**

10 **between West Wood and NAU when they shut down but the**

11 **classes, the West Wood kids were so frustrated that their**

12 **college had just shut down that they found other places**

13 **to go and the classes didn't pack the weight so that fell**

14 **through.**

15 **          I have applied to many positions to try and get**

16 **online adjunct.  They receive about a thousand**

17 **applications a day; pretty hard to get your foot in the**

18 **online teaching world.  And teaching adjunct for like a**

19 **community college here, there are lots of them here, I**

20 **thought that would be a perk for me but you have to be on**

21 **campus.  You have to physically go.  And that's really**

22 **hard for me with five kids.  After I work a full day,**

23 **so...**

24 Q.     Okay.  Let's turn to Exhibit 2 in that binder

25 which is -- if you could identify the first document in

1  that for me, that's going to be Page 32.

2  A.     It's my pay stub.

3  Q.     And what's the date on that?

4  A.     February 12th, 2021.

5  Q.     How often are you paid?

6  A.     I get paid once a month.

7  Q.     Okay.  So this paycheck's pretty representative of

8  your monthly income?

9  A.     Definitely.

10 Q.     Okay.  You've got some deductions on here.

11 I -- Paris testified that he paid for health insurance

12 for him and the kids.  So I'm assuming this health

13 insurance is just for you?

14 A.     Correct.  In fact, Andover schools doesn't have

15 very good benefits package for families.  This is the

16 first time we've been fortunate that we both had

17 companies that had a benefits package with families and

18 we got to pick the better one and his happened to be the

19 better one.

20 Q.     Okay.  I see on here that you have a $303

21 deduction for KPERS?

22 A.     Correct.

23 Q.     Is that a voluntary retirement program?

24 A.     No.  It's something they -- you just have to do if

25 you're a teacher, a portion of your money gets put into

1 **KPERS.**

2 Q.     Do you get to choose how much?

3 **A.     No.  There might be something where you can give**

4 **more.  I've never done that.**

5 Q.     Okay.  Let's go to some expenses for you.  Paris

6 said that you pay a lot of the regular expenses?

7 **A.     Correct.**

8 Q.     Okay.  Exhibit 10 is going to be your bank

9 statements.  I'd like you to turn to the most recent

10 statement that we have on here which is, um, page 387.

11     386, sorry.

12 **A.     Okay.**

13 Q.     Okay.  What's the -- can you tell me how much your

14 house payment is?

15 **A.     I pay 1640 a month.**

16 Q.     Is -- are you paying extra on that?

17 **A.     No.**

18 Q.     How much do you owe on that loan?  Do you know?

19 **A.     I think it's at 193,000 now.**

20 Q.     Okay.  A couple expenses down from that, um,

21 Audible?

22 **A.     Yes.**

23 Q.     Is that a one-time thing or --

24 **A.     I pay for that monthly.  Some of it is for**

25 **personal enjoyment but most of it's for school.  I have**

1  books on there that I teach and I share the audio books

2  with the kids at school.

3  Q.    Okay.  Looks like you transferred $50 to your

4  oldest child there.

5  A.    Yeah.  I -- I don't recall what that particular

6  one was for but I do transfer money into Madison's

7  account from time to time.

8  Q.    Okay.  Waste Connections?  Trash?

9  A.    Yeah, trash.

10 Q.    Is that --

11 A.    Sewer.

12 Q.    How often do you have to pay that?

13 A.    I think that's once every three months; four times

14 a year.

15 Q.    Okay.  On the following page you've got a $69

16 charge for Hulu?

17 A.    That's cable.  Kind of.

18 Q.    Oh, okay.

19 A.    It's cheap -- cheap cable.  It's not really cable,

20 but --

21 Q.    The YMCA, is that recurring or is that a one-time?

22 A.    That's monthly, yeah.

23 Q.    I guess we could have redacted your kids' names on

24 those accounts.

25 A.    Yeah.

1  Q.    Okay.  You've got AT&T U-Verse there.  Is that

2  different than the AT&T that Paris was paying?

3  **A.    Yes, Paris pays for the cell phones, I pay for the**

4  **internet.  They're both through AT&T but they come in**

5  **separately.**

6  Q.    Okay.  City of Wichita is water?

7  **A.    That's water, correct.**

8  Q.    You have had 75.91 that month.  Is that -- are you

9  on like a level payment plan or what's -- is that --

10 **A.    No, it fluctuates.  It fluctuates every month**

11 **based on use.**

12 Q.    How much is the average?

13 **A.    I -- I don't recall, I think --**

14 Q.    Is this pretty close to normal you think?

15 **A.    Yeah.**

16 Q.    Okay.

17 **A.    We have a family of seven, so...**

18 Q.    Right below that one you have got Evergy --

19 **A.    Yeah.**

20 Q.    -- 97.10.  Is that --

21 **A.    The -- the Evergy is the electricity and then the**

22 **Kansas Gas obviously is gas and those take turns being**

23 **high and low.  One is really high in the summer and the**

24 **other is really high in the winter.**

25         **The Kansas Gas is usually like 200 and the high**

 1  end is maybe 250, 275, I'm trying to remember off the top

 2  of my head.  But the high end is pretty -- it's a lot

 3  closer to 300 than this, so...

 4  Q.     Okay.  Let's see.  Oh, that was right before the

 5  deep freeze.

 6  A.     Yeah.

 7  Q.     Let's see.  So then you mentioned Kansas Gas.  Do

 8  you see other recurring payments on here?

 9  A.     Um, State Farm is on there, 224, for $158.

10  Q.     Insurance?

11  A.     That's car insurance and personal property.  My

12  wedding ring I believe is on it.  Our wedding rings are

13  on it.

14  Q.     Okay.

15  A.     And the car insurance.

16  Q.     Okay.  And then I see Netflix on there?

17  A.     Yeah.  That's our entertainment so [inaudible].

18  Q.     So that's the end of the statement.  So quite a

19  bit of your recurring expenses it seems like?

20  A.     Right.

21  Q.     Let's see.  Paris said earlier he didn't know

22  about home maintenance.  Do you know how much you guys

23  spend in home maintenance?

24  A.     It's about 250 a month.  A lot of it, you know,

25  is -- it looks different, some months they're higher and

1  lower but it's about 250 a month.

2  Q.    And what about --

3  A.    And that's really on the low side.  I mean I know

4  he mentioned it but our fence is literally falling apart.

5  The HOA is really not very pleased with the way our fence

6  is looking.  And we have a hole in our patio, in our

7  porch, and Paris wants them to come out and give an

8  estimate and it was $9,000 and we obviously don't want to

9  pay that right now.

10       We also have an air conditioning that needs the

11  furnace as well, and our siding, and then our floors are

12  a mess, so we need to replace those.

13  Q.    Um --

14  A.    I think that they're original ones that were put

15  in with the house when it was built, I don't know, 20

16  years ago, so...

17  Q.    What about, um, gas for your cars?

18  A.    You know, Paris and I pay 250 a month for that but

19  I probably -- you can see that I put money on the kids'

20  accounts.  Madison -- oh, sorry, my oldest I give 40 --

21  Q.    Well, she's 18 now.

22  A.    I give 40 to her, that's just for gas and the 25

23  for Rose is for gas.  They do an awful lot of driving to

24  their different activities.

25       And work, when they have it.

1  Q.     Okay.  What about -- we talked with Paris about

2  the, um, soccer and sports fees.  What about school

3  expenses?

4         I didn't talk much about -- with Paris on the

5  Butler fees but non-Butler fees, what about just like the

6  general school expenses for the kids?

7  **A.     Well, at the beginning of each year we pay about**

8  **$700 for their enrollment and their, uh -- you have to**

9  **pay to play a sport so that's about $700 for the five**

10 **kids.  And then school supplies is about $100 per kid**

11 **each year, so about $500 a year just to get them set up**

12 **for a successful school year.**

13 **        I think that's probably it school -- fee-wise for**

14 **school.**

15 Q.     So then for the Butler expenses, I think that part

16 of it was pretty well covered.

17 **A.     That's about $5,000 a year but I know that on our**

18 **taxes we got a -- we don't call it a kickback, I'm trying**

19 **to think.  We get a credit.  For the higher education for**

20 **that I think is 2500 so it's about 2500 out-of-pocket for**

21 **her associate's degree.**

22 Q.     Yeah, so if you turn to Exhibit 8, that's your tax

23 return.

24 **A.     Oh, There it is, it's on number seven maybe.**

25 Q.     So this is Page 94.  This is the education

1   credits.

2          So you've got a thousand -- you -- basically 2500

3   sounds right; a thousand plus the 1500.

4          Other expenses.  You no longer have that daycare

5   expense.  Um, do you have other expenses that have

6   replaced that?

7   **A.     You know, there are activities for the little**

8   **kids, now that we -- well, COVID has changed our life**

9   **quite a bit.  But prior to COVID, um, we had activities**

10  **for the kids and that's something that we would like to**

11  **get back to for them.  We believe that helps them be**

12  **well-rounded and successful humans, citizens.  We think**

13  **they're valuable to their future, to their communities.**

14  Q.     I don't know why you'd want that.

15         Okay.  Let's -- let's look at some of your future.

16  You're a teacher with two master's degrees?

17  **A.     Yes.**

18  Q.     How much more can you make in the public schools?

19  **A.     Without a doctorate nothing, and with a doctorate**

20  **it's something like $60 more a month.  But the costs of**

21  **the doctorate is not worth the -- I would never make back**

22  **what I pay for that so the two master's degrees is the**

23  **top.**

24  Q.     Is there somewhere else you could be making more

25  money teaching?

