SO ORDERED.

SIGNED this 24th day of February, 2022.



Mitchell L. Herren
United States Bankruptcy Judge

---

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: | |
| PARIS EDWARD THOMAS LOYLE<br>KATHERINE CHRISTINE LOYLE | Case No. 19-10065<br>Chapter 7 |
| Debtors. | |
| PARIS EDWARD THOMAS LOYLE<br>KATHERINE CHRISTINE LOYLE | |
| Plaintiffs, | |
| vs. | Adv. No. 20-5073 |
| UNITED STATES DEPARTMENT OF<br>EDUCATION, NAVIENT SOLUTIONS<br>LLC, EDUCATIONAL CREDIT<br>MANAGEMENT CORPORATION,<br>FEDLOAN SERVICING,<br>EDUCATIONAL COMPUTER<br>SYSTEMS, INC., R3 EDUCATION<br>INC, FIRSTMARK SERVICES,<br>CITIZENS ONE, TAB BANK, | |

1

AMERICAN EDUCATION
SERVICES, CORONADO STUDENT
LOAN TRUST, FCDB NPSL III
TRUST2014-1,  and LIBERTY BANK
n/k/a THE MIDDLEFILED BANKING
COMPANY.

Defendants.

## MEMORANDUM OPINION

I.  Introduction

Paris and Katherine Loyle are joint debtors in this adversary proceeding seeking to obtain a hardship discharge of $435,320 in student loan debt owing to the United States Department of Education (DoE) and Navient Solutions LLC (Navient). [1] Each month, combined interest in the amount of $1,812 accrues on the debt. Like many student loans, the debtors' loans are in negative amortization. Despite being in repayment plans since 2012, the loans are accruing more interest each month than the amount of the monthly payment, resulting in an ever-rising loan balance.

Much of the trial focused on whether debtors were maximizing their income and minimizing their expenses, and if they had made a good faith

---

[1] Paris and Ms. Loyle Loyle appeared at trial in person and by their attorney January Bailey. The Department of Education appeared by Assistant U.S. Attorney Brian D. Sheern. Navient appeared by its attorney David A. Gellis. The Court notes that plaintiffs obtained default judgment against some of the other named defendants holding student loans in this action. According to plaintiffs' counsel some $100,000 of other student loan debt was discharged prior to trial. The DoE and Navient are the only remaining parties in this adversary proceeding.

2

effort to repay. Applying the applicable law regarding hardship discharges and considering the parties' stipulations of fact, their joint exhibits, and the evidence presented, the Court concludes that requiring the Loyles to repay the total remaining principal and interest on these loans would impose an undue hardship on them and their dependents. However, repaying some of the debt would not be an undue hardship. Therefore, the Court grants a discharge of a portion of the student loan debt.

II. Findings of Fact

    A. Background

The Loyles filed this joint Chapter 7 case in 2019 as a no-asset case and obtained a discharge. They scheduled claims in excess of $840,000, of which nearly $561,000 was comprised of student loan debt. In 2020, the Loyles filed a motion to reopen their case to pursue an undue hardship discharge of their student loans. The motion was granted, and this adversary proceeding was filed pursuant to 11 U.S.C. § 523(a)(8).

At the time of trial, Dr. Loyle was age 49 and Ms. Loyle was age 43. Both are employed in good, stable jobs–Dr. Loyle as a chiropractor and Ms. Loyle as a teacher. They have five children, ages 18, 16, 14, 9 and 6. The oldest child was planning to start her first year of college at a local community college. The debtors and their children are healthy and suffer from no serious medical conditions.

B.    <u>Dr. Loyle</u>

      *1.    Education and Student Loans*

Dr. Loyle attended undergraduate school (1989-1993) at Regis University in Denver, obtaining a degree in English. He then attended Parker College (1995-1997) where he earned his chiropractic degree. After practicing chiropractic in Colorado and Wichita for about nine years, Dr. Loyle decided to attend medical school.

From 2006-2011, he attended American University of Antigua, Kasturba Medical College, on the Caribbean Island of Antiqua,[2] transferred to St. Matthew's University (in the Cayman Islands) and ended in Wyoming following two years of clinical and hospital work requirements in the United States. He passed the first two parts of his medical boards, but thereafter, was unsuccessful in securing entrance in a medical residency program, despite applying for various residency programs for three years. As a result, Dr. Loyle could not obtain his medical license and practice medicine. Regarding his choice to attend medical school outside the United States, Dr. Loyle testified that he would have had to retake the MCAT (Medical College Admission Test) for admission into a U.S. medical school and believed it

---

[2] The Navient stipulation states that its loan to Paris was incurred during his attendance at Kasturba Medical College. Doc. 125, ¶ 13.  Though not explained at trial, Kasturba appears to be a former medical school located in Manipal, Karnataka, India that entered into some type of affiliation or collaboration with American University of Antigua, founded in 2004.

4

would take him an extended period of preparation to study for the MCAT because he had been out of school for nearly ten years. He did not have to retake the MCAT for admission to the medical schools in the Caribbean Islands. He acknowledged that he knew going in it would make his acceptance into a U.S. residency program more difficult, describing his medical degree from the Caribbean as "second class."

Most of Dr. Loyle's student loan debt at issue is not from his medical degree. Dr. Loyle took out a series of student loans for his undergraduate ($5,625) and chiropractic ($90,995) studies totaling $96,620. In 2008, he obtained a $10,250 loan for studies at Davenport University.[3] Thus, the total amount he originally borrowed was $106,870. At the time of the last consolidation of these loans in 2012 under the William D. Ford Federal Direct Loan Program (FDLP), his indebtedness to the DoE had grown to $173,507.[4]

In addition to the DoE consolidation loan, Dr. Loyle funded his medical degree in part by an EXCEL graduate loan that was disbursed in 2006 in two parts totaling $38,399.[5] Navient holds this loan. This is the only student loan related to Dr. Loyle's pursuit of a medical degree at issue in this proceeding.

### 2. *Current Loan Amounts and Repayments*

---

[3] This student loan was incurred while Paris was in medical school and he took a couple of graduate business courses offered by Davenport. Tr. at 43. Why he did so was not explained at trial.
[4] Ex. 57, p. 1 (summary compiled from the National Student Loan Database System [NSLDS]). *See also* Ex. 58, p. 2.
[5] Doc. 125, Navient Stipulations.