1  A.      Um, you know, I mean, the adjunct thing is

2  probably my best opportunity but I can't get my foot in

3  the door on the online thing.  I've really tried to go

4  work somewhere, but I would have to get care for my kids

5  and the amount they would pay me to do that wouldn't

6  probably cover the care I would need, so...

7  Q.      Okay.

8  A.      It doesn't make a lot of sense.

9  Q.      On your -- I'd like you to turn to Exhibit 39,

10 which is your NSLDS loan history.  And that starts on

11 Page 703.

12 A.      I see it.

13 Q.      Okay.  And maybe we could just very quickly go

14 through what loans you had because your current loan is a

15 consolidation loan, yes?

16 A.      Yes.

17 Q.      Okay.  So let's start at the last page of that

18 exhibit.  Page 708.

19 A.      I'm there.

20 Q.      There's only one on that page?

21 A.      Correct.

22 Q.      Very small.

23 A.      I had a half ride scholarship to the University of

24 Maine so these are rather small compared to the cost of

25 the school.

1  Q.     Okay.  And then we've just got a summary on the

2  page before that.  Then Page 706.  Just kind of quickly

3  go through some of these, what these loans are.

4  A.     Um, the -- in 1996 I got a loan for $1900 from the

5  University of Maine.  Then it jumped up to 10,281 for the

6  next semester.  I'm guessing that my scholarship paid

7  more on the fall semester or something, I'm not quite

8  sure why the difference there.

9        And then it was 3500 in '97; and another 5500 in

10  '98 for the University of Maine.  And then again 5500 in

11  '99 and that wrapped up the University of Maine degree in

12  education.

13  Q.     Okay.

14  A.     And then I went to the University of Phoenix and

15  got a degree, a master's in education.  That was in 2002

16  and that was for -- I took out 10,000 in 2000 and again

17  8,500 is probably the second semester.

18        I don't know what the 598 is, I don't -- maybe one

19  course or something, I'm not quite sure there.

20        It looks like I consolidated the loans.

21  Q.     But that -- as I understand it, you -- of those

22  other ones at Maine you mentioned, you only had one that

23  was subsidized?

24  A.     That's correct.

25  Q.     And that was 643 so that might be a consolidation

1  of that loan.

2  A.    Okay.  And then -- I'm having a hard time

3  understanding this.  Oh, these are the consolidations.

4       In 2002 you can see I consolidated the U Maine and

5  University of Phoenix loans so it looks like for 589 and

6  then the 18,599.

7  Q.    Okay.

8  A.    And that looks like it continued, um, with the

9  University of Phoenix in 2003 for 4700.

10      And then I consolidated all of them together at

11 that time for, in 2005, 29,000 for the one and then the

12 -- I think that's it for the consolidations.  14,000 for

13 the other.

14 Q.    Okay.

15 A.    And then you can see in 2008 that's when I was

16 working only, I didn't have both the full-time teaching

17 and the online teaching, I was just doing the online

18 teaching but they were restructuring how they were

19 allowing teachers to teach, what credits you had to have

20 in order to teach certain courses.  So that's when I went

21 back to the University of Houston and I went after a

22 master of arts and interdisciplinary studies and you can

23 see it is 8500 in 2008; 12,000 in 2008; 8500 in 2009;

24 12,000 in 2009; 8500 in 2010; 12,000 in 2010.  And then I

25 probably graduated there and I consolidated the loans.

1  Q.     Okay.

2  **A.     With Fed Loan.  And Fed Loan has been my servicer**

3  **since.**

4           MS. BAILEY:  Okay.  Your Honor, I would like to

5  introduce a summary exhibit based on these loan

6  disbursements that Mrs. Loyle have gone over and

7  that -- that Dr. Loyle went over earlier.  I've handed

8  the other counsel a copy.

9        Let me get a copy here.  Just --

10 BY MS. BAILEY:

11 Q.     So personally I have a hard time reading those.

12 So I made a little table based on when you got these

13 loans and whether they said they were subsidized or

14 unsubsidized.

15 **A.     Okay.**

16 Q.     And so it's a lot easier for me to tell from this

17 that you've consolidated these loans three times?

18 **A.     Correct.**

19           THE COURT:  So, counsel, would this be Exhibit

20 57?

21           MS. BAILEY:  Yes, sir.

22           MR. SHEERN:  Your Honor, can I note for the

23 record, I don't have a practice of objecting to summary

24 exhibits, I mean, the math is the math.  But I just

25 received this over the break at our recess and I have not

1  had a chance to confirm that these figures are in fact

2  correct within the exhibits themselves.

3            THE COURT:  Okay.  Do you have any objection

4  other than any possible mathematical mistake?

5            MR. SHEERN:  No, none other than that.

6            THE COURT:  Okay.

7            MR. GELLIS:  With the same caution, Your Honor,

8  I would say the same thing.  No objection other than as

9  to any mathematical issue.

10           THE COURT:  Okay.  And who put it together, Ms.

11 Bailey?

12           MS. BAILEY:  I did, Your Honor, from

13 this -- these NSLDS exhibits provided by the Department

14 of Education.

15           THE COURT:  Okay.  I'll admit it into evidence

16 and let it be used with the witness.

17       If, counsel, if you find there is a mistake,

18 please let the Court know as soon as you can.  I mean you

19 don't -- obviously, can't do it right now today but let

20 me know if you find a mistake and we'll deal with it at

21 that time but otherwise I'll let it into evidence now.

22       Exhibit 57 is admitted.

23           MS. BAILEY:  And I can -- I'll email you the

24 spreadsheet, too, that has the calculations on it.

25           MR. SHEERN:  Okay, thank you.  That would be

1  appreciated.

2  BY MS. BAILEY:

3  Q.     Okay.  So on these -- on these you had -- from the

4  University of Maine there's a -- I did a subtotal of how

5  much you borrowed from them, from the Department of

6  Education altogether.  And then you consolidated them?

7  **A.     Correct.**

8  Q.     The amount that you consolidated for the

9  unsubsidized appears to be less than what you, um,

10  borrowed.  Did you make payments on those?

11  **A.     I made payments whenever I wasn't directly in**

12  **school.**

13  Q.     Okay.  How much did you borrow altogether on your

14  original loans?

15  **A.     It looks like 112,000 total.**

16  Q.     Okay.  Let's turn to Exhibit 53, which is your

17  Certificate of Indebtedness, page 783.

18  **A.     Yes, I see it.**

19  Q.     And this is information that we've stipulated to,

20  which is the amount that you originally borrowed on your

21  loans for the consolidation loan and the interest rate on

22  those.

23         Um, can you tell me how much interest is on your

24  loans?  Accruing per day?

25  **A.     $21.94.**

1  Q.    Okay.  What's your current balance with the

2  Department of Education?

3  **A.    It's 152,913.**

4  Q.    Okay.

5        MS. BAILEY:  I would like to introduce another

6  summary exhibit here, which would be 58 then.

7        MR. SHEERN:  Your Honor, I would have the same

8  limited objection to Exhibit 58, that we've not had a

9  chance to check the mathematical calculations and to the

10 extent that there's math errors on this exhibit we would

11 object to it, but we have no other objections for DOE.

12       MR. GELLIS:  No objection other than the same

13 potential mathematical issue, Your Honor.

14       THE COURT:  Okay.  Then I'll let Exhibit 58 be

15 admitted without objection, other than the reservation of

16 the ability to correct any mistake in mathematics made on

17 the exhibit.  And we'll correct the record if you bring

18 that to the Court's attention.

19      Go ahead, Ms. Bailey.

20       MS. BAILEY:  Thank you, Your Honor.

21 BY MS. BAILEY:

22 Q.    The first table on this summary exhibit, Kate, is

23 monthly interest accrual on your student loans.

24      So we've stipulated to the, um, current balances

25 -- excuse me, the current balances on each of the loans,

1  and the interest rates on each of those loans are

2  stipulated, or in the exhibits provided by the Department

3  of Education.  And we had the daily interest on the

4  Department of Education loans at least.

5          What does the monthly interest total look like?

6  A.      $1800 looks totally outside of our budget.  And

7  that's just to pay the --

8  Q.      So you don't think you could have afforded to pay

9  1500 buck as month?

10  A.      We could not.  That is outside of what we could

11  afford to do.  No, we would have to cut things, I

12  suppose, to pull that off.

13          I think the things that we would have to cut would

14  be detrimental to our children's future.

15  Q.      Now the Department of Education at least has

16  offered repayment plans, income based repayment plans.

17  Looking through your stipulations you have also been in

18  IBR and repay almost the entire time, at least for this

19  consolidation loan?

20  A.      Yes.

21  Q.      Did you accomplish anything in those income based

22  repayment programs?

23  A.      No.  I pay every month and I watch the amount go

24  up actually.  It's -- it's frustrating.