**5**

As of May 2020, the balance owed on the Navient loan was $55,706.99.[6] This loan accrues interest at a variable rate, ranging from 1%-8%, and the 25-year term matures in January 2039 (meaning the loan term began in 2014). Dr. Loyle regularly made monthly payments on this loan "for quite awhile," but it appears his last payment was made in February 2019, shortly after filing bankruptcy. The Court's review of Exhibit 16 indicates that Dr. Loyle made monthly payments of $287.95 in 2014; those payments increased to $368.50 in 2015, declined to $251.57 during 2016, increased to $255.02 in 2017 and to $332.75 in the fall of 2018. He intermittently missed some payments during 2015-2016. The most recent monthly payment amount of $332 is now insufficient to pay off the loan by the maturity date due to the accrual and capitalization of interest. Since 2014, he has paid a total of $21,427.43 on the Navient loan–$13,249.81 interest and $7,852.62 principal.[7] This loan is not eligible for an income-based repayment plan.[8] At the beginning interest rate of 5.75%, the Navient loan accrues monthly interest of about $267.

Dr. Loyle currently owes $226,699 on the 2012 DoE consolidation loan.[9] This loan accrues interest at 4.38%, or a monthly interest accrual of $827.[10]

_____

[6] Exhibit 16 shows a balance of $58,161 as of February 11, 2021.
[7] Ex. 58, p. 2.
[8] Doc. 125, Navient Stipulations.
[9] Ex. 58, p. 1. *See also* Ex. 37.
[10] Ex. 58, p. 1.

He applied for income-driven repayment plans upon consolidating his loans in 2012.[11]

The Income-Based Repayment (IBR) plan in which Dr. Loyle enrolled, limit monthly payments to no more than 15% of the amount by which his adjusted gross income (AGI) exceeds 150% of the poverty level income for his family size. The borrower must recertify his income each year and recalculate the monthly payment based upon his current income. The maximum term of an IBR plan is 25 years. The remaining loan balance after 25 years is eligible for forgiveness.

He first applied for and was approved for an IBR plan in October of 2012 at a monthly payment of $67.62. He made his scheduled payments. After one year, Dr. Loyle recertified his income for the IBR plan and his monthly payment increased to $276.37 for the next twelve months. He requested and received a one-month forbearance at the end of 2013 and made his first $276 payment on February 7, 2014, but contemporaneously requested and obtained a hardship deferment, resulting in postponement of the monthly payment from February-August, 2014. He resumed his IBR $276 monthly payment from August-October, 2014. In November, Dr. Loyle again

---

[11] At the time of consolidation, the loan balance was approximately $174,000. Under the DoE's Standard Repayment Plan, Dr. Loyle's fixed monthly payment would have been $878 for 360 months (30 years). Doc. 127, p. 10, ¶33. It appears that Dr. Loyle made few payments toward this student loan debt during the nine years he practiced chiropractic before pursuing the degree in medicine.

7

requested and obtained a one-year deferment to the end of November 2015.

In August 2016 Dr. Loyle recertified his income and reenrolled in the IBR plan. He was approved for a monthly payment of $73.38 for twelve months beginning December 27, 2016. Dr. Loyle made these monthly payments from April-September of 2017, missed October, and made November and December. In October of 2017, Dr. Loyle recertified his income and his IBR plan was approved for a monthly payment of $0 from December 27, 2017 through November 27, 2018.

He recertified his income in December of 2018 and his IBR plan was approved for a $100.27 monthly payment for the next year. He made no payments under the IBR plan during that year.

The Loyles filed their bankruptcy on January 17, 2019, and the DoE placed holds on Dr. Loyle's account until he received his discharge on April 22, 2019. When servicing of the account resumed, Dr. Loyle requested and obtained forbearance from April 2019 through March 28, 2020. By the spring of 2020, the COVID-19 pandemic had arrived. Since then, Dr. Loyle's student loan payments have been suspended by the CARES Act (Coronavirus Aid, Relief, and Economic Security Act). The last extension of the CARES Act is set to expire May 1, 2022.[12]

---

[12] The CARES Act became law on March 27, 2020, providing federal student loan borrowers emergency relief by temporarily suspending loan payments through September 30, 2020. President Trump twice extended the student loan relief through January 31, 2021, and President Biden

8

In summary, in addition to the payments on his Navient loan, during the six-year period from December 7, 2012, through November 27, 2018, Dr. Loyle made 35 payments through an IBR plan totaling $2,909 on his consolidated loan, none of which paid any loan principal. He has made no loan payments on the DoE consolidation loan since November 2018.

### 3. Employment

After Dr. Loyle could not gain admittance into a medical residency program, he searched for a medical research job (to use his medical degree) but had no success in obtaining one because he lacked experience. He eventually returned with his family to Wichita. He was unemployed for a period of time and had difficulty finding a full-time chiropractic job. He worked part-time as a substitute mail carrier for the post office about a year, worked for a pain center in 2018, and ultimately obtained employment at a chiropractic office in 2019, where he remained a salaried employee at the time of trial.[13] Dr. Loyle averages monthly take-home pay of $4,388.[14] He has no retirement benefit through his employment and no retirement savings on his own. He does have health insurance through his job for himself and his

---

extended the relief three times with the final extension set to end May 1, 2022. Under the CARES Act, in addition to pausing loan payments, the Act stopped accrual of interest by setting federal student loan interest rates at 0%.

[13] Dr. Loyle's bank account statements first show a payroll deposit for his employment as a chiropractor at Air Capital Chiropractic on July 19, 2019. *See* Ex. 9

[14] Ex. 56.

children.

    C.    <u>Ms. Loyle</u>

        *1.    Education and Student Loans*

Ms. Loyle attended undergraduate school at the University of Maine (1996-1999) where she obtained a degree in education. She took out student loans totaling $27,406 while at Maine, nearly all of which were unsubsidized.[15]

In 2002 and 2003, she pursued a master's degree from the University of Phoenix while teaching full time. Ms. Loyle incurred student loan debt of $23,204 for her Phoenix studies. With the master's degree she was able to teach online courses from home on a part-time basis as an adjunct instructor for Westwood College. That college later closed.

When the credentials for adjunct instructors changed, Ms. Loyle returned to school at the University of Houston (2008-2010) where she obtained a Master of Arts degree in interdisciplinary studies, to enable her to teach more courses and subjects. She borrowed $20,500 *each* of the three years she was enrolled at Houston.

---

[15] In general, a borrower of direct unsubsidized loans does not have to demonstrate financial need but is responsible for paying interest from the time of disbursement until paid in full. Thus, if the borrower does not pay the interest while in school or during periods of deferment or forbearance, the interest accrues and is capitalized.

**10**

Thus, the total amount Ms. Loyle originally borrowed for her education was $112,110.[16] At the last consolidation of these loans in 2012, her indebtedness to the DoE was $115,359.