25          I at one point put my information into a

1  **calculator and it said something we will, after paying**

2  **something like $300,000 over 25 years, we would owe**

3  **$500,000 more at the end of the term.  And I don't know**

4  **how it's going to be taxed later.  I don't -- but that**

5  **seems unclear with the way things keep changing in that**

6  **regard but that's a lot of money to be taxed on.**

7  Q.     So the IBR program, which is 15 percent of the

8  disposable income, and the stipulation, says the payment

9  would be 742 for the both of you and 495 under repay.

10       You and I looked at some numbers on that?

11  **A.     Yes.**

12  Q.     On that 25-year program, are you ever going to pay

13  anything on principal?

14  **A.     No.**

15  Q.     Are you ever going to come close to paying

16  anything on principal?

17  **A.     No.**

18  Q.     In -- how old's your youngest?

19  **A.     Six -- well, she's turning six in a few days.**

20  Q.     So 12 years from now she'll be graduating?

21  **A.     Right.**

22  Q.     In 2034 it will just be the two of you.  If you're

23  making the same amount of money you're making right now

24  and, you know , cost of living increases, but assuming

25  that and the poverty levels stay about the same, running

1  that 15 or 10 percent calculation to see how much your

2  income would have to be to pay to cover at least the

3  interest on those loans I came up with some pretty high

4  numbers?

5  **A.      Yeah.**

6  Q.      I mean, I don't know why anybody would do IBR but

7  so if you were doing the repay program, in 2034 how much

8  would your income have to be in order to pay on the

9  interest that's accruing today?

10  **A.      Something I'm not able to make.  I don't -- I**

11  **don't -- I don't know what I would have to make but it's**

12  **not something that is possible for a public school**

13  **teacher.**

14  Q.      What about Paris?  Do you think he's maximized his

15  income?

16  **A.      Paris does very well with the bonuses and --**

17  Q.      Don't look at him.

18  **A.      Sorry.**

19  Q.      You can talk smack on him if you need to.  You

20  think he's max'd his income?

21  **A.      I love that man.  He has maximized his income and,**

22  **you know, even when he had his own business he didn't**

23  **make what he is making now and I know that's probably a**

24  **better way, but people are always like, oh, he should**

25  **have his own business.  That's what people think.  Oh, he**

1  should go use his doctorate because that's -- they don't

2  understand.  They don't understand how it works.

3      We would not be in this situation if he got his

4  doctorate.  This is a circumstance that we found

5  ourselves in.  He had every intent to pay every penny.

6  With the medical degree we thought we would pay it

7  simply.  We're not.

8      But that's not something difficult for us to do.

9  We are happy to drive old cars that rattle and have

10  200,000 miles on them to make what needs to happen

11  happen.  And we thought it would take us at maximum five

12  years to pay all this off if he were making 250 to

13  $300,000 a year.

14      We would continue trying to live off of my income

15  and use all of his to pay all of this and that is not the

16  situation we found ourselves in and it's really hard to

17  explain to people who don't understand the system.  That

18  if you don't have a residency, your degree means nothing.

19      Even a research job would probably make him less

20  than he's making as a chiropractor now and, um, he

21  can't -- he can't get them.  He can't even get them

22  because he has no experience in them.

23      MR. SHEERN:  Your Honor, I'm going to object.  I

24  think at this point we have exceeded the scope of the

25  last question that was asked --

 1              THE WITNESS:  I'm sorry.

 2              MR. SHEERN:  -- which I believe was I believe

 3  about whether Paris was maximizing his income.

 4              THE WITNESS:  I'm sorry.

 5              MS. BAILEY:  We can move on.

 6              THE COURT:  Okay.  Ask another question.

 7  BY MS. BAILEY:

 8  Q.      On page 2 of this summary exhibit for the loans?

 9  **A.      Yes.**

10  Q.      We've got the amounts that you have stipulated to

11  pay on each of those loans, the amounts that we've

12  stipulated on the current balances, and the amounts that

13  you received when those loans were disbursed.

14  **A.      Yes.**

15  Q.      The amount -- can you tell me what the total is of

16  how much you guys have borrowed on these current loans?

17  **A.      The total loans disbursed was $328,000.**

18  Q.      And how much do you owe right now on these loans?

19  **A.      435,000.**

20  Q.      Okay.  Do you know how much you'd have to pay to

21  repay 435,000?

22  **A.      Uh, I think, um, it would have to be over $2,000**

23  **if we -- if we were to pay it off in 30 years and that's**

24  **not even possible that we can even.  But in 30 years, we**

25  **would have a 30-year loan it would be at least $2300 a**

1  month.

2  Q.     And how old will you be in 30 years?

3  A.     In 30 years I'll be 73.

4  Q.     When do you anticipate retiring?

5  A.     You know, I was hoping to retire at 67 probably to

6  get my full benefits.  I mean, I would like to retire

7  sooner but that's the...

8  Q.     How do you feel like these student loans effect

9  your financial situation?

10 A.     I feel, um, really frustrated because I think what

11 we see right now is a large amount of money in savings

12 that came from, um, COVID, like we could anticipate that;

13 from saving from not having our kids in as many

14 activities in COVID; and from, finally, finally having

15 two incomes.

16        We have spent most of our life on a single income.

17 This has been a battle.  And it's been really hard for me

18 and my husband and we've done the best we could every

19 step of the way.  We've asked for deferments when we

20 needed them.  There was one point where we got zero

21 dollar income based repayment because it was so obvious

22 we couldn't afford to pay anything.

23        We've tried.  We really have.  I'm sorry.  I get

24 emotional but this last two years is the best situation

25 we've been in since I've known my husband.

1  Q.    So just to be clear, how much money did you guys

2  make last year?

3  **A.    I think the taxes say $119,000.**

4  Q.    And how much do you owe in student loans?

5  **A.    $435,000.  And that's -- that's the current**

6  **balance because interest accrues on that and I did put in**

7  **a calculator.  That is not the final balance.  That is**

8  **not what I will owe in 30 years; it will keep going up.**

9  **It's suffocating.**

10 Q.    Actually, this is -- this is to repay the loan in

11 full.

12 **A.    Okay.**

13 Q.    In 30 years.

14 **A.    Okay.**

15 Q.    At the interest rates that were stipulated to.

16       MS. BAILEY:  I don't think I have any other

17 questions at the moment.

18       THE COURT:  All right, Mr. Sheern.

19       MR. SHEERN:  Thank you, Judge.

20                 CROSS-EXAMINATION

21 BY MR. SHEERN:

22 Q.    Do you need water or anything before we start?

23 **A.    I'd like to grab my water bottle.  May I?**

24 Q.    Let me get it for you.

25       MR. SHEERN:  May I approach the witness, Judge?

1             THE COURT:  Certainly.

2             THE WITNESS:  Thank you.  Appreciate it.

3  BY MR. SHEERN:

4  Q.     You let me know when you're ready.

5  **A.     I'm ready.  Thank you.**

6  Q.     Sure.

7         So you mentioned in your direct examination that

8  your oldest daughter is 18?

9  **A.     Correct.**

10 Q.     Is that correct?

11 **A.     Yes.**

12 Q.     Just 18?

13 **A.     Yes.**

14 Q.     And she's the one that she's going to Butler

15 County Community College in the fall?

16 **A.     She is.**

17 Q.     And so presumably she will move out of the house

18 at some point later this summer?  Is that right?

19 **A.     Yes.**

20 Q.     And so then you'll have four kids living at home

21 with you?  Is that right?

22 **A.     Yes.**

23 Q.     And then your second oldest child is how old?

24 **A.     She's 16.**

25 Q.     She's 16.  So is it your expectation or belief

1  that when she reaches college age in two years that she

2  will also move out and go to college somewhere?

3  **A.      I do believe that she will take that path.**

4  Q.     Okay.  So in two more years presumably, it's

5  possible if not probable, then you'll have three children

6  at home with you, is that right?

7  **A.      Yes.**

8  Q.     Okay.  And then how old's your middle or the third

9  oldest child?

10 **A.      He's a freshman in high school, 14.**

11 Q.     Okay.  So then presumably it's probable that in

12 four years from now he'll also go to college and then

13 you'll be down to two kids?

14 **A.      And we'll have three kids in college at the same**

15 **time --**

16 Q.     You will have three kids in college --

17 **A.      -- and two kids at home.**

18 Q.     -- and two kids at home.

19        And then how old is your second -- the second

20 youngest?  The next oldest?

21 **A.      The next one is nine, she'll be in fourth grade**

22 **next year.**

23 Q.     Okay.  And then littlest one is six?

24 **A.      Yeah, just finished kindergarten, yeah.**

25 Q.     Okay.  You spread them out?

1  A.     We sure did.

2  Q.     And like I asked Paris, you would agree that, um,

3  your youngest one at six is going to grade school now and

4  you don't have those daycare expenses, right?

5  A.     Correct.  And she still needs after school care

6  but not during the day, no.

7  Q.     Does she get -- strike that.

8         All right.  If you would turn to Exhibit 10,

9  please.

10 A.     Yes.

11 Q.     Okay.  These are the bank records from your

12 checking account, correct?

13 A.     Correct.

14 Q.     Okay.  And you and Paris keep separate checking

15 accounts?