### 2.  *Current Loan Amounts and Repayment*

Ms. Loyle currently owes $152,913 on her 2012 DoE direct consolidation loan.[17] This loan accrues interest at 5.63% with a monthly interest accrual of $717.[18]

Like Dr. Loyle, Ms. Loyle initially entered into an IBR plan in May 2012. That plan required a $0 monthly payment for one year. She recertified her income in June 2013 and entered an IBR plan with a $451 monthly payment for the next year.  Ms. Loyle made her scheduled payments through May 2014. She sought and obtained forbearance from July through October of 2014.[19]

Ms. Loyle recertified her income and was approved for an IBR plan monthly payment of $267 for the year 2015. She made her scheduled payments. In 2016 she was granted a series of forbearances to March 2017. In January of 2017, Ms. Loyle submitted a new income-driven repayment application, seeking to change to a different plan with the lowest monthly

---

[16] Tr. at 97.
[17] Ex. 58, p. 1. *See also* Ex. 37.
[18] Doc. 126, ¶ 32. Ms. Loyle's daily accrual is $21.94.
[19] Doc. 126, ¶s 17-20.

11

payment. She was approved for a REPAYE plan with a $290 monthly payment beginning in March of 2017.[20] She failed to make the March payment and in April sought and obtained a forbearance to postpone her monthly payments through early May 2017. She submitted an application with updated income in April 2017. Her REPAYE monthly payment was recalculated as $0 for eight months beginning in July 2017. Ms. Loyle also submitted a Public Service Loan Forgiveness (PSLF) Employment Certification Form in April of 2017 to participate in the PSLF program. That was denied due to incomplete information. She did not resubmit the form and supply the additional information.[21]

In April of 2018, Ms. Loyle recertified her income for the REPAYE plan and was approved with a monthly payment of $51 for twelve months beginning in May. She made her scheduled payments through March 2019. Holds were placed on Ms. Loyle's account from January-April, due to the 2019 bankruptcy filing.[22]

Following recertification of her income for the REPAYE plan, Ms. Loyle was approved for a monthly payment of $99 for one year beginning May of 2019. She made her scheduled payments through March 2020. She recertified

---

[20] The REPAYE plan functions in the same manner as the IBR plan, except that instead of paying no more than 15% of the amount by which the borrower's AGI exceeds 150% of the poverty level income for the family size, the borrower pays no more than 10%.
[21] Doc. 126, ¶s 21-25.
[22] Doc. 126, ¶s 26-27.

**12**

her income and was approved for a monthly REPAYE payment of $165 beginning in June 2020. But no payments were made and holds were placed on her account due to the CARES Act.[23]

To summarize, Ms. Loyle made 67 payments under an IBR or REPAYE Plan from May of 2012 through March 23, 2020, totaling $10,205.[24]

### 3.    Employment

At the time of trial, Ms. Loyle was employed full-time as a teacher at Andover High School. She has been unable to find a part-time online adjunct teaching job at the community college level to supplement her regular income, because unlike her prior online teaching job for Westwood, the Kansas community colleges require the teacher to be on campus.[25]  Ms. Loyle's average monthly take-home pay is $3,765.[26]  As of year-end 2020, her KPERS retirement account had a balance of $22,238.[27] Participation in KPERS is mandatory and Ms. Loyle contributes 6%, or approximately $297 per month.[28]

---

[23] Doc. 126, ¶s 28, 30-31
[24] Doc. 126, ¶ 29. Ex. 58, p. 2.
[25] Westwood College has since closed.
[26] Ex. 56.
[27] Ex. 12.
[28] Ex. 56. Some courts have held that *voluntary* retirement contributions are not necessary to maintain a minimal standard of living and are an unnecessary expense for undue hardship purposes. *See e.g. Gesualdi v. Educ. Credit Mgmt. Corp. (In re Gesualdi),* 505 B.R. 330, 341 (Bankr. S.D. Fla. 2013); *Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner),* 309 B.R. 405, 417 (Bankr. E.D. N.Y. 2009); *Speer v. Educ. Credit Mgmt. Corp. (In re Speer),* 272 B.R. 186, 194 (Bankr. W. D. Tex. 2001). *But see Mendenhall v. Navient Corp. (In re Mendenhall),* 621 B.R. 472, 485-86 (Bankr. D. Idaho 2020) (allowing as a "modest and reasonable" expense, voluntary retirement contributions of 7% of gross income to a Roth 401(k) account).

D.    Current Budget/Disposable Income/Financial Situation

    *1.    Income*

The Court examined the period 2018-2021, a period when both Dr. Loyle and Ms. Loyle were fully employed. The Loyles' joint federal income tax returns for years 2018-2020 reflect that they had AGI of $128,441 and taxable income of $103,594 in 2018,[29] AGI of $109,259 and taxable income of $84,859 in 2019, and AGI of $119,604 and taxable income of $94,804 in 2020.[30]

They received federal tax refunds in each of those years.[31] The sizeable tax refunds were largely generated by the child tax credit.[32] The average annual federal tax refund received by the Loyles from 2018-2020 was $5,594. That amounts to an additional $466 in monthly income. Dr. Loyle maintained that the refunds were held for anticipated maintenance projects around their home, citing the need to repair or replace their fence, a broken porch, air conditioning, and carpet and flooring.[33] No evidence was presented at trial that the Loyles actually spent the refunds on those home maintenance

---

[29] In 2018, Ms. Loyle had additional income of about $4,500 from tutoring.

[30] Ex. 6, 7, 8.

[31] Tax refunds are generally included in debtors' monthly income for undue hardship purposes. *See In re Gesualdi*, 505 B.R. 330, 341*; Gharavi v. U.S. Dept. of Educ. (In re Gharavi),* 335 B.R. 492, 500 (Bankr. D. Mass. 2006); *Piccinino v. Dept. of Educ. (In re Piccinino)*, 577 B.R. 560, 564 (8th Cir. BAP 2017) (applying "totality of the circumstances" test and considering debtor's past, present, and reasonably reliable future financial resources). *But see In re Mendenhall*, 621 B.R. 472, 493 n. 19 (refusing to consider income tax refunds or CARES Act stimulus payments as a regular sources of income that debtor could count on to make loan payments).

[32] *See* Ex. 6 at 072; Ex. 7 at 081; Ex. 8 at 090.

[33] Tr. at 75

14

projects, but there was testimony that a number of household repair projects would be upcoming.

In addition to the tax refunds, the Loyles received federal stimulus payments of $4,900 and $4,200 due to the coronavirus pandemic in 2020 and 2021, respectively.[34] Dr. Loyle testified that his income was not affected by COVID in 2020. Both of them remained employed throughout the pandemic. No evidence was presented that the Loyles applied those stimulus payments to their student loan debt. While the stimulus payments are arguably additional income of $379 per month, those payments are not ongoing and it would be highly speculative to assume continued receipt of that income going forward in the repayment period. It is also worth noting that 11 U.S.C. § 1325(b)(2) excludes such stimulus payments from the definition of disposable income for Chapter 13 plan confirmation purposes. The Court declines to include those payments in the consideration of the Loyles' regular monthly income. The Loyles use of the payments will, however, will be considered later in connection with the good faith inquiry under *Brunner*.