16 A.     We do.

17 Q.     All right.  So if you would turn to Loyle 278 and

18 279.

19 A.     I'm there.

20 Q.     Okay.  So this is the June -- am I correct, the

21 June of 2018 statement from your checking account, right?

22 A.     Yes.

23 Q.     Okay.  And on two seven eight you had a beginning

24 balance of $2,616.97 and you had deposits of

25 approximately 13,000?

1  A.      Yes, that's -- it looks horrible but that's my

2  actual pay.

3  Q.      Okay, that's what my next question is.  If we

4  moved to 279?

5  A.      Yeah.

6  Q.      And we go down to June 20th, you have four

7  payments -- excuse me.

8          You have four payments from the Unified School

9  District, right?

10  A.      Yes.

11  Q.      And then three of those payments are around $4,000

12  a piece, correct?

13  A.      Correct.

14  Q.      Okay.  And are those because you get paid for the

15  summer months in one lump sum?

16  A.      There was something going on with the district at

17  the time and the recommendation was as they were agreed

18  figuring out some things to take a lump sum.  So I took a

19  lump sum.  Those are my June, July, and August payments.

20  Q.      Okay.

21  A.      So those are my paychecks.

22  Q.      So those are your paychecks for June, July, and

23  August of 2018, right?

24  A.      Correct.

25  Q.      And is the lump sum summer payment, as I'll

1   describe it, optional now or is that -- how do you get

2   paid for that now?

3   **A.      Oh, yeah, you could still do it.  I only did it**

4   **that year because they were restructuring something and I**

5   **was just trying to safeguard.  There was some belief that**

6   **your August payment could be held up and you wouldn't get**

7   **it until your September payment or something like that**

8   **and we couldn't afford to -- to not have that money**

9   **coming in regularly so I -- I did want some option, only**

10  **that year.  I've never done it before.**

11  Q.      Okay.  And since then if we look at your bank

12  records you still get paid monthly --

13  **A.      Correct.**

14  Q.      -- in the summer?

15  **A.      Correct.**

16  Q.      Just try and let me finish the question --

17  **A.      Okay.**

18  Q.      It's fine.  It's natural, it's just for the

19  record.  Okay?  So it's clear.

20          So now you're getting monthly payments through the

21  summer, right?

22  **A.      Yes.**

23  Q.      Okay.  All right.  If you would turn to Loyle two

24  eight two.  282.  Let me know when you get there.

25  **A.      I'm there.**

1   Q.     All right.  This is your July of 2018 --

2   A.     Yes.

3   Q.     -- statement, right?

4   A.     Yes.

5   Q.     All right.  And you have a beginning balance of

6   11,500, this is on page 282?

7   A.     Yes.

8   Q.     And deposits of 3,000?

9   A.     Yes.

10  Q.     Okay, so about 14,500 approximately, right?

11  A.     Right.

12  Q.     And a large part of that is because of those lump

13  sum payments you just mentioned, right?

14  A.     Correct.

15  Q.     Okay.  So if we move over to 283, on July 6th, and

16  July 9th, there's three payments:  350 on July 6th; 370

17  on July 6th; and 350 on July 9th.

18         Do you know what those were for?

19  A.     Um, I'm sorry, I -- I don't recall, that was

20  sometime ago.

21  Q.     Fair enough.  Do you have any idea if they might

22  have been for soccer?

23  A.     I was making the payments?  Not receiving that

24  money?  Yeah.  That could very well be soccer.  That's

25  something that we apparently enjoy spending our money on.

1  Q.     So those payments add up to $1070 and there's

2  nothing else that you can think of as you're sitting here

3  today that you spent $1,070 on that week in July.

4         I know it was back in '18, is that right?

5  A.     Yeah, I'm very sorry, I don't know.  I -- I'm

6  looking here that, um, I was working for a company called

7  Boston Education International and I did have to buy a

8  passport and I'm wondering if maybe that has something to

9  do with that.

10        Not buy a passport but you understand we have to

11  update my passport and I recall that being expensive and

12  it was right around that time I think that I updated

13  that.

14  Q.     Okay.

15  A.     So could have been that, could have been soccer, I

16  don't recall.  I apologize.

17  Q.     And you just referred to, on page 282, the Boston

18  Education which is under your money market account?

19  A.     Yeah.

20  Q.     And that deposit, that's your paycheck from your

21  part-time job at Boston Education?

22  A.     Correct.

23  Q.     For $3,060?

24  A.     Yes.  At that particular time.  That

25  wasn't -- that wasn't commonplace.

1  Q.      So moving on to page 283, I see that on July 10th

2  you had a charge at Sam's Club in Colby, Kansas, is that

3  right?  July 10th?  For $13.07?  Or $13.22, it's one of

4  those?

5  A.      Yeah, I see it.

6  Q.      Okay.  So then if we go down slightly on that same

7  page, 283, to July 11th, your charges go from Colby and

8  then they're in Aurora, Colorado?

9  A.      Yes.

10  Q.      So I believe Paris mentioned earlier in his

11  testimony that his mother has a condo in Colorado, is

12  that correct?

13  A.      Correct.  And my family lives there.

14  Q.      And that's where you go for your summer vacation?

15  A.      True.

16  Q.      Okay.  Is that what you were doing in this

17  instance?

18  A.      Definitely.

19  Q.      Okay.  And then if we go to page 284, and then

20  move on to 285, it looks like your summer vacation was

21  over July 30th of 2018.  That's when your charges start

22  to move back into Wichita, Kansas.

23  A.      That's probably right.

24  Q.      Okay.  So at least from your checking account it

25  appears that you went to Colorado around July 11th and

1  came back around July 30th?

2  **A.      Yes.**

3  Q.      Okay.  All right.  And then moving on to page 287.

4  After your July statement you started August with a

5  beginning balance of $5,427.19?

6  **A.      Yes.**

7  Q.      And you ended with a balance of zero, right?

8  **A.      Correct.**

9  Q.      All right.  If we move on to Loyle 308.

10  **A.      I'm there.**

11  Q.      Okay.  March 2nd, 2019?

12  **A.      Yes.**

13  Q.      This is that Blue Sombrero sports charge, $175 and

14  this is when you were paying for kids' soccer fees?

15  **A.      Sometimes I pay for it.  He -- Paris usually pays**

16  **for it.**

17  Q.      But you pay for it occasionally?

18  **A.      Sometimes.  If it's like due and he's at work then**

19  **I'll pay for it.**

20  Q.      Okay, fair enough.  And this is one of those

21  instances where you paid the soccer fees, right?

22  **A.      Yes.**

23  Q.      Okay.  Then if we move to Loyle 313.

24  **A.      Yes.**

25  Q.      So let's back up one page, Loyle 312.

1  A.     Okay.

2  Q.     At the very bottom of that page you have a deposit

3  from the IRS.  I presume that was your income tax refund

4  from that year?

5  A.     Correct.

6  Q.     Okay.  And at some point you've moved receiving

7  the income tax refunds from your account to Paris'

8  account, correct?

9  A.     Correct, yes.

10  Q.     And then if we move to 313, now, on -- on April

11  8th, 2019 there's a Golden Plains Credit Union charge for

12  $1800?

13  A.     Yes.

14  Q.     Do you -- what's that for?

15  A.     Um, I probably -- I don't really recall but I

16  probably took money out from the tax refund and put some

17  of it to Paris or something, I -- I really don't recall,

18  I'm sorry, I'm just trying to --

19  Q.     Do you have an account at Golden Plains Credit

20  Union?

21  A.     So, no, I don't technically but credit unions

22  are -- do shared branch banking and so Golden Plains is

23  the bank that I use in Wichita.  I've had -- I actually

24  opened Westerra when I was 16 and everywhere we've lived

25  I have used shared branch banking to access my account.

1  Q.     Okay.  So when we see Golden Plains Credit Union

2  charges and some of those similar charges in here is

3  because your bank that you actually use, Westerra, is in

4  Colorado?

5  **A.     That's correct.**

6  Q.     And you need a local branch?

7  **A.     Correct.**

8  Q.     Okay.  Then if we move on to 316, on May 31st,

9  2019 another Blue Sombrero soccer charge for $100, right?

10 **A.     So these are back in 2018 and early 2019 we**

11 **started switching things to primarily Paris doing the**

12 **soccer.  There was a time period where I had the only**

13 **income and so we -- as he started making money we started**

14 **switching over some of the things.**

15 Q.     Okay.  And he was employed as a chiropractor in

16 2019, wasn't he?

17 **A.     Yes, he was, correct.  Sorry I was looking at 2018**

18 **but, yeah.**

19 Q.     Okay.  If we flip the page to 319, on June 23rd,

20 2019 we have another debit card transaction, Blue

21 Sombrero for soccer, for $400, right?

22 **A.     Yes.**

23 Q.     Okay.  Then if we move to 325, this is August of

24 2019, we have a charge on August 13 for ACH BCC, I would

25 assume that's Butler Community College?

1   A.      I'm sure it is.

2   Q.      Of $200 for your -- paying for the fees for your

3   oldest daughter's secondary education, right?