The Loyles combined monthly take-home pay from their salaries is $8,153.[35] When one hundred percent of their average annual tax refund is added to those earnings, their monthly income is $8,619. Whether all of their

---

[34] Doc. 125, ¶s 11-12.
[35] Ex. 56. ($4,388 + $3,765)

15

income tax refunds should be applied to student loan payments will be addressed later in the opinion.

2.    *Expenses*

The Loyles and their five children reside in east Wichita in a home valued at $238,000 that they purchased in 2015. The loan is in Ms. Loyle's name only because Dr. Loyle could not qualify with his student loan debt. The mortgage loan balance is approximately $193,000. They own three vehicles: a 1999 Honda Accord with over 250,000 miles that the oldest daughter drives (gifted to her by a grandmother), a 2005 Honda Pilot with nearly 200,000 miles, and a 2012 Toyota Camry with under $4,000 owed on the loan. Dr. Loyle testified they will need to replace one of the older vehicles in the near future.

Dr. Loyle and Ms. Loyle divide responsibility for paying monthly household expenses between them and pay those expenses from separate bank accounts. Those monthly expenses are as follows:[36]

|         |                                               |
|---------|-----------------------------------------------|
| $ 1,640 | Home mortgage                                 |
| $    15 | Homeowners association dues ($179 per year)   |
| $   250 | Home maintenance                              |
| $    13 | Trash ($40 per quarter)                       |
| $    75 | Water                                         |
| $   400 | Utilities (Electricity/Gas)                   |
| $   250 | Out of pocket medical expenses ($3,000 per year) |
| $ 2,000 | Food/household expenses                       |

[36] The monthly expenses are compiled from trial testimony, the most recent bank statements, Ex. 9 (Dr. Loyle) and Ex. 10 (Ms. Loyle), and to a lesser extent, their schedule J as filed in their 2019 bankruptcy.

16

| | | |
|---|---:|---|
| $ | 175 | Dr. Loyle's professional liability insurance ($2,100 per year) |
| $ | 42 | Dr. Loyle's continuing education ($500 per year) |
| $ | 238 | Cell phones |
| $ | 50 | Internet |
| $ | 69 | Cable (Hulu subscription) |
| $ | 17 | Netflix subscription (entertainment) |
| $ | 15 | Audible books subscription (Ms. Loyle) |
| $ | 200 | Clothing, laundry, dry cleaning |
| $ | 165 | Car Payment (2012 Toyota Camry) |
| $ | 21 | Car Tags/registration fees ($250 per year) |
| $ | 158 | Car insurance |
| $ | 140 | Car maintenance |
| $ | 500 | Gas |
| $ | 100 | Children school enrollment/supplies ($700/$500) |
| $ | 54 | YMCA membership (recreation) |
| $ | 75 | Dr. Loyle's martial arts class (recreation) |
| $ | 458 | Children club soccer fees (est. $4,000 per year), travel/hotels (est. $1,500 per year), etc. |
| $ | 417 | Daughter's campus housing @ Butler County Community College ($5,000 per year) |
| $ | 208 | High school academy program courses ($2,500 per year) |
| $ 7,745 | | Total[37] |

Assuming no other unexpected expenses (which would be a very unlikely assumption given the nature of the family's current point in life), and assuming that the Loyles made all of their income tax refunds available for student loan repayment, that preliminarily leaves $874 of disposable income

---

[37] In the Navient stipulation, Doc. 125 ¶ 8, it was noted that the Loyles reported monthly expenses of $5,666 in response to interrogatories. However, those interrogatory answers are not part of the record. Neither side presented any explanation of what particular expenses comprised the $5,666 total, why that number was different than the $8,213 monthly expense amount listed in 2019 on Debtors' schedule J, whether the $5,666 amount was still considered accurate as of the time of trial or was expected to change, or any other details about the number. The Court has simply been made aware that at some point in discovery, the Loyles reported monthly expenses of $5,666.

**17**

from which the Loyles could make a payment on their student loan debt.[38]
Such a payment would not pay the monthly accrual of interest on the loans
and would not reduce the principal balance.

## II.   Conclusions of Law

### A.   Legal Standards

An adversary proceeding that seeks to discharge student loan debt as
imposing an undue hardship under 11 U.S.C. § 523(a)(8) is a core proceeding
over which this Court may exercise subject matter jurisdiction.[39]

In 2004, the Tenth Circuit Court of Appeals adopted the three-prong
*Brunner* test for establishing undue hardship and discharge of student loan
debt:

> (1) that the debtor[s] cannot maintain, based on current income
> and expenses a "minimal" standard of living for [themselves] and
> [their] dependents if forced to repay the loans; (2) that additional
> circumstances exist indicating that this state of affairs is likely to
> persist for a significant portion of the repayment period of the
> student loans; and (3) that the debtor[s] ha[ve] made good faith
> efforts to repay the loans.[40]

---

[38] $8,619 of monthly income (including the average annual tax refund) minus $7,745 of calculated monthly expenses.

[39] 28 U.S.C. §§ 157(a) and (b)(2)(I), 1334 and the Amended Standing Order of the United States District Court for the District of Kansas for referral to the District's bankruptcy judges, D. Kan. Standing Order 13-1 (effective June 24, 2013), *printed in* D. Kan. Rules of Practice and Procedure (March 2021).

[40] *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1307 (10th Cir. 2004), quoting *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir. 1987).

If debtors fail to establish any one of the three prongs, the inquiry ends and the student loan is not dischargeable.[41]  The *Polleys* court expanded upon the *Brunner* test by considering bankruptcy's fresh start policy and other relevant considerations in the undue hardship analysis:

> [T]o better advance the Bankruptcy Code's 'fresh start' policy, and to provide judges with the discretion to weigh all the relevant considerations, the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged.[42]

*Polleys* also instructs that a discharge of student debt should be based upon an inability to earn and not simply a reduced standard of living.[43] The availability of income-driven repayment plans and debtor's participation in such plans, ordinarily goes to the good faith prong, not the minimal standard of living prong.[44]

Discharge of student loan debt is not necessarily an all-or-nothing proposition. *Alderete* held that courts may grant a partial discharge, provided debtors show that the portion being discharged imposes an undue hardship.[45] The Kansas bankruptcy court has issued several student loan decisions in

---

[41] *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete),* 412 F.3d 1200, 1205 (10th Cir. 2005).

[42] *Polleys,* 356 F.3d at 1309.

[43] *Id.* at 1306.

[44] *Alderete,* 412 F.3d 1200, 1206. *See also Murray v. Educ Credit Mgmt. Corp. (In re Murray),* 563 B.R. 52, 60 (Bankr. D. Kan. 2016) (rejecting availability of income driven repayment plan as a basis for finding debtors' net income sufficient to repay loans while maintaining a minimal standard of living), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Murray,* No. 16-2838-CM, 2017 WL 4222980 (D. Kan. Sept. 22, 2017).