4   A.      Yes.

5   Q.      Then if we move to 328.

6           September 2019 two more charges for Butler County

7   Community College, $200 for each of those charges, right?

8   A.      I'm sorry, I'm not with you.

9   Q.      Sorry.  On 328?

10  A.      I'm on another --

11  Q.      Page 328?

12  A.      Yes.

13  Q.      September 17th of 2019, towards the bottom of the

14  page.

15  A.      Oh, I see that now, yes.

16  Q.      We have two $200 for a total of $400?

17  A.      Correct.

18  Q.      To Butler County Community College.  Again, for

19  your daughter's secondary education, right?

20  A.      Correct.

21  Q.      And if we move to 337, three three seven.

22  A.      Yes.

23  Q.      All right.  December 13th, 2019 we have another

24  $200 charge to Butler County Community College again for

25  your daughter, right?

1  **A.      Yes.**

2  Q.      Okay.  And then 341?

3  **A.      Yes.**

4  Q.      All right.  January 1st -- excuse me, January is

5  the first month.

6         January 17th of 2020 we have another Butler County

7  charge for your daughter of 326.45, right?

8  **A.      Correct.**

9  Q.      Okay.  Then if we move to page 344.

10         February 19th, 2020, towards the bottom of the

11  page, two more Butler County Community College tuition

12  payments, 296.45 for each payment.

13  **A.      Yes.**

14  Q.      So there's two payments of 296.45, right?

15  **A.      Yes.**

16  Q.      Okay.  Then if we go to 387, February 16th of this

17  year, 2021, towards the top of the page, we have a $70

18  charge to Butler County Community College for your

19  daughter, right?

20  **A.      Correct.**

21  Q.      Okay.

22  **A.      I know it's complicated but you keep calling those**

23  **secondary education because it is technically, um, but**

24  **she couldn't get a loan to pay for that and going after**

25  **associate's degree, the only way for her to do that is**

1  **through cash.**

2  Q.     Is for you to do it.  Okay.

3  **A.     I just wanted to --**

4  Q.     Okay.  Let's see here.

5         And you said in your direct examination that if

6  you work until the age 67 then that's when you're

7  eligible for the highest amount of benefits through your

8  employer, is that right?

9  **A.     Um, correct.**

10  Q.     Okay.

11         MR. SHEERN:  I don't have any further questions.

12  Thank you very much.

13             THE COURT:  Mr. Gellis.

14                     CROSS-EXAMINATION

15  MR. GELLIS:

16  Q.     Good afternoon, ma'am.  I just have a few

17  follow-up questions for you.

18         You mentioned, when your attorney was questioning

19  you, you went through the -- your bank account and there

20  was a charge for Hulu that was monthly?

21  **A.     Yes.**

22  Q.     There's a charge for Netflix which is monthly?

23  **A.     Yes.**

24  Q.     Are there any other online subscriptions that you

25  have that you pay for each month?

 1  A.      I have Audible.

 2  Q.      Okay.  I think it's -- it was $69 for the Hulu and

 3  $17 for Netflix.  Do you know how much the Audible was

 4  each month?

 5  A.      Yes, 14.95.

 6  Q.      14.95.  All right.

 7          You also mentioned that you sometimes will

 8  transfer money each month to -- to your children for gas.

 9  A.      I do.  I have.

10  Q.      Do any of your children have jobs?

11  A.      Uh, they do sometimes when they can.  They're

12  obviously very busy with school and soccer.

13  Q.      Okay.  Do they pay for any of their own expenses

14  in terms of gas or auto maintenance or things like that

15  on their vehicle?

16  A.      They sometimes do.  They are, you know, again,

17  very busy but they, uh, they practically

18  aren't -- they'll get, you know, money, from a

19  grandparent, for instance, for their birthday and they'll

20  put it in their savings account, that's why it is hard to

21  see that money being lumped into us because that's not

22  all from us.  A large portion of that has been choosing

23  to save.  You know, they're really financially

24  responsible, they're good kids.

25          But they do help pay for them, I mean they pay for

1 gas sometimes but I give $40.  Our oldest has to travel

2 farther to do their associate's in high school.  So she

3 is not driving four miles to the high school, she is

4 driving, um, to a Rose Hill location and so I like to

5 help her pay for that.

6 Q.      All right.  You and your husband bought your home

7 in 2015, correct?

8 A.      That's correct.

9 Q.      Have you looked into refinancing that at all since

10 then or is that still the original mortgage that you have

11 on it?

12 A.      We have not looked into refinancing it.  I have a

13 good rate and it would complicate things to add into it.

14           THE COURT:  I'm sorry, what did you just say?

15           THE WITNESS:  I said it could complicate things

16 to try and refinance and add them to it and given our

17 situation with the bankruptcy it's not -- this is not a

18 good time to attempt to do those things.

19 BY MR. GELLIS:

20 Q.      Have you looked in to getting any kind of a home

21 equity loan to pay for any of the additional expenses

22 that you are talking about you may need to make repairs

23 on the house?

24 A.      I have not.  Again, I think our situation

25 is -- needs us to get through this first before we do

1  **anything of that nature.**

2  Q.     I want to make sure I understand something that

3  you said when you were on your direct testimony.  And

4  correct me if I'm wrong.

5       I believe what you said was that your original

6  plan when Paris went to medical school was that he was

7  going to come out of medical school, you anticipated he

8  was going to get a residency --

9  **A.     Yes.**

10 Q.     -- and he was going to be making between 250 and

11 $300,000 when he first came out of medical school?

12 **A.     Sure, yes.**

13 Q.     And the plan was that between that and your

14 teacher's salary you would be able to pay off all of

15 these loans within five years?

16 **A.     No problem.  Absolutely.  We crunched the numbers**

17 **before we made that decision.**

18 Q.     Had you and your husband saved any money before he

19 decided to go into medical school?

20 **A.     Uh, no.  Paris is always the saver so I am sure he**

21 **had money saved.  I did not, no.  I am very good at**

22 **paying the fixed bills and sticking to that budget and**

23 **he's the saver, so I am sure that he did.  That's a good**

24 **question for him.**

25 Q.     Well, you were married when he was -- you were

 1  living in Colorado and he was a chiropractor, had his own

 2  chiropractic business, correct?

 3  **A.     Yes.**

 4  Q.     Do you know whether he had saved any money before

 5  going to medical school?

 6  **A.     You know, we keep our accounts separate but I -- I**

 7  **know how he does money and I'm certain he had money**

 8  **saved.  But not much to be honest.  We -- we were relying**

 9  **on my income, and I worked, um, full-time from home and**

10  **that's how we took care of the kids.**

11  **      If he went to medical school with three children,**

12  **we left when our young -- our third was three weeks old.**

13  **He accomplished that degree with a -- with a large amount**

14  **of stuff going on in his life.**

15           MR. GELLIS:  Thank you, ma'am, I don't have

16  anything further.

17           THE WITNESS:  Okay.

18           THE COURT:  Ms. Bailey, anything?

19                 REDIRECT EXAMINATION

20  BY MS. BAILEY:

21  Q.     Um, just -- just to clarify, your oldest that you

22  were paying the Butler fees on, how old is she now?

23  **A.     She just turned 18.**

24  Q.     Okay.  And so I think Paris said earlier she got

25  her associate's.  She has an associate's now, too?

1  A.      She is one of four kids who accomplished getting

2  an associate's while working on her diploma.  It's a

3  program that is very unique and, um, it allows the kids

4  to get that -- that higher degree while still in school

5  at a major discount that is not ordinarily -- that's a

6  huge savings.  We were absolutely saving money moving

7  forward for her --

8  Q.      Okay.

9  A.      -- keeping her from the situation we're in.

10 Q.      Okay.  And you already went through the tax return

11 with the credit on that for those.

12         Are you going to be claiming her on your tax

13 returns this year also?

14 A.      Uh, yeah, I would like to.

15 Q.      Okay.  I mean, is she working right now?

16 A.      No, I -- I think she just picked up a job to be a

17 lifeguard and she will not make much money or work many

18 hours.  She is very busy, but...

19 Q.      Okay.  So if you claim her on your taxes again

20 this year you'll presumably get another credit on your

21 taxes for the tuition contribution?

22 A.      Right, contribution to her -- anything we

23 contribute to her college, yes.

24 Q.      Okay.

25              MS. BAILEY:  That is all the questions I have,

1   Your Honor.

2           THE COURT:  Okay.

3           MR. SHEERN:  I have nothing further with the

4   witness.

5       Thank you, Judge.

6           MR. GELLIS:  Nothing further, Your Honor.

7           THE COURT:  All right.  Ma'am, you may step

8   down.

9       Ms. Bailey, any other witnesses?

10          MS. BAILEY:  No, Your Honor.

11          THE COURT:  Any other evidence?

12          MS. BAILEY:  No, Your Honor.

13          THE COURT:  All right.

14      Mr. Sheern.

15          MR. SHEERN:  Your Honor, I have no evidence to

16  put on today other than to direct the Court to the

17  stipulations for the Department of Education and the

18  Navient stipulations that have been referred to

19  throughout the trial today.  But I have nothing in

20  addition to that.

21      Thank you.

22          THE COURT:  Okay.

23      So, the plaintiffs have rested.  The DOE is

24  resting with pointing me to the stipulations.