[45] *Alderete,* 412 F. 3d at 1206-07.

recent years; in all of them—*Goodvin, Metz,* and *Murray*—the bankruptcy court granted a partial discharge of the student loan debt and on appeal, the District Court affirmed.[46]

### B. Maintaining a minimal standard of living while repaying the student loans

A minimal standard of living generally refers to the ability to provide for the necessities of life—those things that are minimally necessary for the debtors' and their dependents' care, including food, shelter, clothing, and medical treatment.[47] As one court aptly stated, it means living "within the strictures of a frugal budget in the foreseeable future."[48] But courts are reluctant to impose "a spartan life" on family members, particularly children, who do not owe the debt.[49] Where that line is drawn is an issue in this case.[50]

---

[46] *See Goodvin v. United States Dept. of Educ. et al., (In re Goodvin),* Adv. No. 19-5105, 2020 WL 6821867 (Bankr. D. Kan. Sept. 1, 2020) (Somers, J.), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Goodvin,* No. 20-1247-JWL, 2021 WL 1026801 (D. Kan. Mar. 17, 2021) (Lungstrum, J.); *Metz v. Educ. Credit Mgmt. Corp. (In re Metz),* 589 B.R. 750 (Bankr. D. Kan. 2018) (Nugent, J.), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Metz,* No. 18-1281-JWB, 2019 WL 1953119 (D. Kan. May 2, 2019) (Broomes, J.); *Murray v. Educ Credit Mgmt. Corp. (In re Murray),* 563 B.R. 52 (Bankr. D. Kan. 2016) (Somers, J.), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Murray,* No. 16-2838-CM, 2017 WL 4222980 (D. Kan. Sept. 22, 2017) (Murgia, J.).

[47] *Buckland v. Educ. Credit Mgmt. Corp. (In re Buckland),* 424 B.R. 883, 889 (Bankr. D. Kan. 2010).

[48] *Innes v. State of Kansas (In re Innes),* 284 B.R. 496, 504 (D. Kan. 2002) (quoting *In re Ritchie,* 254 B.R. 913, 918 (Bankr. D. Idaho 2000)).

[49] *Buckland,* 424 B.R. 883, 889.

[50] The availability of an income-driven repayment (IDR) plan is a factor considered under the good faith prong, and the Court will address the debtors' IDR options in that section. *See Alderete,* 412 F.3d 1200, 1206 (describing participation in a repayment program as "an important indicator" of good faith); *Murray,* 563 B.R. 52, 60 (rejecting availability of a minimal payment under IDR plan as a basis for finding sufficient income to repay the loan while maintaining a minimal standard of living).

Both Loyles are now gainfully employed in their respective professions, Ms. Loyle as a teacher and Dr. Loyle as a chiropractor. With two master's degrees, Ms. Loyle has likely reached the high end of the pay scale for a high school teacher working in a suburban school district just outside of Wichita. As Dr. Loyle testified, his medical degree is "useless" without completing a residency program and obtaining a license to practice medicine.[51] He therefore has been practicing chiropractic since 2019 and he indicated his compensation is unlikely to substantially increase, unless he earned substantial bonuses each year.

But their monthly expenses include two items that are not necessary for a minimal standard of living.[52]

### 1. College on-campus housing

The Loyles' oldest daughter plans to live on campus at nearby Butler County Community College (BCCC) while attending college, at an estimated annual expense of $5,000 that Dr. Loyle indicated he planned to provide.[53] The El Dorado campus of BCCC is less than 30 miles from the Loyles'

---

[51] Tr. at 39.

[52] The Loyles' expenses for subscriptions for TV, Netflix, Audible, a YMCA membership, and a martial arts class are permitted as a "small diversion or source of recreation" for themselves and their children. *See Murray,* 563 B.R. 52, 59 (citing *Ivory v. United States (In re Ivory),* 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)).

[53] *See Standish v. Navient et al (In re Standish),* 628 B.R. 692, 701 (Bankr. D. Kan. 2020) (while debtor's desire to pay for daughter's post-secondary education instead of her own student loans with $45,000 inheritance was understandable, it was an unnecessary expense to maintain a minimal standard of living).

residence. The Loyles could eliminate this expense by having their daughter reside at their current home and make the short drive to BCCC to attend classes.  This would reduce their monthly expenses by $417.

2.    *Club soccer fees, travel, and hotel*

The Loyles' older children are on club soccer teams that participate in a competitive league in Kansas City in the spring and fall. During those seasons they travel to Kansas City on the weekends for tournaments or games. Dr. Loyle pays the expenses associated with the children's soccer activities. He estimated he paid $4,000 per year on soccer fees and $1,500 on hotels. Those estimates are the basis for the monthly expense listed above at $458. Dr. Loyle acknowledged that in addition, the children participated on soccer teams through their schools and locally in Wichita during the summer and winter months. He justified their participation on club soccer teams and the Kansas City league because they are more competitive, and the children receive more coaching than through local soccer teams. He believed their participation at the club level of soccer improved the possibility of his children receiving a collegiate soccer scholarship.[54]

Counsel for the DoE walked through several of the soccer expenditures with Dr. Loyle at trial. The Court independently reviewed in detail Exhibit 9,

---

[54] His oldest daughter received a scholarship from BCCC for tuition and books.

Dr. Loyle's 2018-2020 bank statements for transactions related to the club soccer activities. In 2018, the year prior to filing bankruptcy he spent $4,346 on soccer fees and hotel expenses alone. In 2019, the year of their bankruptcy, Dr. Loyle spent $3,606 on soccer fees and hotel expenses. In 2020, at the height of the covid pandemic, he spent $3,493. Thus, the average annual amount spent during those three years was $3,815, or an average monthly amount of $318. Though the Court's calculations are less than Dr. Loyle's estimates, the Court's numbers do not consider fuel or restaurant expenses for traveling to Kansas City for soccer tournaments. The statements reflect a high volume of restaurant debits that correlate to travel, or hotel stays. The Court has no doubt that if gas and meals for the soccer trips were included, the club soccer expense is closer to the $458 monthly estimate provided at trial.

The bottom line is that the club soccer expenses are not necessary for a minimal standard of living. Depriving their children of the club soccer experience is not imposing a "spartan life" on the children. The children can participate in soccer through their schools and local soccer leagues without average spending of $458 per month.

With these two adjustments to the Loyles' expenses, their monthly disposable income increases on paper from $874 to $1,749. That amount is still less than the amount of interest that accrues each month on the student

loans. In other words, the Loyles are unable to repay their student loans while maintaining a minimal standard of living.[55] They satisfy the first *Brunner* test.

C.    The Loyles' Situation is Likely to Persist
      for a Significant Portion of Repayment Period

This *Brunner* prong considers whether there are other circumstances making it likely that the Loyles will be unable to repay their loans for a significant portion of the repayment period.[56] The Loyles' situation is likely to persist for most, if not all, of a 25-year repayment period.