25          And how about Navient?

1          MR. GELLIS:  We have no further exhibits or

2    evidence other than the stipulations that have been

3    entered with regard to Navient.  And we would also direct

4    the Court towards the unsworn affidavit of Petra Shipman,

5    which is Exhibit 13 as well.

6          THE COURT:  All right.  Court will take notice

7    of all of those stipulations.

8          All right.  Are you all prepared to make a few

9    closing remarks now?

10         Okay.  Go ahead, Ms. Bailey.

11         MS. BAILEY:  Thank you, Your Honor.

12         Your Honor, what we've seen here today is a family

13   that is struggling with their student loans.  We're not

14   talking about a case where they owe $70,000 in student

15   loans and have filed this adversary proceeding.  They

16   still owe $435,000 of student loans.  They will never

17   repay them.

18         Paris Loyle did not qualify for his home mortgage

19   loan.  He can't qualify for a car loan on his own.  He's

20   49.  He doesn't need to be under this burden of the

21   student loans for the rest of his life.  Most of Paris'

22   loans are from the '80s and '90s except for 10,000 from

23   the Department of Education and the 55,000 from Navient.

24         The current monthly interest on these loans is

25   about 1800 a month.  The Loyles cannot afford to repay

1  these student loans in their current situation and

2  maintain any sort of decent living.  If they had to repay

3  these student loans over, let's say a 20-year repayment

4  period, the payment would be so much that they would have

5  to cut all activities for their children, and other

6  expenses as well, because the activities that they pay

7  for for their children don't even cover the amount that

8  they would have to pay on a monthly basis to actually be

9  repaying on these student loans.

10       These are people that drive old cars.  Their

11  newest car is a 2012 Toyota Camry and I would guess that

12  they're probably going to need replacement cars at some

13  point.  The only real extravagance they have is the

14  soccer for their kids and I think they made a good

15  argument that, uh, that it helps the kids.  It certainly

16  helped them both get scholarships to college.

17       Paris is not currently putting anything away for

18  retirement and he needs to be doing that.  I think

19  that -- that the budget information shows that they

20  cannot afford to currently repay $435,000 in student loan

21  debt on their current budget.

22       On the second prong of the *Brunner* test, they are

23  both -- they both have maximized their income for the

24  most part.  The kids are going to be growing up and

25  leaving the house, yes.  But even when the household is

1  just the two of them in 13, 14 years, a repay program,

2  which is of course what they're encouraged to be in,

3  still wouldn't even be paying the interest on the loans.

4  So, again, these loans are never going to be repaid.

5       On the Navient loan, um, Paris has paid 21,000

6  back on this loan and the balance is still one and a half

7  times what it was when he borrowed the money.  They've

8  been making payments consistently, been in forbearance

9  programs, um, different income based repayment programs.

10  They've reconsolidated these loans.

11       I think that the payment history and the history

12  of their loan taking out, all shows that they have made a

13  good faith effort on these -- these loans to pay them.

14  And that they're filing this in good faith as well

15  because they've seen the writing on the wall that the

16  loans will never be repaid.

17       There are no income based repayment programs for

18  the Navient private loans.  The maturity date is 2039 and

19  whatever is not paid off at that time is -- my

20  understanding of the loan, is that it is a lump sum at

21  that point is immediately due, whatever's left.

22       Your Honor, I think you could see these people

23  work hard.  They've tried to provide a better financial

24  future for themselves by going from -- by Paris going to

25  medical school and by Katherine going to graduate school.

Case 20-05073    Doc# 130    Filed 09/01/21    Page 128 of 148

1  For Paris medical school, sadly, ended up being a bust.

2  For Katherine, it's moved her to the top of the pay scale

3  at her -- at any public school probably at least in the

4  area.

5        Although Paris wasn't able to get a residency

6  after med school, only -- really only a portion of the

7  amount that we're looking at today is from that medical

8  school, which is the Navient loan.  So 55,000 of the 435

9  that is owed is from that medical school.

10        Let's see.  I think that to me, Your Honor, what's

11  most glaring is that the amount of the student loans

12  currently at issue in this case, they are more than 3-1/2

13  times what the Loyles' AGI was in 2020.  And that's a

14  pretty glaring amount.

15        So we would ask that you find undue hardship and

16  allow these student loans to be discharged.  I believe

17  that that will enable the Loyles to really obtain the

18  fresh start that they need from their Chapter 7

19  bankruptcy case.  Thank you.

20            THE COURT:  Thank you.

21        Before you step back, I have just a question or

22  two to make sure I have all of the information that I

23  need.

24        If I wanted to count up all of the payments that

25  have been made over the years by each of them, am I

1   correct that that would be contained in the DOE and the

2   Navient stipulations?

3       MS. BAILEY:  Uh, well, Your Honor, I know that

4   the Department of Education's stipulations say how many

5   payments were made.  They do not say -- they do not

6   include the zero dollar payments but it does say how many

7   payments were made with dollar amounts.

8       I don't believe that the Navient one says a number

9   of payments but it does say the amount paid on the loans.

10  Which was 21,000.

11      THE COURT:  Okay.  And then I want to make sure

12  I didn't miss something.

13      Was there testimony maybe from Mr. Loyle about the

14  reason for the forbearances in 2019 that ended up going

15  through COVID hitting and then the forbearance from the

16  CARES Act?

17      MS. BAILEY:  No, I don't believe there was.

18      THE COURT:  Okay.  All right.

19      And your summary document, 58 and 59, would point

20  me to the amount of accruing interest, correct?

21      MS. BAILEY:  Correct, Your Honor.

22      THE COURT:  Okay.  Thank you.

23      MS. BAILEY:  Thank you.

24      THE COURT:  All right.

25      Mr. Sheern, thank you.

1           MR. SHEERN:  Thank you, Judge.  May it please
2   the Court.
3           The plaintiffs' arguments in this case seem to
4   come down to two things:  The first is that the
5   plaintiffs admittedly have disposable income, and they
6   have a significant amount of it, but they want to spend
7   it on things like soccer and various other things shown
8   in their finances, instead of repaying their student
9   loans.  And I'll get more into that in a minute and why
10  that, under the case law, is not acceptable.
11          The second is that essentially the, What's the
12  point argument?  I can't pay back the loan entirely in
13  the rest of my working career over the next 20 or 25
14  years, so why should I pay anything at all?  And that
15  argument is advanced most often by debtors who have
16  accrued such a significant amount of student loan debt,
17  as we see in this case, and it almost seems that they ask
18  to be rewarded for having more debt as opposed to less
19  debt.
20          As Ms. Bailey mentioned, we're not talking about a
21  case where a debtor owes 70,000, we are talking where a
22  debtor -- two debtors put together owe over $400,000 and
23  the interest is significant.  But these debtors were
24  adults.  They went through college.  They have advanced
25  degrees.  They work in what I would consider advanced

1  professions and they knew what they were doing and they

2  knew that they had an obligation to repay those loans at

3  some point and that they accrued interest over the life

4  of the loans.  And we're talking about loans that have

5  been taken out consistently over the past 25 years.

6          So they should be required to pay something back

7  into the system and should not be able to escape

8  repayment entirely simply because they went about

9  accruing such a significant amount of debt.  They

10 shouldn't be rewarded for it.

11         What they have to do today, though, and what the

12 Court should focus on is that they have to prove the

13 three prongs of the *Brunner* test like we talked about

14 earlier.  And that burden is on them.  The case law is

15 clear that if they don't prove it today, they don't get a

16 discharge.  It's our position that they have not proved

17 those prongs today.

18         The first prong, as you know, is the minimal

19 standard of living prong.  We review their income and

20 expenses and see if they can show that they can't

21 maintain a minimal standard of living while repaying the

22 debt.  Minimal standard of living is -- is food, shelter,

23 care, medical care, those sorts of things for them and

24 their dependents.

25         Courts have often looked to the Federal Poverty

1  Guidelines as one measure of whether someone is -- is

2  maintaining a minimal standard of living.

3        Plaintiffs' 2020 Adjusted Gross Income was

4  $119,604.  That's three times the 2021 Federal Poverty

5  Guidelines for a family of seven, which are $40,000 --

6  $40,120.  The plaintiffs have triple the Federal Poverty

7  Guidelines which in and itself disproves the minimal

8  standard of living argument.

9        But we move on from that.  Courts have generally

10  considered tax refunds as part of the debtor's monthly

11  income.

12        Now I don't think these two cases were in our

13  pretrial order so I can give them to you today,

14  *Piccinino*, which is P-i-c-c-i-n-i-n-o, *versus Department*

15  *of Education*, 577 BR 560, it's an Eighth Circuit BAP case

16  from 2017; and *Gesualdi*, which is G-e-s-u-a-l-d-i, *versus*

17  *Educational Credit Management Corporation*, that's 505 BR

18  330, from the Southern District of Florida Bankruptcy

19  Court in 2013.

20        Now the *Gesualdi* case includes a string cite of

21  four or five other cases which also, from different

22  districts, had the same holding that tax refunds are

23  considered a part of the debtor's monthly income and not

24  something that they can essentially withhold to make

25  payments as they choose.  And should -- it has to be

1  considered when the repayment is looked at for the

2  student loans.