As noted above, the Loyle's income is unlikely to substantially increase in the foreseeable future in the jobs that they hold. The Loyles are in their mid and late forties. The youngest child will turn eighteen in 2034; Dr. Loyle will turn 63 that same year—about thirteen years into a 25-year repayment period. By that time, they will lose the child tax credit and tax benefit it provides. Their monthly expenses will likely only modestly decrease. They will still have a home mortgage payment. Their current cars are old, with very high mileage and will need to be replaced at some point.

---

[55] *See Murray,* 563 B.R. 52, 60 (the question is whether debtor can maintain a minimal standard of living if required *to repay the loan*, not whether she has a surplus in her budget to make a monthly payment); *Metz,* 589 B.R. 750, 759 (agreeing with those courts that reject the availability of repayment plans as a basis for finding debtors' net income sufficient to repay the loans while maintaining a minimal standard of living).
[56] *Polleys,* 356 F.3d at 1310.

24

During the second half of the repayment period, the Loyles will reach retirement age and their retirement income from social security will be less than their income while employed and working. Dr. Loyle has no personal retirement account and Ms. Loyle's retirement through KPERS is modest. So, while their monthly expenses may decrease by having a smaller household, so will their monthly income. In short, the record before the Court suggests that the Loyles' financial circumstances are likely to persist for a significant portion of the repayment period. The Loyles satisfy the second prong of the *Brunner* test.

D.    Debtors' Good Faith Efforts to Repay the Loans

Under the third *Brunner* prong, the Court must assess the debtors' "efforts to obtain employment, maximize income and minimize expenses."[57] The Tenth Circuit Court of Appeals added in *Polleys* the additional consideration of whether the debtors acted in good faith in seeking the discharge, or intentionally created the hardship.[58] Based on the Court's analysis of the facts under the first *Brunner* prong, the Court has little difficulty in concluding that the Loyles are maximizing their income. Though Dr. Loyle experienced periods of unemployment after medical school, he ultimately returned to practicing chiropractic and appears to now have stable

---

[57] *Buckland v. Educ. Credit Mgmt. Corp. (In re Buckland),* 424 B.R. 883, 890 (Bankr. D. Kan. 2010) (internal quotation and alteration marks omitted).
[58] *Polleys,* 356 F. 3d 1302, 1309.

25

employment in his field of study. Ms. Loyle has been fully employed as a teacher for several years.

With the adjustments to monthly expenses previously addressed by the Court, the Loyles would minimize their expenses. The Court further notes that its review of the Loyles' bank statements revealed frequent "eating out," that in the Court's experience inflates the household food expense, but neither defendant raised any concern over these expenditures or the Loyles' food budget for a household size of seven with both parents employed.

Ms. Loyle testified that they intended to repay all of their student loan debt when Dr. Loyle became a medical doctor. She projected that with a physician's annual salary ranging from $250,000 to $300,000, they could repay all of their student loans in five years. Those best-laid plans never came to fruition due to the inability to obtain a medical residency. The fact that Dr. Loyle could not complete the medical program and obtain a medical license, might not be a basis for discharge of all their student loan debt, but it does demonstrate that Dr. Loyle has "an inability to earn" a physician's higher income.[59] In any event, the student loan debt related to the medical

---

[59] *See Koeut v. U.S. Dept. of Educ. (In re Koeut),* 622 B.R. 72 (Bankr. S.D. Cal. 2020) (granting a partial discharge of student loan debt after examining the *Brunner* prongs where debtor was unable to match a medical residency program and obtain a medical license); *Elebrashy v. Student Loan Corp. (In re Elebrashy),* 189 B.R. 922 (Bankr. N.D. Ohio 1995) (debtor who obtained his medical degree in the Dominican Republic but was unable to secure a residency in the United States and therefore pursued education as a podiatrist, satisfied all three prongs of *Brunner;* student loan was discharged).

degree (the Navient loan), is a small portion of the total student loan debt at issue here. Nothing in the record suggest that either Dr. Loyle or Ms. Loyle "willfully contrive[d] a hardship."[60]

Like *Murray*, this case is not a situation where the Loyles are not attaining their full earning potential.[61] Nor are they seeking to discharge their student loans on the heels of graduation. In Ms. Loyle's case, she obtained an undergraduate teaching degree in 2000, and returned for graduate degrees in education in 2002 and 2008.[62] She has been out of school since 2011. While some may in hindsight question the wisdom of the two graduate degrees in education at an additional cost of some $85,000 in student loan debt, that is not the test of good faith for an undue hardship discharge. Some might also question the choice to pursue a medical degree outside the United States, knowing there was a risk of failure in securing a residency. That is not the issue before the Court either. As noted in *Polleys,* good faith is not to be used "as a means for courts to impose their own values on a debtor's life choices."[63]

---

[60] *Polleys,* 356 F.3d at 1310.
[61] *Murray,* 563 B.R. 52, 59 (noting there was no suggestion that debtors, both in their late forties with approximately $312,000 of student loan debt, had intentionally sought employment below their earning potential).
[62] Ex. 57, p. 2.
[63] 356 F.3d at 1310.

27

The Court must assess whether the Loyles have made a good faith effort to repay their loans. The Loyles' have paid a total of $34,543 on these loans since 2012, the last consolidation:  $21,427 on Dr. Loyle's Navient loan, $2,910 on Dr. Loyle's DoE loan and $10,206 on Ms. Loyle's DoE loan. Only the payments on the Navient loan paid any principal.

### 1. Navient Loan

Dr. Loyle has made a good faith effort to repay his medical school loan. Once it became apparent that he was not going to be admitted into a residency program, Dr. Loyle entered into a long-term repayment plan for the $38,399 he borrowed. Over six years, he has paid a total of $21,427.43 on the Navient loan -- $13,249.81 applied to interest and $7,852.62 applied to principal. Dr. Loyle stopped paying on this loan in *2019* after filing bankruptcy.

### 2. DoE Consolidation Loans

As described in the facts, the Loyles have been enrolled in income-driven repayment plans since their last consolidation in 2012.[64] Due to the large amount borrowed and the accrual of interest, none of their loan payments were sufficient to reduce the principal amount of the indebtedness.

---

[64] It appears that after Dr. Loyles completed his chiropractic studies and during the eight- or nine-year period he operated a chiropractic practice before starting medical school (1998-2006), that he made few payments on his then existing student loan debt, despite consolidating that debt in 1999, 2002, and 2004. The debt therefore grew exponentially due to the accrual of interest, particularly on the unsubsidized portion of the student loans. *See* Ex. 57, p. 1.