3        So in this case, we have tax refunds since 2015,

4  the last six years, totalling $32,161.  In addition to

5  that, we have two stimulus payments totalling $9,100,

6  which is a little unique.  We don't normally see stimulus

7  payments in these cases but I would argue in this

8  situation it should be treated exactly the same as a tax

9  refund because both debtors remained employed and their

10  income did not change and was not reduced due to COVID,

11  which was the purpose of the stimulus payments.  So, in

12  essence, they got an extra tax refund this year.  And

13  last year.

14        So when you lump those together you come up with

15  $41,261 in payments above and beyond their salary that

16  they have received since 2015.  That's a significant

17  amount.  There was no evidence here today that was set

18  forth that show that they have taken anything out of that

19  significant $40,000 amount and used it to pay down their

20  student loans.  We saw no significant lump sum payments

21  from that amount of money.

22        Now, according to the case law that I just

23  mentioned, we are to take that total amount and amortize

24  it over -- prorate it over monthly to see what it would

25  add to their disposable income.  In this case, $41,261

1  over the last six years [sic] is 6876 -- six eight seven

2  six dollars a year, or $573 a month.  So that -- this

3  alone gives them an additional almost $575 a month that

4  needs to be considered for their disposable income.

5        Now if we turn to Exhibit 56, which was our

6  stipulated amount of their average income, it had their

7  monthly income, Exhibit 56 had a net monthly income,

8  combined for the two debtors of $8,153.82.  When we apply

9  the case law and we add the tax refund and stimulus money

10  with the net income of Exhibit 56, we have a net monthly

11  income of $8,726.82.  I would argue to you today that a

12  married couple living in the middle of Kansas that nets

13  $8700 a month can afford to pay back some of their

14  student loans.

15        Well, then when we compare that to the expenses,

16  to see what the disposable income is for this couple.

17  The expenses in their interrogatory, which is stipulated

18  to in the Navient stipulation, that amount was $5,660 in

19  monthly expenses.

20        We also look at Schedule J.  Now in Schedule J it

21  includes a daycare cost, which the debtors admitted that

22  they no longer pay of $1200, so we remove that from a

23  Schedule J expense.  And it also includes on Line 17

24  student loan payments of $920.

25        So if we take those out to see what their

Case 20-05073    Doc# 130    Filed 09/01/21    Page 135 of 148

1  disposable income is, without including the daycare and

2  what -- and the student loan payments, we get a

3  disposable income from Schedule J of $6093.

4       So whichever one of those we use we have a

5  significant amount of disposable monthly income.

6       If we use the interrogatory, 5660, we have

7  $3,066.82 in disposable income every month.

8       If we use the Schedule J we have $2,633.82 per

9  month in disposable income.

10      That is enough disposable income in either

11 situation that the debtors can make some sort of payment

12 back into the student loan system that they benefitted

13 from.  And with payments under the IBR plan, in this case

14 the repay for the couple together, for the next year,

15 would be $495.20.  When you combine that even with the

16 Navient payment, they're well within the disposable

17 income to make those two payments.

18      In addition, to consider for the minimum standard

19 of living argument, they have almost $24,000 in one

20 checking account right now.

21      So we have a couple with a net income monthly of

22 over 8,000, which is almost $100,000 a year living in

23 Central Kansas.  And they're not destitute, they're not

24 even close.  So they have not proven the minimal standard

25 of living prong.

1          Second prong.  They have to show that they have a

2    dire financial condition that's likely to exist for a

3    significant portion of the repayment period.

4          I would argue, first, they haven't met the first

5    prong so they're not able to show that it's likely to

6    continue.  Separately, this case doesn't present anything

7    approaching significant or dire circumstances that are

8    usually seen for a discharge.  There is no illness,

9    there's no disability, the debtors are gainfully

10   employed.  They're in their 40s and they have

11   planned -- they maintain employment and plan to stay

12   employed in the foreseeable future.

13         Third prong:  You have to consider whether the

14   debtors have made a good faith effort to repay their

15   student loan debt.  And when we look at the case law this

16   is measured by their efforts to obtain employment,

17   maximum income, and minimize expenses.  And even if

18   they've maximized income by getting the best jobs that

19   they can, they have not minimized expenses in this case.

20   There are several areas that I think you have to look at

21   to consider for good faith or lack of it.

22         As was pointed out, Paris has paid $2,909.68 to

23   the Department of Education since 2012.  Over the last

24   nine years Paris has paid an average of $323 a year.  Not

25   a month, a year, to the Department of Education.

1      So let's see how that him compares to their
2  expenses.  We looked at their bank records.  I asked them
3  a lot of questions about soccer fees.  And I did some
4  math on here for my closing argument that apparently
5  doesn't even come up with the total fees because I missed
6  some of the soccer fees from one of the other kids.

7      But I came up with that since August in 2018 they
8  had paid at least $6878 in soccer fees.  Apparently it's
9  quite a bit more than that if it's $4,000 a month.  I
10  found $5,227.50 in soccer fees alone since their Chapter
11  7 filing on January 17th of 2019.

12      THE COURT:  I'm sorry, how much?

13      MR. SHEERN:  $5,227.50.  But like I said, that's
14  probably short because there was another set of soccer
15  fees in there that I was unable to identify in my review
16  of the bank records.

17      That's twice as much in soccer fees since they
18  filed Chapter 7 than Paris has paid the Department of
19  Education since 2012.  That does not show good faith.

20      The Butler County Community College payments.
21  Judge Berger has a case, it's *In re: Martha Louise*
22  *Standish,* it is S-t-a-n-d-i-s-h.  It's an adversary case
23  number from Kansas, 18-6052.  In Document 51 Judge Berger
24  held that using an inheritance to pay for a daughter's
25  education and not the debtor's own student loans defeated

1  the good faith prong.

2       The debtor in that case had inherited about

3  $45,000 from her mother's estate, which is very similar

4  to the amount the debtors have received in this case from

5  their tax refunds.  The debtor -- the debtor in the

6  *Standish* case decided to use that money to pay for her

7  daughter to go to college.  And the Court found that

8  while that was notable, that the desire to use -- to pay

9  the money for her daughter's education is understandable,

10 it was not necessary to maintain a minimal standard of

11 living.  It was not a finding of good faith.

12      And even though the debtor in the *Standish* case

13 actually clearly met the first two prongs of the *Brunner*

14 test, because she spent a significant amount of money on

15 her daughter's education instead of paying back her

16 student loans, Judge Berger found that she did not meet

17 the third prong in that case and he found that she could

18 not have her loans discharged.

19      Here, if we look at the numbers, of the bank

20 accounts that we looked at today, Paris has paid Butler

21 County Community College $5,606.90.  Katherine has paid

22 Butler County $1794.35.  So that means that together they

23 have paid $7,401.25 since August of 2019.

24      Again, this amount paid for a daughter's

25 education, similar to *Standish*, is three times -- almost

1 three times what's been paid by Paris to the Department

2 of Education since 2012.

3      I think it's important to look at the debtors'

4 finances and their spending in these areas since this

5 adversary case was filed. I find it remarkable that this

6 case was filed on May 12th, 2020 when they asked this

7 Court to discharge their student loans because those

8 loans are a hardship and they're not able to make any

9 payments from now on towards that loan.

10      But then we look at Loyle page two two eight in

11 Exhibit 9, 228, in between soccer and Butler County

12 spending, just then, within two months of the adversary

13 case being filed, they spent $4,561.50 on soccer and

14 their daughter's education, within two months after

15 filing a lawsuit to discharge these student loans.

16      And I think in addition to that, it's -- it's just

17 an example of excessive spending as opposed to true undue

18 hardship.

19      A prime example for Katherine on that -- on that

20 front, going back to July and August of 2018, Exhibit 10

21 in July '18, Katherine had a balance in her checking

22 account of, with deposits, $14,500. By the end of

23 August, that balance was zero. So what happened?

24      Well, if you look at those bank records they spent

25 $9,000 in the month of July and a significant amount of

1  that was spent on vacation in Colorado.  So I get, again,

2  looking at those bank records it does not show the

3  minimized spending requirement that's required to prove

4  the third prong.  And so we would posit that the debtors

5  have not met any of the three prongs in this case and

6  that they have not met their burden to discharge their

7  student loans.

8        Thank you, unless you have any further questions.

9        THE COURT:  No, sir, thank you.

10        MR. SHEERN:  Thank you.

11        THE COURT:  All right.  And Navient's close.

12        And just a housekeeping matter.

13        Annette, have you communicated with the CSOs?

14        COURTROOM DEPUTY:  Jana has.

15        THE COURT:  All right.

16        COURTROOM DEPUTY:  She will let them know when

17  we are done.

18        THE COURT:  Thank you.

19        Sorry for the interruption, go ahead.

20        MR. GELLIS:  Thank you, Your Honor.  And I will

21  be brief.

22        Counsel for the Department of Education summed up

23  the arguments very -- very cleanly and succinctly.  In

24  regards to the -- both the Department, as well as

25  Navient, with regard to these loans and with regard to

1  the debtors we additionally do not believe that the

2  debtors have met any of the three prongs, particularly

3  with regard to the burden of it being -- of not being

4  able to maintain a minimal standard of living if they're

5  forced to repay the loans.  We believe that the evidence

6  and the bank records and the tax returns clearly indicate

7  that is not the case.