During much of the period from 2012-2019, Dr. Loyle was unemployed or irregularly employed and the Loyles had only one income source—Ms. Loyle's teacher salary. That likely explains the intermittent deferments and forbearances they were granted during the repayment period. Dr. Loyle is now maximizing his ability to earn by practicing chiropractic full time since 2019. The Loyles have made a good faith effort to repay the DoE consolidation loans under the circumstances.

The Court also considers whether the Loyles' failure to apply their CARES Act stimulus payments and income tax refunds to their student loan debt evidences a lack of good faith. The Court notes that they set those funds aside for savings in the event of large unanticipated expenses and for deferred maintenance on their home.[65]

There is no fatal lack of good faith with respect to "saving" the stimulus payments. There was much uncertainty surrounding the effects of the COVID pandemic when the stimulus payments were issued. Many people lost their jobs and lost their ability to maintain their rent or mortgage payment and provide for their families; the stimulus payments served as a temporary bridge for many. Fortunately, the Loyles did not lose their jobs and were able to maintain their earnings during the pandemic, despite the fact that their

---

[65] *In re Mendenhall,* 621 B.R. 472, 481 (debtor deposited tax refunds and stimulus payments into a savings account, reasoning that paying them toward the student loan debt would not make any impact on the principal owed).

29

jobs required close contact with patients and students. In hindsight it appears that Dr. Loyle's practice did not suffer a great loss of patients, and that teachers remained employed. This, however, should not be the basis for declaring months later that the Loyles had a duty to spend their CARES Act stimulus receipts on student loan payments.

The income tax refunds present a more complicated question. The defendants appear to argue that the Loyles' failure to use their last six years' income tax refunds to pay down their student loans shows a lack of good faith. In addition to the previously discussed point that payment of even one hundred percent of the refunds would not impact the principal amount due on the loans, it should be noted that for many of the six years in question the Loyles were in income-driven repayment plans and receiving periodic deferments and forbearances. There was no evidence presented about whether the amount of their income tax refunds during those times was or was not considered in their qualification for these alternative payment plans. It would be speculative for the Court to impose, after the fact and based on a dearth of relevant evidence, a finding that the Loyles acted in bad faith in not forwarding their income tax refunds to repay student loans when they were, for most of these years, qualifying for low payments under income-driven

repayment plans.[66]  The Court believes the more relevant issue with respect to the income tax refunds is how much of future refunds should be expected to be available for student loan payments over the repayment period.  That will be analyzed below.

In summary, the Court holds that the third prong of the *Brunner* test has been satisfied by the Loyles.  In further support of this holding, the Court notes that both of the Loyles were credible and earnest witnesses at trial. The Court was not left with any impression that they had been attempting to manipulate their situation in order to avoid making their loan payments.  On the contrary, both simply presented as honest, but discouraged parents facing a potential lifetime of overwhelming debt.

E.     The Loyles have demonstrated that repaying their
       student loan debt imposes an undue hardship on them; a partial
       <u>discharge is warranted</u>

The parties stipulated to the amount of loan repayments under either the IBR or REPAYE options available to the Loyles for the DoE consolidation loans.[67] Under both options, the repayment period would be 25 years with

---

[66] *See In re Mendenhall,* 621 B.R. 472, 493 n. 19 (concluding that CARES Act stimulus payment is not a regular source of income that debtor can count on to make payments on his student loan); *Lamento v. U.S. Dept. of Educ. (In re Lamento),* 520 B.R. 667 (Bankr. N.D. Ohio 2014) (finding debtor acted in good faith even though she did not apply her tax refund to student loans, but spent the refund on her children's needs and car repairs). *See also,* § 1325(b)(2) (excluding COVID stimulus payments from disposable income calculation in chapter 13). *Cf. Standish v. Navient et al (In re Standish),* 628 B.R. 692 (Bankr. D. Kan. 2020) (debtor's failure to devote $45,000 inheritance to payment of her student loans but used the inheritance to pay for daughter's post-secondary education, precluded finding of good faith effort to repay and discharge of student loan debt).
[67] Doc. 126, ¶s 33-37; Doc. 127, ¶s 31-37.

forgiveness of the loan balance remaining at the end of 25 years. Utilizing the Loyles' AGI from their 2020 tax return, the IBR monthly payment would be $743 and the REPAYE monthly payment would be $495.[68] Though the Loyles have sufficient disposable income to make these payments, neither of these repayment plans is sufficient to pay even the $1,500 of interest that accrues each month on the Loyles' two DoE consolidation loans.[69]

In order for the Loyles to currently pay any part of the principal balance, their combined income would have to exceed $183,770 for the IBR plan and would have to exceed $245,565 for the REPAYE plan.[70] Even after the Loyles' children reach majority and their household size drops to two (beginning in 2034), their AGI would have to exceed $149,720 for the IBR plan and $211,515 for the REPAYE plan.[71] That assumes the 150% poverty guidelines for the applicable household size remains constant throughout the repayment period. No evidence was presented that the Loyles might achieve that level of combined income in their current jobs or in retirement.

---

[68] Dr. Loyle's and Ms. Loyle's share of the monthly payment is divided proportionately between them based on the percentage of loans that each comprises of the total loan balance. Dr. Loyle's loans comprise 59.72% of the total and Ms. Loyle's loans comprise 40.28%. Thus, under the IBR plan, Dr. Loyle's share of the $743 monthly payment would be $444 and Ms. Loyle's portion of the monthly payment would be $299. Under the REPAYE plan, Dr. Loyle's share of the $495 monthly payment would be $296 and Ms. Loyle's portion would be $199. Doc. 126, ¶s 35, 37 and Doc. 127, ¶s 35, 37.
[69] Ex. 58, p. 1.
[70] *Id.*
[71] *Id.*

To fully repay the DoE consolidation loans in the next 25 years, Ms. Loyle and Dr. Loyle would have to pay a combined $2,196 per month, *plus* an additional sum in excess of $350 each month to repay the Navient loan by its maturity date, for a total of $2,546 per month.[72] They cannot afford such monthly payments; their disposable income is only, at most, $1,749, and they are likely to be retired with greatly diminished income before the conclusion of the 25 years. Shortening the term of the repayment plan would impose an even greater hardship on the Loyles. A monthly amount of $4,617 would be required to fully pay all the student loan debt in ten years and a $2,874 monthly amount would be required to fully repay the student loan debt in twenty years.[73]

Nor is requiring the Loyles to remain in such repayment plans for 25 years a satisfactory answer. Compelling that for 25 years to achieve forgiveness of an even greater loan balance, when Dr. Loyle will be 74 and Ms. Loyle will be 68, hardly seems like a fresh start from their 2019 bankruptcy. The Court applies the *Brunner* test such that debtors who truly cannot afford to repay their loans may have some or all of their loans discharged.[74] That is the situation in which the Loyles find themselves. The Court finds that Debtors have satisfied their burden to show that that

---

[72] Ex. 58,p. 2.
[73] *Id.*
[74] *Polleys,* 356 F. 3d at 1309.