8         With regard specifically to the, uh -- the amount

9  of money being spent on soccer, certainly, while that

10 is -- is a laudable goal for any parent, I think Mrs.

11 Loyle summed that up very clearly when during her

12 testimony she said they enjoy spending money on the kids'

13 soccer.  And that appears to define disposable income

14 pretty clearly, that that's what they are choosing to

15 spend the money on, which is -- is their choice but

16 certainly can be used to defeat the request to have these

17 loans discharged based on their claims that they're

18 unable to -- to make those payments.

19        With regard to the Navient loan specifically,

20 these were loans that were taken out for the purpose of

21 Paris to attend medical school after having already

22 obtained an undergraduate degree and a chiropractic

23 degree.  This was -- these were adults who were married,

24 had more than one -- at least one child at that point,

25 understood that they already had over $200,000 in

1  combined student debt between them, and made the

2  conscious decision to take out more debt to attend

3  further school and understood that they were going to owe

4  that money back.  Certainly Paris realizes that -- that

5  that was owed back.

6      With regard to the issue on the amount of

7  interest, that was clear in the loan documents.  The

8  amount that is due is -- is what is due.  This is a

9  situation of the debtors' own making.  They were not

10  placed in this situation and it was a scenario that

11  accumulated over, as counsel pointed out, over 25 years.

12      They live in a -- in a very nice house and have --

13  have gainful employment.  There is no health concern.

14  There is no anticipation that their income is going to

15  decrease.  In fact, as their children graduate from high

16  school and move on to college, there is an anticipation

17  that their -- their expenses will likely decrease, which

18  would also defeat one or more of the prongs in *Brunner*.

19      We believe that the debtors have failed to

20  establish at least one, if not more, of the prongs.

21      And I don't normally bring this up but because

22  debtors' counsel did note that there was apparently no

23  income based repayment option with regard to the Navient

24  loan, I will note for the Court that an offer was made to

25  significantly reduce that, lock in an interest rate.

1  Once the -- after the adversary proceeding was filed and

2  no response whatsoever was even received to that.

3         We do not believe that these loans should be

4  discharged at this time, Your Honor.

5         Thank you.

6          THE COURT:  All right.  Thank you.

7         All right.  Thank you all for your work on this.

8  You've taken a lot of information and summarized it and

9  made it accessible to the Court.

10         The only loose ends we have are these last two

11 exhibits that I did admit.  If there is any objection to

12 the math on those exhibits, if you could let the clerk's

13 office know by the end of the week.  And if we hear from

14 you that you do have an objection based on math what

15 we'll do is we'll just schedule a conference call for

16 next week.  I'm going to be out for a few days but I'll

17 be back next week and we can get on the phone and discuss

18 it if that is an issue.

19         Other than that, thank you, again, for your time.

20 Thank you for your testimony.  These are difficult

21 issues, not only for you but for a lot of folks right

22 now.  And the personal aspect of it is difficult, the

23 legal aspect of it is difficult, and I will take it under

24 advisement and get you my decision as soon as I can but

25 it will -- it will take a little bit of time to pull this

1    together, so all right.

2          Unless any party has anything else?

3            MR. SHEERN:  No, Your Honor.

4            THE COURT:  All right.  We will be in recess

5    then.  And thank you again.

6          (Proceedings conclude at 5:11 p.m.)

7

8          *****************************************

9

10                   C E R T I F I C A T E

11

12          I, Jana L. McKinney, certified shorthand reporter,

13    certify that the foregoing is a correct transcript from

14    the official electronic sound recording of the

15    proceedings in the above-entitled matter.

16          Dated this 27th day of July, 2021.

17

18                     s/ Jana L. McKinney_____

19                     Jana L. McKinney
                       United States Court Reporter
20

21

22

23

24

25

1                    I N D E X

                                                    PAGE
2

3    OPENING STATEMENTS
     MS. BAILEY                                        6
4    MR. SHEERN                                        9
     MR. GELLIS                                       11
5
     **WITNESSES**
6        **FOR THE PLAINTIFF**
         **PARIS LOYLE**
7            Direct Examination                       13
         By Ms. Bailey
8            Cross-Examination                        54
         By Mr. SHEERN
9            Cross-Examination                        70
         By Mr. GELLIS
10           Redirect Examination                     74
         By Ms. Bailey
11           Recross Examination                      77
         By Mr. Sheern
12       **KATHERINE LOYLE**
             Direct Examination
13       By Ms. Bailey
             Cross-Examination                       105
14       By Mr. Sheern
             Cross-Examination                       119
15       Mr. Gellis
             Redirect Examination                    123
16       By Ms. Bailey

17   EXHIBITS                                       ADMD

18   No. 1         Pay stub                           4
     No. 2         Pay stub                           4
19   No. 3         2015 Tax Return                    4
     No. 4         2016 Tax Return                    4
20   No. 5         2017 Tax Return                    4
     No. 6         2018 Tax Return                    4
21   No. 7         2019 Tax Return                    4
     No. 8         2020 Tax Return                    4
22   No. 9         Andover Bank statements            4
     No. 10        Westerra Credit Union              4
23                 Statements
     No. 11        Andover Bank Childrens'            4
24                 Account Statements
     No. 12        KPERS Statement                    4
25   No. 13        Navient's Unsworn Affidavit        4
                   of Petra Shipman

| | | | |
|---|---|---|---|
| 1 | No. 14 | Navient's Application, Promissory Note and | 4 |
| 2 | | Certification | |
| | No. 15 | Navient's Account Summary | 4 |
| 3 | | Electronic Record | |
| | No. 16 | Navient's Payment History | 4 |
| 4 | No. 17 | Paris DOE Promissory Note | 4 |
| | No. 18 | Paris NSLDS Loan History | 4 |
| 5 | No. 19 | Paris NSLDS Loan Detail 1 | 4 |
| | | and Loan Detail 2 | |
| 6 | No. 20 | Paris NSLDS Outstanding | 4 |
| | | Balance History | |
| 7 | No. 21 | Paris DOE Consolidation Loan | 4 |
| | | Origination History Record | |
| 8 | No. 22 | Paris DOE IBR Application | 4 |
| | No. 23 | Paris DOE ACS Servicing | 4 |
| 9 | | History | |
| | No. 24 | Pris DOE Navient Servicing | 4 |
| 10 | | History | |
| | No. 25 | Paris DOE IBR Application | 4 |
| 11 | No. 26 | Paris DOE forbearance | 4 |
| | | Request December 2013 | |
| 12 | No. 27 | Paris DOE COD IDR August | 4 |
| | | 2016 | |
| 13 | No. 28 | Paris DOE IBR Approval | 4 |
| | | Letter | |
| 14 | No. 29 | Paris DOE IDR | 4 |
| | | Recertification | |
| 15 | No. 30 | Paris DOE IBR Approval | 4 |
| | | Letter | |
| 16 | No. 31 | Paris DOE IDR | 4 |
| | | Recertification | |
| 17 | No. 32 | Paris DOE IDR | 4 |
| | | Recertification | |
| 18 | No. 33 | Paris DOE IBR Approval | 4 |
| | | Letter | |
| 19 | No. 34 | Paris DOE Forbearance | 4 |
| | | Request | |
| 20 | No. 35 | Paris DOE Forbearance | 4 |
| | | Request | |
| 21 | No. 36 | Paris DOE Combined Payment | 4 |
| | | History | |
| 22 | No. 37 | Paris DOE Certificate of | 4 |
| | | Indebtedness | |
| 23 | No. 38 | Katherine DOE Promissory | 4 |
| | | Note | |
| 24 | No. 39 | Katherine NSLDS Loan History | 4 |
| | No. 40 | Katherine DOS NSLDS Loan | 4 |
| 25 | | Detail 1 and Loan Detail 2 | |

```
 1

 2    No. 41        Katherine DOS NSLDS                4
                    Outstanding Amount Balance
 3                  History
      No. 42        Katherine DOE Consolidation        4
 4                  Loan Origination History
                    Record
 5    No. 43        Katherine DOE ACS Servicing        4
                    History
 6    No. 44        Katherine DOE FedLoan              4
                    Servicing History
 7    No. 45        Katherine DOE COD IDR              4
      No. 46        Katherine DOE COD IDR              4
 8    No. 47        Katherine DOE IDR APP              4
      No. 48        Katherine DOE IDR APP              4
 9    No. 49        Katherine DOE COD IDR              4
      No. 50        Katherine DOE COD IDR              4
10    No. 51        Katherine DOE COD IDR              4
      No. 52        Katherine DOE Combined             4
11                  Payment History
      No. 53        Katherine DOE Certificate of       4
12                  Indebtedness
      No. 54        Katherine DOE PSLF                 4
13                  Employment Certification
                    Form
14    No. 55        Katherine DOE ECF Denial           4
                    Letter
15    No. 56        Summary Exhibit of Loyle           4
                    Income
16    No. 57        Summary Exhibit                   96
      No. 58        Summary Exhibit                   98
17

18    CLOSING ARGUMENTS
           By MS. BAILEY                             126
19         By MR. SHEERN                             131
           By MR. GELLIS                             141
20

21    REPORTER'S CERTIFICATE                         145

22

23

24

25
```