33

repaying their current student debt in full would be an undue hardship under § 523(a)(8).

The next question is whether the Court should exercise its § 105 equitable powers to grant a partial discharge of the student loan debt. It is my conclusion that the Loyles could afford to pay a portion of their remaining student loan debt without undue hardship. On paper, the Loyles have $1,749 of monthly disposable income after adjustments to their current monthly budget for tax refunds, on-campus college housing, and club soccer expenses, as previously addressed in this opinion. Requiring them to make a monthly student loan payment of this full amount would still impose an undue hardship. It pays no principal amount of the debt and is insufficient to pay even all of the interest that accrues each month. The $1,749, especially since it includes one hundred percent of the Loyles' average income tax refunds, also leaves no cushion for larger unexpected expenses or the ability to save for such contingencies.

Furthermore, it does not consider the likely decrease and elimination of the tax refund generated by the child tax credit. In approximately ten years, the Loyles' youngest child will turn eighteen and they will no longer qualify for the child tax credit. As each of the four older children reaches age eighteen during this ten-year period, the amount of the tax credit and tax refund is likely to decrease. In short, the average monthly tax refund of $466

34

included in the Loyles' current monthly income will be much less, and may be zero in the future, resulting in monthly disposable income less than $1,749 for a student loan payment.[75]

On the expense side, the Loyles will certainly have to replace vehicles or pay large repair costs during the student loan repayment period. The 1999 Honda Accord has over 250,000 miles and the 2005 Honda Pilot has nearly 200,000 miles. The Loyles are still making car payments on their "newest" vehicle, a 2012 Toyota Camry. Each vehicle replacement will likely result in higher personal property taxes and insurance costs. There is no line item in their budget for vehicle replacement, and a significant portion of their future income tax refunds may be necessary for vehicle expenses alone.

Finally, the Court takes judicial notice of the negative impact of inflation on the Loyles' monthly budget. While their mortgage payment is fixed, several budget items—food, utilities, gas, clothing, and car and home maintenance—are now likely understated due to inflation. The annual inflation rate for 2021 was seven per cent. This rate of inflation across these budget items alone conservatively adds $245 to the Loyles' monthly expenses and reduces their disposable income.

---

[75] *See Mendenhall,* 621 B.R. 472, 493 n. 19 (declining to consider income tax refunds and stimulus payments as a regular source of income on which the debtor could rely to make loan payments).

35

Of course, all of the computational gymnastics in this opinion are simply an effort to objectively predict a very unpredictable future for the Loyle family. Exercising its judgment, the Court finds that the Loyles' have monthly disposable income available for student loan payments over the future years in the amount of $1,250. This amount paid over a fifteen-year period, at 0% interest, yields a total of $225,000. Thus, the Court finds that requiring repayment of $225,000 of the total student loan debt does not impose an undue hardship. In about fifteen years Dr. Loyle will be age 65 and eligible to retire from his physically demanding job and draw social security. Ms. Loyle will also likely be retired as a teacher or nearing retirement by that time. Their income in retirement will likely be substantially less than their current income. Because the household income will decline markedly, the Loyles are unlikely to have disposable income of $1,250 beyond fifteen years.

Accordingly, $225,000 of the Loyles' total student loan debt is excepted from discharge. All accrued and capitalized interest, and any interest that would accrue in the future, does impose an undue hardship and is discharged. To be clear, the nondischargeable debt shall not bear interest. Any unpaid principal amount of the student loan debt in excess of $225,000 is also discharged as imposing an undue hardship. The nondischargeable debt of $225,000 shall be apportioned among the three loans based on the

proportion that each separate loan's "Current Balance" bears to the total "Current Balance" of the student loan debt sought to be discharged.[76]

III.   <u>Conclusion</u>

The Loyles' complaint under § 523(a)(8) seeking to discharge their student loan debt as imposing an undue hardship is granted in part and denied in part. All principal and interest (accrued, capitalized, or accruing in the future) is discharged except for $225,000.  The $225,000 nondischargeable debt shall not bear interest. The nondischargeable student loan debt is apportioned between the loan creditors as follows: Navient shall have a nondischargeable loan balance of $28,777. The Department of Education (Dr. Loyle's loan) shall have a nondischargeable loan balance of $117,180. The Department of Education (Ms. Loyle's loan) shall have a nondischargeable loan balance of $79,043.

Judgment will be entered this day.

# # #

---

[76] Based upon Ex. 58, p. 2 the total "Current Balance" of the three loans is $435,320 (rounded to the nearest dollar). Navient's current loan balance comprises 12.79% of the total, and is therefore apportioned $28,777 of the nondischargeable debt. DoE-Dr. Loyle's current loan balance comprises 52.08% of the total, and is therefore apportioned $117,180 of the nondischargeable debt. DoE-Ms. Loyle's current loan balance comprises 35.13% of the total, and is therefore apportioned $79,043 of the nondischargeable debt.

Loyle,

    Plaintiff

    United States Department of Education,

    Defendant

Adv. Proc. No. 20-05073-MLH

# CERTIFICATE OF NOTICE

| District/off: 1083-6 | User: admin | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Feb 24, 2022 | Form ID: pdf020ap | Total Noticed: 3 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Feb 26, 2022:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| pla | + | Katherine Christine Loyle, 15213 E Stratford St, Wichita, KS 67230-6640 |
| pla | + | Paris Edward Thomas Loyle, 15213 E Stratford St, Wichita, KS 67230-6640 |

TOTAL: 2

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| ust | + | Email/Text: ustpregion20.wi.ecf@usdoj.gov | Feb 24 2022 20:13:00 | U.S. Trustee, Office of the United States Trustee, 301 North Main Suite 1150, Wichita, KS 67202-4811 |

TOTAL: 1

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Feb 26, 2022                Signature:       /s/Joseph Speetjens

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on February 24, 2022 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Brian D Sheern | |
| | on behalf of Defendant United States Department of Education brian.sheern@usdoj.gov michelle.lies@usdoj.gov;phyllis.creed@usdoj.gov;jeanette.may@usdoj.gov;CaseView.ECF@usdoj.gov |
| Christopher C Miles | |
| | on behalf of Defendant FirstMark Services christopher.miles@huschblackwell.com |

David Alan Gellis
       on behalf of Defendant Navient Solutions LLC dgellis@mslawkc.com  ccariani@mslawkc.com

January M Bailey
       on behalf of Defendant FirstMark Services january@eronlaw.net  prelleeronbailey@gmail.com

January M Bailey
       on behalf of Plaintiff Katherine Christine Loyle january@eronlaw.net  prelleeronbailey@gmail.com

January M Bailey
       on behalf of Plaintiff Paris Edward Thomas Loyle january@eronlaw.net  prelleeronbailey@gmail.com

TOTAL: 6